JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Hospitality Insurance Company

**DEFENDANTS**

Sam 939 LLC; Samuel Arbitman; DeAndre Hopson; Jacqueline Donlan

**(b)** County of Residence of First Listed Plaintiff   Worcester, MA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Delaware, PA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Nicholas A. Cummins, Bennett, Bricklin & Saltzburg LLC
1500 Market Street, West Tower, 32nd Floor,
Philadelphia, PA 19103; 215-561-4300

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [x] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [x] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 840 Trademark | [ ] 460 Deportation |
| | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| | | | | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | | [ ] 895 Freedom of Information Act |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332

Brief description of cause:
Insurance Declaratory Judgment

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE
11/21/2025

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

10/2024

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: <u>Marcus Hook, Pennsylvania</u>

---

***RELATED CASE IF ANY:*** Case Number:_____ Judge:_____

1. Does this case involve property included in an earlier numbered suit?    Yes ☐

2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?    Yes ☐

3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?    Yes ☐

4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?    Yes ☐

5. Is this case related to an earlier numbered suit even though none of the above categories apply?    Yes ☐
If yes, attach an explanation.

I certify that, to the best of my knowledge and belief, the within case ☐ is / ☒ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

**A.** *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Wage and Hour Class Action/Collective Action
- ☐ 6. Patent
- ☐ 7. Copyright/Trademark
- ☐ 8. Employment
- ☐ 9. Labor-Management Relations
- ☐ 10. Civil Rights
- ☐ 11. Habeas Corpus
- ☐ 12. Securities Cases
- ☐ 13. Social Security Review Cases
- ☐ 14. Qui Tam Cases
- ☐ 15. Cases Seeking Systemic Relief **\*see certification below\***
- ☐ 16. All Other Federal Question Cases. *(Please specify)*:_____

**B.** *Diversity Jurisdiction Cases:*

- ☒ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify)*:_____
- ☐ 7. Products Liability
- ☐ 8. All Other Diversity Cases: *(Please specify)*_____
_____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒ Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐ None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

### UNITED STATES DISTRICT COURT FOR
### THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HOSPITALITY INSURANCE COMPANY : | CIVIL ACTION | |
| 106 Southville Road : | | |
| Southborough, MA 01772 : | | |
| : | NO. | |
| vs. : | | |
| : | | |
| SAM 939 LLC d/b/a MAXI'S : | | |
| 939 Market Street : | | |
| Marcus Hook, PA 19061 : | | |
| : | | |
| SAMUEL ARBITMAN : | | |
| 1825 East Moyamensing Ave : | | |
| Philadelphia, PA 19148 : | | |
| : | | |
| DeANDRE HOPSON : | *JURY TRIAL DEMANDED* | |
| 1430 Fresno Road : | | |
| Wilmington, DE 19803 : | | |
| : | | |
| JAQUELINE DONLAN : | | |
| 3764 Ridgewood Lane : | | |
| Brookhaven, PA 19015 : | | |
| : | | |

## COMPLAINT FOR DECLARATORY JUDGMENT

### PARTIES

1.     Plaintiff Hospitality Insurance Company ("HIC") is a corporation and insurance company incorporated under the laws of the State of Massachusetts with its principal place of business at the address set forth in the caption.  It is a citizen of the Commonwealth of Massachusetts for the purposes of diversity jurisdiction.

2.     Defendant, Samuel Arbitman is an adult individual, and a citizen and resident of the Commonwealth of Pennsylvania residing at the address set forth in the caption.

3.    Defendant Sam 939 LLC d/b/a Maxi's ("Sam 939 LLC") is a limited liability company formed under the laws of the Commonwealth of Pennsylvania with its principal place of business at the address set forth in the caption.

4.    Defendant, Samuel Arbitman, a resident of the Commonwealth of Pennsylvania, is the sole member of Sam 939, LLC.  Therefore, Sam 939 LLC is a citizen of the Commonwealth of Pennsylvania for purposes of diversity jurisdiction.

5.    Defendant DeAndre Hopson is an adult individual, and a citizen and resident of the State of Delaware residing at the address set forth in the caption.

6.    Defendant Jaqueline Donlan is an adult individual, and a citizen and resident of the Commonwealth of Pennsylvania residing at the address set forth in the caption.

## JURISDICTION AND VENUE

7.    The amount in controversy, exclusive of interests and costs, exceeds Seventy-Five Thousand Dollars ($75,000.00).

8.    The citizenship of plaintiff Hospitality is diverse from the citizenship of each of the defendants.

9.    This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) based upon diversity of citizenship and an amount in controversy in excess of $75,000.00.

10.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, or a substantial part of property that is the subject of the action is situated in this jurisdiction.

11.    An actual controversy exists between the parties with respect to insurance claims arising from a car accident on January 26, 2024.

## BACKGROUND FACTS
### Sam 939 LLC d/b/a Maxi's

12.     Sam 939 LLC is a bar/restaurant located in Marcus Hook, Pennsylvania known as "Maxi's." See Exhibit A at 7-8, Excerpts of Examination Under Oath of Samuel Arbitman (P.I.I. Redacted).

13.     Sam 939 LLC has been in business since 2020.  See Exhibit A at 18.

14.     Sam Arbitman is the managing owner and member of Sam 939 LLC.  See Exhibit A at 10.

15.     Mr. Arbitman is the person responsible for "obtaining insurance" and "filling out applications" for insurance for Sam 939 LLC.  See Exhibit A at 12.

16.     Since Sam 939 LLC opened in 2020, Mr. Arbitman worked with the John Meehan Insurance Agency ("Meehan Agency") to obtain and maintain the General Liability and Liquor Liability policies.  See Exhibit A at 22.

17.     Robert Saracino of the Meehan Agency was Mr. Arbitman's main contact.  See Exhibit A at 25-26.

18.     On April 7, 2021, Sam 939 LLC applied to renew its Liquor Liability policy with CTS Underwriters.  See Exhibit B, Sam 939 LLC liquor Liability Application dated April 7, 2021 (PII Redacted).

19.     On the April 7, 2021 application, electronically signed by Samuel Arbitman, Sam 939 LLC, reported that its hours of operation were "7A-2A 6 days sun 11A-2A," which indicated that the establishment closed at 2:00 AM seven days a week.  See Exhibit B at MA00522.

20.     On April 6, 2022, Sam 939 LLC again applied to renew its Liquor Liability policy with CTS Underwriters.  See Exhibit C, Sam 939 LLC Liquor Liability application dated April 6, 2022 (PII Redacted).

3

21.    On the April 6, 2022 application, electronically signed by Samuel Arbitman, Sam 939 LLC, reported that its hours of operation were "7A-2A 6 days sun 11A-2A," which indicated that the establishment closed at 2:00 AM seven days a week.  <u>See</u> Exhibit C at MA00468.

22.    On March 7, 2023, Sam 939 LLC, through Robert Saracino, submitted a liquor liability application to Specialty Insurance Agency seeking a quote for liquor liability insurance coverage.  <u>See</u> Exhibit L at MA 290-291, Emails between Robert Saracino Specialty Insurance.

23.    It is believed that the liquor liability application submitted to Specialty Insurance Agency on March 7, 2023 listed Sam 939 LLC's hours of operation as 7:00 AM to 2:00 AM, because, on March 31, 2023, Specialty Insurance Agency reported that it declined to write coverage, in part, because, "[t]he hours of operation are unacceptable.  They are serving alcohol for 19 hours a day-6 days a week.  They are open at 7am and just about 100% liquor.  Not an exposure we want."  <u>See</u> Exhibit L at MA 288.

24.    On March 31, 2023, Robert Saracino, on behalf of Sam 939 LLC, responded to Specialty Insurance Agency with the incorrect assertion (as set out below) that "hours of operation are noon-midnight, 7 days as per the specialty app submitted earlier this week and attached.  It was my bad those old hours were not updated but no more."  <u>See</u> Exhibit L at MA 288.

25.    On March 28, 2023, Robert Saracino, on behalf of Sam 939 LLC, submitted an unsigned insurance application to HIC, including an unsigned Liquor Liability Application, requesting a quote for, *inter alia*, liquor liability coverage for Sam 939 LLC with limits of $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate. See Exhibit D at 8, Emails of March 28, 2023 to April 4, 2023 between Roberta Saracino and Lucinda Yuille; <u>See</u> Exhibit E, Unsigned Liquor Liability Application Submitted to HIC (PII Redacted).

26.    The unsigned application sent to HIC on March 28, 2023, indicated that Sam 939 LLC's earliest open hour was noon, and its latest open hour was midnight.  See Exhibit E at 1.

27.    After HIC issued its quote, on April 4, 2023 at 11:05 AM, Ms. Lucinda Yuille, in the HIC underwriting department, emailed Mr. Saracino indicating that Sam 939 LLC's website listed a 2:00 AM closing time; Ms. Yuille's email stated:

> The hours of operation indicate a 2 am close – please advise. I quoted based on a 12 am close with $1M/$2M limits.

See Exhibit D at 5.

28.    Ms. Yuille included a screen shot of Sam 939 LLC hours of operations from the Maxi's website. It showed:

**Address**: 939 Market St, Marcus Hook, PA 19061

**Hours**:

| Tuesday | 11 AM–1 AM |
|---|---|
| Wednesday | 11 AM–1 AM |
| Thursday | 11 AM–1 AM |
| Friday | 11 AM–2 AM |
| (Good Friday) | Hours might differ |
| Saturday | 7 AM–2 AM |
| Sunday | 11 AM–12 AM |
| (Easter) | Hours might differ |
| Monday | 11 AM–1 AM |

See Exhibit D at 5.

29.    On April 4, 2023 at 11:55 AM, Mr. Saracino responded:

> i will confirm closing midnight which is what he told me. Often times they forget to change the hours on the website.

See Exhibit D at 4.

30.    Later the same day, on April 4, 2023 at 2:51 PM, Mr. Saracino sent an email to HIC which stated, "This is to confirm closing is at midnight and he will change on website."  See Exhibit D at 3.

5

31.     The same day, on April 4, 2023, Mr. Saracino sent a text message to Mr. Arbitman, which stated, "change hours to closing at midnight."  See Exhibit F, Text Message from Robert Saracino dated April 4, 2023 (Bank Account Number Redacted).

32.     On April 5, 2023 at 1:12 PM, Sam 939 LLC, through Mr. Saracino, submitted a fully completed and executed Hospitality Insurance Group Liquor Liability Application (the "Application") to HIC.  See Exhibit G, April 5, 2023 email from Robert Saracino; See Exhibit H, April 5, 2023 HIC Liquor Liability Application (the "Application") (PII Redacted).

33.     The Application was DocuSigned by Mr. Arbitman on behalf of Sam 939 LLC on April 5, 2023.  See Exhibit I, April 4, 2023 DocuSign Certificate of Completion.

34.     The Application represented that the hours of operation of Sam 939 LLC were an earliest open hour of noon and a latest open hour of midnight, as follows:

> **Hours of Operation:**
> Earliest Hour Open – NOON
> Latest Hour Open – MIDNIGHT

See Exhibit H at 1.

35.     In signing the Application, Mr. Arbitman, on behalf of Sam 939 LLC, represented and agreed as follows:



**AGENT'S / APPLICANT'S CERTIFICATION & AUTHORIZED SIGNATURES**

Whereupon the agent/applicant, under the pain and penalty of perjury, hereby acknowledges this application to be true and complete to the best of the agent's/applicant's knowledge and belief. By signing this application, we certify that the information contained herein is true and accurate to the best of our knowledge and belief, and we acknowledge that providing truthful and accurate information is a condition precedent to obtaining liquor liability insurance. We further acknowledge that any insurance which may be issued upon receipt of this application will be issued based upon the company's reliance on the information we have provided, and if such information is misleading or false, the company may void the insurance issued pursuant to this application. By signing this application, the applicant also hereby authorizes and directs each entity from whom the applicant purchases alcoholic beverages to provide to the company or its designated auditor all information regarding the applicant's retail and wholesale purchases of alcoholic beverages.

**1. APPLICANT'S SECTION**

Applicant's Name: Sam Arbitman     Title:

Fed ID# / Soc. Sec. #:     Telephone:

Email Address:

Applicant's Signature: X     DocuSigned by:     Date: 4/5/2023

EAC41475D3A340E...

See Exhibit H at 4 (highlights added).

36.    In reliance on the representations made by Sam Arbitman and Sam 939 LLC in the Application, *inter alia*, that "Maxi's" had a latest open time of midnight, HIC issued Liquor Liability Policy No. CPP3702631 to the named insured, Sam 939 LLC DBA Maxi's for the policy period from April 9, 2023 to April 9, 2024 with Liquor Liability limits of $1,000,000 per person and occurrence, and $2,000,000 in the aggregate (the "HIC Policy"). See Exhibit J at 48-49, the HIC Policy.

37.    The premium charged for the Liquor Liability coverage, not including endorsements, was $4,189.00. See Exhibit J at 49.

38.    As more fully discussed below, the representations made by Mr. Arbitman and Sam 939 LLC in the Application with respect to Maxi's hours of operation were false.

39.    During the entire period of time from the date the Application was signed on April 5, 2023 through the remainder of the policy period on April 9, 2024, including the date of the underlying accident on January 26, 2024, Maxi's earliest open hour was 7:00 AM and its latest open hour was 2:00 AM.

40.    If Sam 939 LLC and Mr. Arbitman had accurately applied for coverage with a closing time of 2:00 AM, HIC would not have issued a policy with Liquor Liability limits of $1,000,000 per occurrence/person and $2,000,000 in the aggregate, and would have charged a substantially higher premium for any lesser level of Liquor Liability limits it may have been willing to offer to Sam 939 and Mr. Arbitman.

**The HIC Policy**

41.    The Insuring Agreement to the Liquor Liability coverage on the HIC Policy provides, in relevant part:

**Section I – Liquor Liability Coverage**

**A.     Insuring Agreement.**

We will pay on behalf of the Insured all sums which the Insured becomes legally obligated to pay as "damages" because of "bodily injury" to any person, caused by an "occurrence", if such liability is imposed upon the Insured by reason of the negligence of the Insured in the distribution, sale or serving of any alcoholic beverage at the "Insured premises" to an intoxicated person or minor, or in violation of any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.  We shall have the right and duty to defend any "suit" against the Insured seeking such "damages", even if the allegations of the "suit" are groundless, false or fraudulent, and may make such investigation and settlement of any claim or "suit" as we deem expedient.  However, we will have no duty to defend the Insured against any "suit" seeking damages for "bodily injury" to which this insurance does not apply. This insurance applies only to "occurrences" which result in "bodily injury" during the Policy period in the "coverage territory".  We have no other obligation or liability to pay any other sums or perform any other acts of services unless they are explicitly provided for under SUPPLEMENTARY PAYMENTS.

See Exhibit J at 52.

42.     The Liquor Liability Policy contained in the HIC Policy is subject to the following condition in Section IV, which states, in relevant part:

**E.     Representations**

By accepting this Policy, you agree that:

1.      The statements in the Declarations are accurate and complete

2.      Those statements are based upon representations made by you or on your behalf in your application for Liquor Liability Insurance and otherwise; and

3.      We have issued this Policy in reliance upon the representations made by you or on your behalf. These representations are a condition precedent to issuance of the Policy and the Company shall have

> the right to void this Policy in which case we shall
> have no obligation under this Policy if those
> representations are false or materially incomplete.

See Exhibit J at 57.

43.    The HIC Policy further contains "The Pennsylvania Changes – Cancellation and

Nonrenewal endorsement (Form IL 46 09 07)" which states, in relevant part:

**CANCELLATION**

\* \* \*

**3.      Cancellation Of Policies In Effect for 60 Days Or More**

If this policy has been in effect for 60 days or more or if this policy
is a renewal of a policy we issued, we may cancel this policy only
for one or more of the following reason:

**a.**      You have made a material misrepresentation which affects
the insurability of the risk.

\* \* \*

This policy may also be cancelled from inception upon discovery
that the policy was obtained through fraudulent statements,
omissions or concealment of facts material to the acceptance of the
risk or to the hazard assumed by us.

See Exhibit J at 76-77.

**The Hopson Lawsuit**

44.    On or about September 13, 2024, a lawsuit captioned, <u>Deandre Hopson v. Sam 939</u>

<u>LLC d/b/a Maxi's, Samuel Arbitman, and Jacqueline Donlan</u>, was filed in the Philadelphia County

Court of Common Pleas at docket number 240901327 (the "Hopson lawsuit"). <u>See</u> Exhibit K,

Complaint in Hopson Lawsuit.

45.    The Complaint in the Hopson Lawsuit alleges that:

a.      Sam Arbitman is the owner and/or executive of Sam 939 LLC and is the
owner of a Pennsylvania liquor license used to operate Sam 939 LLC.  <u>See</u>
Exhibit K at ¶ 5.

b.    Sam 939 LLC as a holder of a liquor license utilized to manage a bar serving alcoholic beverages had a duty and an obligation to formulate and disseminate rules, regulations policies, procedures, protocols, and guidelines with regard to identifying and refusing the service of alcohol to visibility intoxicated patrons. <u>See</u> Exhibit K at ¶ 8.

c.    Sam 939 LLC had the responsibility to hire, monitor, supervise, train and monitor employees to ensure they had appropriate experience to recognize, identify, and refuse service of alcohol to visibility intoxicated patrons. <u>See</u> Exhibit K at ¶¶ 9, 10.

d.    On the night of January 25, 2024 Jaqueline Donlan was served excessive amounts of alcohol at Sam 939 LLC. <u>See</u> Exhibit K at ¶ 12.

e.    While Ms. Donlan was at Sam 939 LLC her behavior deteriorated and she exhibited signs of intoxication and impairment such as slurred speech, unsteady gait, and glassy eyes which amounted to visible intoxication. <u>See</u> Exhibit K at ¶ 15.

f.    Sam 939 LLC had actual and constructive notice of Ms. Dolan's intoxication and did not refuse service of alcoholic beverages to her in violation of Pennsylvania Law. <u>See</u> Exhibit K at ¶ 16.

g.    On January 26, 2024 at approximately 2:39 a.m. Ms. Donlan left Sam 939 LLC in an intoxicated state with the intent to drive and at no time prior to leaving was she stopped or questioned by Sam 939 LLC employees. <u>See</u> Exhibit K at ¶¶ 17, 18.

h.    On January 26, 2024 at approximately 2:39 a.m. Ms. Donlan departed Sam 939 LLC operating a 2020 Mitsubishi Mirage with Mr. Hopson as a passenger and struck a traffic pole at the intersection of Market Street and West Ridge Road in Marcus Hook, Pennsylvania causing injury to Mr. Hopson. <u>See</u> Exhibit K at ¶ 20.

i.    As a result of the accident Mr. Hopson has sustained injuries including displaced fracture of the left hip requiring an open reduction and internal fixation surgery, left hip dislocation, loss of consciousness, and additional injuries to his left leg, neck, and back. <u>See</u> Exhibit K at ¶ 28.

j.    Sam 939 LLC is liable to plaintiff by negligently violating Pennsylvania Dram Shop Act by serving and permitting its employees to serve Ms. Donlan while she was visibly intoxicated. <u>See</u> Exhibit K at Count I

k.    Sam 939 LLC and Sam Arbitman are liable to plaintiff due to their negligence of over serving Ms. Donlan to the point of visible intoxication

10

and failing to refuse service or remove Ms. Donlan from the establishment or provide proper training to employees in connection with the safe operation of a restaurant. See Exhibit K at Count II.

l.     Sam Arbitman is liable to plaintiff individually pursuant to a "piercing the corporate veil" theory in which Mr. Arbitman did not observe corporate formalities and is therefore personally liable  for the actions of the employees of Sam 939 LLC. See Exhibit K at Count III.

46.     Contrary to the representations set out in the Application, the Hopson Lawsuit alleges that Deandre Hopson was patronizing Maxi's after 2:00 AM on the date of the accident.

47.     On October 11, 2024, Mr. Arbitman confirmed to HIC that Maxi's closing hours in 2023 were 1:00 AM on weekdays, and 2:00 AM on Fridays and Saturdays.

48.     HIC subsequently agreed to assume the defense of Mr. Arbitman and Sam 939 LLC against the Hopson Lawsuit subject to a full and complete reservation of its rights to withdraw the defense and disclaim any duty to indemnify Mr. Arbitman and Sam 939 LLC based, *inter alia*, on material misrepresentations in the Application.  See Exhibit M, Reservations of rights letters dated October 24, 2024 and September 10, 2025.

49.     In investigation of the potential material misrepresentation, on February 13, 2025, Mr. Arbitman sat for an examination under oath ("EUO"). See Exhibit A.

50.     At the EUO Mr. Arbitman testified that since it opened in 2020, Sam 939 LLC would always stay open until 2:00 AM serving liquor. See Exhibit A at 30-31.

51.     Mr. Arbitman testified, "So the entire time I owned Maxi's, like every other bar I own, we worked till 2:00 a.m.  The only exception at Maxi's would have been if there were any restrictions during the pandemic… which means the Township says be closed at this time."  See Exhibit A at 30-31.

52.     Mr. Arbitman testified that Maxi's is actually open and serving liquor until 2:00 AM when they lock the doors.  See Exhibit A at 31-32.

53.     Mr. Arbitman also testified that the operating hours of Sam 939 LLC have been 7:00 AM to 2:00 AM six days a week the entire time he operated the bar. See Exhibit A at 43-44.

54.     Mr. Arbitman testified that the operating hours of Sam 939 LLC never changed to closing at midnight. See Exhibit A at 53:7-24, 97.

55.     Mr. Arbitman testified that Maxi's hours have been 7:00 AM to 2:00 AM, six days per week, and Sunday from 11:00 AM to 2:00 AM, since he's operated the bar, and that those hours have never changed.  See Exhibit A at 43-44.

56.     Mr. Arbitman testified, "we close at 2:00.  …That's the bottom line."  See Exhibit A at 53:22-24.

57.     At issue for purposes of this declaratory judgment action is Hospitality's duty under the Policy to defend and indemnify Sam Arbitman and Sam 939 LLC against the claims asserted against them in the civil lawsuit.

58.     Hospitality is seeking declaratory judgment that the subject policy is void *ab initio* and rescinded for material misrepresentation in the application for coverage.

## COUNT I – DECLARATORY JUDGMENT

**The Hospitality Policy Is Void *Ab Initio* and Rescinded For Material Misrepresentations In the Application For Coverage, And Hospitality Has No Duty To Defend Or Indemnify Sam 939 LLC Or Samual Arbitman Against The Hopson Lawsuit**

59.     The allegations of the foregoing paragraphs are incorporated herein by reference as though fully set forth.

60.     Pursuant to the Application, the Policy was issued in reliance on the information contained in the Application, and "if such information is misleading or false, the company may void the insurance issued pursuant to this application."  See Exhibit H at 4.

12

61.    Pursuant to the Conditions to the Liquor Liability coverage, the representations made in the Application "are a condition precedent to the issuance of the Policy and the Company shall have the right to void this Policy in which case we shall have no obligation under this Policy if those representations are false or materially incomplete." See Exhibit J at 57.

62.    Under the Pennsylvania Changes – Cancellation and Nonrenewal endorsement to the Policy, "This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us." See Exhibit J at 76.

63.    Under Pennsylvania law, a liability insurance policy may be deemed void *ab initio* and rescinded for a material misrepresentation in the application.

64.    Sam Arbitman represented on the April 5, 2023 Liquor Liability Application that the hours of operation of Sam 939 LLC were noon to midnight.

65.    Sam 939 LLC's agent, Mr. Saracino of the Meehan Agency confirmed to Hospitality that Sam 939 LLC hours of operation were noon to midnight.

66.    The hours of operation of "noon to midnight" are a material misrepresentation in the Application.

67.    Contrary to the representations made to Hospitality by Sam Arbitman and Sam 939 LLC in the Application, at the time of the Application, and during the entire policy period, Sam 939 LLC's earliest open hour was 7:00 AM and its latest open hour was 2:00 AM.

68.    The representations made in the Application with respect Maxi's hours of operation were false.

69.    Mr. Arbitman and Sam 939 LLC knew that the representations made in the Application with respect Maxi's hours of operation were false.

70.    Alternatively, to the extent Mr. Arbitman contends that he did not read that application and relied on Mr. Saracino in completing the application, Sam 939 LLC is nonetheless bound by the representations made by Mr. Saracino on behalf of Sam 939 LLC as the agent of Sam 939 LLC.

71.    The false representations made in the Application with respect Maxi's hours of operation were made in bad faith.

72.    HIC relied upon the representations made in the Application in issuing the policy.

73.    Based on the representation by Sam Arbitman and Sam 939 LLC that the establishment had hours of operation of noon to midnight, HIC issued Liquor Liability Policy No. CPP3702631 for policy period from April 9, 2023 to April 9, 2024 with Liquor Liability limits of $1,000,000 per occurrence for a premium (exclusive of endorsements) of $4,189.00.

74.    If the Application had correctly reported the hours of operation, HIC would not have offered a policy with Liquor Liability limits of $1,000,000 per occurrence/person and $2,000,000 in the aggregate, and would have charged a substantially higher premium for any lesser amount of Liquor Liability limits it might have offered.

75.    The false representations made in the Application with respect Maxi's hours of operation were material to the risk and hazard insured by HIC.

76.    The hours of operation were material to HIC's decision making in issuing the policy.

77.    The accident in the <u>Hopson</u> matter occurred at approximately 2:39 a.m. when Ms. Donlan left Sam 939 LLC.

78.    Pursuant to the provisions of the HIC policy and Pennsylvania law, the policy should be deemed void *ab initio* and rescinded, and HIC should have no duty to defend or indemnify Sam 939 LLC or Samuel Arbitman against the Hopson Lawsuit.

WHEREFORE, pursuant to 28 U.S.C. § 2201, plaintiff, Hospitality Insurance Company, demands that judgment be entered in its favor, and that the Court enter a declaratory judgment as follows:

A)    Policy No. CPP3702631 issued by Hospitality Insurance Company to the named insured, Sam 939 LLC dba Maxi's, covering the policy period from April 9, 2023 to April 9, 2024 is void *ab initio* and rescinded;

B)    Hospitality Insurance Company has no duty to defend Sam Arbitman and Sam 939 LLC against the allegations made in the Hopson lawsuit, and may immediately withdraw the defense it is affording to Sam Arbitman and Sam 939 LLC in the Hopson Lawsuit; and

C)    Hospitality Insurance Company has no duty to indemnify Sam Arbitman and Sam 939 LLC for any judgment or settlement that might be entered against them in the Hopson Lawsuit.

Respectfully submitted,

**BENNETT, BRICKLIN & SALTZBURG LLC**

BY: _____

NICHOLAS A. CUMMINS, ESQ.
Attorney I.D. No. 203238
cummins@bbs-law.com
SARA GRAY, ESQUIRE
Attorney I.D. No. 328440
gray@bbs-law.com
Centre Square, West Tower
1500 Market Street, 32nd Floor
Philadelphia, PA 19102
Phone: (215) 561-4300
Facsimile: (215) 561-6661
*Attorneys for Plaintiff,*
*Hospitality Insurance Company*

Date: <u>November 21, 2025</u>

# **Exhibit A**

To Complaint for Declaratory Judgment
Hospitality Insurance Company v. Sam 939 LLC, et al.

Transcript of the Testimony of

# Examination under oath of Samuel Arbitman

**February 13, 2025**



PO Box 30218
Philadelphia, PA 19103
(215)853-6777
www.TrifectaCR.com

Examination under oath of Samuel Arbitman ~ February 13, 2025

5

under oath, which means what you're doing here today is you're giving sworn testimony just like if you were in a courtroom with a judge and a jury.  Do you understand that?

A        Yes, sir.

Q        All right.  A couple of things to keep in mind.  So first of all, because we have a court reporter taking down everything we say out loud, I need you to make all of your responses out loud and verbal for me.  If you just shake your head, --

A        Very good.

Q        -- none of that comes across.

The second thing is she can only take the two of us speaking or -- at one time, right, so you have to do your best to let me ask my entire question before you give your answer.  I'll do my best to let you give your full answer before I ask my next question.  Fair enough?

A        Fair.

Q        All right.  If, at any point in time, I talk over you, you weren't finished, please let me know.  That's not intentional, all right.

Next, I'm only interested in what you actually know or remember, so if I ask a question

6

1    and you don't know or you don't remember, as long as
2    that's an honest answer, that's a perfectly
3    acceptable answer.  Now, you can estimate.  I might
4    ask you for a time or a date.  You may not be able
5    to say it was February 9th, but you might be able to
6    say, you know, it was in the winter.  That's okay.
7    As long as you have a basis for an estimate, feel
8    free to estimate.  Just let me know you're doing
9    that and we won't hold you to a specific figure, all
10   right?
11   A        Good.
12   Q        All right.  If, at any point in time, you
13   do not understand my question, please let me know.
14   I'll be happy to repeat it or rephrase it.  The most
15   important thing is that you're understanding what
16   I'm asking so the two of us are communicating and
17   we're getting a clear record of what it is that you
18   have to say, okay?
19   A        Okay.
20   Q        All right.  I don't think we'll be too
21   terribly long today, but if, at any point in time,
22   for any reason whatsoever, you'd like to take a
23   break, please let me know.  I'm happy to accommodate
24   you.  The only thing I'd ask is if I've asked you a

7

1    question, you answer that question before we take
2    the break.  Okay?
3    A        Fine.
4    Q        All right.  So, sir, may I please have
5    your full name and address?
6    A        Samuel Arbitman, ███████████████████
         ████████████████████████████████████████
9    Q        All right.  As you sit here today, do you
10   have any plans to move?
11   A        No.
12   Q        All right.  Your date of birth, please,
13   sir.
14   A        ████████
15   Q        And are you employed, sir?
16   A        Yes.
17   Q        What do you do?
18   A        I operate businesses.
19   Q        Okay.  All right.  We're here today
20   specifically to talk about a business Sam 939, LLC.
21   A        Yes, sir.
22   Q        What is Sam 939?
23   A        Sam 939 is a bar/restaurant located in
24   Marcus Hook.

8

1    Q        All right.  And is that also known as
2    Maxi's?
3    A        That would be Maxi's, yes.
4    Q        Okay.  And am I correct in my
5    understanding it's known as Maxi's Marcus Hook?
6    A        Basically, --
7    Q        Okay.
8    A        -- just Maxi's.
9    Q        Okay.
10   A        The sign reads Maxi's.  Maxi is the name
11   of my granddaughter, and that's it.
12   Q        Okay.  All right.  There's not more than
13   one Maxi?
14   A        Nope.
15   Q        Okay.  I understand.  And so what is your
16   role or position in that particular company, Sam
17   939?
18   A        So there's two corporations involved here.
19   One is the bar and one is the business, so Max --
20   939 would be the business --
21   Q        Okay.
22   A        -- located at 939 Market Street, Marcus
23   Hook.
24   Q        Okay.

Examination under oath of Samuel Arbitman ~ February 13, 2025

9

1  A       And that's a bar/restaurant.
2  Q       All right. I think you said that there's
3  a bar and there's a business. Is that what you
4  said?
5  A       It is the business. It's a
6  bar/restaurant.
7  Q       Okay. The business is the bar?
8  A       Yes, sir.
9  Q       All right. And you said there was another
10 business entity involved. Which -- what is that?
11 A       Well, one -- one entity owns the property,
12 one entity owns the business.
13 Q       I think I saw that. Is that Zac, Z-A-C,
14 939?
15 A       Yes, sir.
16 Q       All right. So that owns the property?
17 A       Yes, sir.
18 Q       All right. Fair to guess that Zac is
19 another relative of yours?
20 A       Zac is my son.
21 Q       Okay.
22 A       He's an attorney. You and him could hang
23 together.
24              MR. CUMMINS: Off the record.

10

1              (At this time, a discussion was
2              held off the record.)
3  BY MR. CUMMINS:
4  Q       All right. So I'm primarily interested
5  today in Sam 939, LLC. That's a bar and restaurant.
6  What specifically is your role in that business?
7  A       I'm the managing owner. I manage the
8  business.
9  Q       All right. It's an LLC. How many members
10 of the LLC are there?
11 A       I am the member.
12 Q       Okay. All right. And just take me
13 through the actual duties that you personally
14 perform for that business.
15 A       I, in general, try to close it up every
16 night, which explains my hours.
17 Q       Okay.
18 A       I'll get up at 1:00 in the morning. I'll
19 drive into Marcus Hook and shut the bar down 2:00
20 a.m.
21 Q       Okay. All right.
22 A       I also do all the ordering: liquor, beer,
23 food. Hiring and firing. In essence, I do
24 everything except work in the bar. I'm not a

11

1  bartender. I'm not a cook. I operate the bar.
2  Q       Okay. Am I correct in assuming that you
3  have a manager that runs the business during the day
4  before you arrive?
5  A       So there's been managers that come and go.
6  There's no one there right now.
7  Q       Oh, okay.
8  A       So it's really hard in today's world to
9  find a good manager, so I try to hire them, --
10 Q       Mm-hmm.
11 A       -- they come, they go. There have been
12 different managers. Right now, I'm managing it with
13 one of the people that work for me, but yeah, I, in
14 general, do it myself.
15 Q       All right. So then, fair to assume then
16 that -- well, so we're really interested in the time
17 period from March of 2023 --
18 A       Mm-hmm.
19 Q       -- up through January of 2024.
20 A       Mm-hmm.
21 Q       In that time period, were you working
22 generally the same hours, about 1:00 a.m. to closing
23 at the bar?
24 A       Yeah.

12

1  Q       All right.
2  A       Yup. I would come in -- not every night,
3  but I would come in most nights between 1:00 and
4  3:00. Some nights, I get tied up at a different
5  business I have that's open 24 hours --
6  Q       Mm-hmm.
7  A       -- and would get there still 3:00, 4:00
8  maybe. I wouldn't get there at 1:00 or 3:00, but my
9  goal has always been that's my first stop, and then
10 I have another business that's open 24 hours is my
11 second stop.
12 Q       Okay. Now, as you know, we're here to
13 talk primarily about insurance coverage for this
14 particular business. Are you the person that is
15 responsible for things like obtaining insurance
16 coverage, filling out applications for your
17 business?
18 A       Yes, sir.
19 Q       All right. Do you have any other
20 employees that would be involved in that sort of
21 office paperwork?
22 A       So I have a gentleman that works for me
23 that is at a central office that we have at
24 Moyamensing Avenue --

Examination under oath of Samuel Arbitman ~ February 13, 2025

5 (Pages 17 to 20)

17

1  A        -- I think of myself more as a people
2  person.  Hank, people I do business with -- I'm 66
3  years old.  I've known Hank for 40 years.  The
4  people I do business with are people I trust, and I
5  trust them to do what I ask them to do and what I
6  pay them to do.
7  Q        Sure.
8  A        So when I -- this kid, Rich, he does what
9  I ask him to do.  He reviews it and he explains it
10 to me and then I have an answer for him.
11 Q        Okay.
12 A        All right?
13 Q        I understand that.
14 A        Anyone I do business with is -- are people
15 that I trust and -- because I know what my
16 shortcomings are and I know that -- what my pros
17 are.
18 Q        Okay.
19 A        My pros are that I could build businesses,
20 finance businesses, but I know that there need to be
21 people behind me that oversee things that I decide.
22 Q        All right.
23 A        It's pretty simple.
24 Q        I appreciate that.  Thank you for the

18

1  explanation.  So before we get too far afield, I
2  just want to get a little bit more about your
3  background.  So first of all, how long has Sam 939
4  been in business?
5  A        Five years.
6  Q        All right.  So that puts us, what, 2020?
7  A        Yup.
8  Q        All right.
9  A        It was a gift for the pandemic year.  Take
10 this and have fun with this.
11 Q        Has Sam 939 always operated the business
12 as Maxi's or did it have different names in the
13 past?
14 A        It was developed as Maxi's, yes.
15 Q        Okay.  All right.  Other than Sam 939, are
16 you involved in any other restaurant or bar
17 businesses?
18 A        Yeah.
19 Q        All right.  What are those businesses?
20 A        So I have one called Moonshine, Wolf
21 Burger, Chuckles.  So I have another restaurant that
22 has no alcohol.  Do you want to know what that is?
23 Q        Sure.
24 A        Dock Street.

19

1  Q        Any others?
2  A        I operate a vending company called Zac
3  Vending, Z-A-C Vending.
4  Q        It's not terribly important, so just the
5  thumbnail version.  What's a vending company do?
6  A        So if you have a bar and in the bar
7  there's a pinball machine, a jukebox, a pool table,
8  I'm the operator of that equipment to that bar.
9  Q        Okay.  Let me just go through these one at
10 a time.  So Moonshine, over what years has that been
11 in operation?
12 A        That's -- Moonshine is ten years old right
13 now.
14 Q        All right.  And where is that located?  I
15 just need the city.
16 A        18 -- 1825 East Moyamensing.
17 Q        All right.  And that's a restaurant and a
18 bar?
19 A        Bar/restaurant, yeah.
20 Q        Okay.  And how long has Wolf Burger been
21 in operation?
22 A        Just three years.
23 Q        Okay.
24 A        And that's at 2003 South Front Street.

20

1  Q        Philadelphia?
2  A        Mm-hmm.
3  Q        Is that a yes?
4  A        Yes, sir.
5  Q        All right.  And Chuckles?
6  A        45 years.
7  Q        Oh, wow.
8  A        3055 Frankford Avenue.
9  Q        Have you run Chuckles that whole time?
10 A        Yes, sir.
11 Q        And then Dock Street is not a bar.  Is
12 that just a restaurant?
13 A        Just a restaurant.
14 Q        All right.
15 A        Open 24 hours.  And that's at 63rd and
16 Essington Avenue.
17 Q        Also in Philadelphia?
18 A        Yes, sir.
19 Q        All right.  So it sounds like you have
20 been in the restaurant/bar business at least 45
21 years, right?
22 A        Yes, sir.
23 Q        All right.  I don't need a list, but other
24 than what you just told me, how many other

21

1  establishments that sell alcohol have you owned over
2  the course of the years?
3  A      20.
4  Q      Okay.  I saw in a document -- I think it
5  was in the application -- a reference to Maxi's
6  being formerly known as -- I think it was
7  O'Connell's Pub.
8  A      That was the owner, Jerry O -- Jerry
9  Connolly, Connolly's Pub.
10 Q      Connolly's Pub?
11 A      Yes, sir.
12 Q      Did you have any ownership interest in
13 that business?
14 A      No, but I was the vendor in that
15 operation.
16 Q      Okay.  All right.
17 A      For 30 years.
18 Q      All right.  Did you buy the liquor license
19 from Connolly's?
20 A      Jerry died.
21 Q      Oh, okay.
22 A      His wife then operated it for a year and
23 then she wanted me to buy it.
24 Q      All right.  I understand.

22

1          All right.  So I want to talk a little bit
2  about the John Meehan Insurance Agency.
3  A      Yes, sir.
4  Q      Meehan is M-E-E-H-A-N.
5          So I understand that Mr. Meehan's agency
6  was your insurance agent or broker to purchase this
7  particular policy from Hospitality Insurance
8  Company; is that right?
9  A      I inherited Mr. Meehan.
10 Q      Okay.
11 A      So when I bought the bar, it was halfway
12 through the policy.  Marge says they're good people,
13 deal with them.  I just carried them.
14 Q      Okay.
15 A      It isn't a company that I've used in the
16 past.  I still deal with the companies that I've
17 used in the past.
18 Q      All right.  That answers a lot of
19 questions for me.  Thank you.  So do I understand
20 that your first involvement with a Meehan agency
21 then would have been approximately 2020, when you
22 acquired Sam 939?
23 A      Yes, sir.
24 Q      All right.  Does the Meehan agency handle

23

1  insurance for any other businesses other than Sam
2  939 and Zac 939?
3  A      Nothing.
4  Q      Okay.  All right.  And then, for your
5  other business, what insurance agencies do you use?
6  Is it a mix?
7  A      It's no big deal.  I'd have to get back to
8  you with the actual names, but I can tell you
9  it's -- Sue and Joe operate the one.  Off the top of
10 my head, I can't tell you the name.  I -- other
11 companies with other people, but I could supply you
12 with their names later.
13 Q      All right.
14 A      Now, the one group is a woman, Sue, and
15 her boss, and they basically make sure I'm covered
16 and stay covered, and, yeah, they'd be good people
17 for you to talk to because they know what the
18 coverages I have and what I need and they make sure
19 I'm covered, --
20 Q      And I --
21 A      -- so yeah.
22 Q      -- appreciate you don't remember the name.
23 That's totally fine.
24 A      I really don't know their company -- when

24

1  I literally tell you -- I could give you her phone
2  number.
3  Q      Well, that's all right.  You don't have to
4  do that right --
5  A      Okay.  It's --
6  Q      -- now because I do want to --
7  A      -- literally on --
8  Q      -- get you out of here so you can --
9  A      -- my phone as Sue insurance girl.
10 Q      Okay.  I believe you.
11 A      And that's how I buy my insurance.
12 Q      So here's the only thing I'm trying to
13 understand, --
14 A      Go ahead.
15 Q      -- all right.  So you've got, I think you
16 told me, three other restaurant/bar businesses.
17 A      Mm-hmm.
18 Q      Are they all through the same insurance
19 agency or do they each have different ones?
20 A      So -- so this -- I -- the Wolf Burger is a
21 relatively new place.  I played football at West
22 Chester.  The quarterback was a friend of mine.  He
23 lost his job.  He went into the insurance business.
24 I insured that place through him --

Examination under oath of Samuel Arbitman ~ February 13, 2025

25

1  Q      Okay.
2  A      -- because he was a friend of mine and I
3  wanted to generate help for him.  Sue does all my
4  other places.
5  Q      Okay.
6  A      So yes.
7  Q      And how long have you been with Sue's
8  company?
9  A      30 years.
10 Q      Okay.  All right.  So it -- would it be
11 fair to say that if I wanted to know most of your
12 insurance history, I could get that from --
13 A      You --
14 Q      -- Sue's company?
15 A      They would be happy to give you the kind
16 of person I am and how I move through business.
17 Q      All right.  That's fine.
18        All right.  So as far as the Meehan agency
19 goes then, I know that in this particular case at
20 least, you were dealing with Robert Saracino,
21 S-A-R-A-C-I-N-O; is that correct?
22 A      Yes, sir.
23 Q      Is he the person you primarily deal with
24 at the Meehan agency or are there others?

26

1  A      He is the person that I inherited.
2  Q      Okay.
3  A      So that was Jerry and Marge's guy.
4  Q      Understood.
5  A      That's it.  As far as if you tell me
6  Meehan -- if you tell me Mr. Meehan sat there, I
7  would say I don't know who that guy is, I can't help
8  you.
9  Q      Understood.
10 A      I'll go another step further.  If there
11 was a guy sitting over there and you said why don't
12 you say hi to Bob, I would go is that Bob?  I
13 wouldn't know him if I bumped into him.  Our
14 conversations have been basically on the phone,
15 short, to the point, and quick.
16 Q      Okay.  I understand.
17        All right.  So just so I have an
18 understanding of the Meehan agency and
19 Mr. Saracino's role, am I right that, at least from
20 your perspective, their job is to go to various
21 insurance companies and try to find the best policy,
22 best fit for you, right?
23 A      I -- I don't know.
24 Q      Okay.

27

1  A      I couldn't answer that for you.  All I
2  could tell you is Bob's the guy I inherited.  Bob
3  would call me.  The original application I filled --
4  I said this is what I do.  This is what I need
5  insurance for.  Fine.  Never came out to meet me.
6  Never came to see me.  I wired my payments to him.
7  It was basically conversations on the phone.
8  Q      I understand.
9  A      As far as like did he bid it out to other
10 people, did he do the best he can for me, I simply
11 carried them out of respect for Jerry and Marge.
12 Q      Okay.
13 A      And Marge was -- is -- still holds the
14 note for the place.  So to say like, well, why is he
15 still there, it's because Marge is still there and
16 it's because it's what Marge would like me to do.
17 Q      I understand.  Okay.  That makes sense.
18 A      Okay.
19 Q      I saw -- let me see if I can find it.  Oh.
20 So I saw on one of your applications it looks like
21 you had insurance at one point for Sam 939 with a
22 company called Axis and then with a company called
23 Ategrity.
24 A      It seems that way, yes.

28

1  Q      All right.  Did both of those insurance
2  policies also come through the Meehan agency?
3  A      Yes, sir.
4  Q      All right.
5  A      So one covered property and one covered
6  liquor liability, --
7  Q      Okay.
8  A      -- two different things.
9  Q      All right.  I also saw in the
10 application -- and we can look at it if you want to,
11 but it looks like Axis was listed on the application
12 as beginning in 2018 and going to 2021, so that
13 would overlap the time that you owned the property.
14 Did -- do you know, did that policy just carry over?
15 A      Again, remember, I inherited it, --
16 Q      Mm-hmm.
17 A      -- so yes.
18 Q      Okay.
19 A      If they were there in '18, it's because
20 that's who Marge was using.  And then, when I came
21 in, I just carried and continued, --
22 Q      Okay.
23 A      -- yes.
24 Q      All right.  So let's talk then about the

Examination under oath of Samuel Arbitman ~ February 13, 2025

29

1 **process of obtaining this particular insurance**
2 **policy. And so it looks like -- and you correct me**
3 **if you feel differently, but the process got started**
4 **in March of 2023, and then it looks like you**
5 **ultimately signed the application in April of 2023.**
6 A      Are we just talking about this one
7 here, --
8 **Q      This one policy.**
9 A      -- this one policy?
10 **Q      Correct.**
11 A      If you're saying that's what the documents
12 say, --
13 **Q      Mm-hmm.**
14 A      -- I would not deny it, but I couldn't
15 confirm it.
16 **Q      Okay. No, that's fine.**
17 A      Really the numbers and dates, I know at
18 the end of that policy -- at the beginning of that
19 policy, there -- Bob was under a lot of pressure to
20 sell me the policy --
21 **Q      Okay.**
22 A      -- and there was a lot of things like we
23 need this as soon as possible, we need this done
24 today. We didn't -- there was a lot of pressure, I

30

1 think, on him, to sell me this policy than on me
2 buying it. I'm like, listen, this is what I want,
3 this is what I need. Just make -- do what I need.
4 **Q      All right. So just -- just so we get the**
5 **time frame right --**
6 A      Go ahead.
7 **Q      -- and so you know -- so the policy itself**
8 **started on April 9th -- hold on, let me make sure --**
9 **of 2023.**
10 A      Mm-hmm.
11 **Q      We've got some text messages from you to**
12 **Mr. Saracino. They're in February. And then you**
13 **actually sign -- and they go into March as well.**
14 **And then you actually sign the application on**
15 **April 5, 2023. So --**
16 A      Seems --
17 **Q      -- we're talking about that time period,**
18 **okay?**
19 A      Seems right.
20 **Q      All right. So first of all, in that**
21 **March, April of 2023 time period, what were Maxi's**
22 **hours of operations for its bar?**
23 A      So the entire time I owned Maxi's, like
24 every other bar I own, we worked till 2:00 a.m. The

31

1 only exception at Maxi's would have been if there
2 were any restrictions during the pandemic, --
3 **Q      Mm-hmm.**
4 A      -- which means the Township says be closed
5 at this time. Wouldn't make me alter my insurance
6 coverage because I want full coverage all the time.
7 I think it's important in that business. I live by
8 one goal in the alcohol business, and this is the
9 goal I've learned 40 years ago. Nothing, nothing,
10 nothing good happens after 9:00 in the bar business.
11 For me, I make some money, but that's the extent of
12 the good. Everything that happens after 9:00 at
13 night in that business, in general, is not good.
14 For that reason, I always want to be fully insured
15 for the multi -- for the extent of my hours.
16 **Q      I appreciate that.**
17 A      Always.
18 **Q      And so just so I'm clear then, I want to**
19 **make sure we're on the same page. So you said that**
20 **Maxi's, your hours, you would always work till**
21 **2:00 a.m. Does that mean that the bar was actually**
22 **open and serving liquor up until 2:00 a.m.?**
23 A      Till 2:00 a.m., yes.
24 **Q      All right.**

32

1 A      2:00 a.m., we lock the doors.
2 **Q      Okay. And I know you mentioned it might**
3 **have been different during COVID, but by the spring**
4 **of 2023, you would have been back to the 2:00 a.m.**
5 **schedule?**
6 A      And even during COVID, I didn't alter my
7 hours --
8 **Q      Okay.**
9 A      -- as far as we advertise our operating
10 hours till 2:00. If the government says we got
11 to close at 12:00, we're closing because they're
12 gonna come. The Marcus Hook Police are very
13 diligent. They'll come by at 12:00 at night if we
14 have to be closed and they'll say, hey, close.
15 Not -- and that is not in a bad way. We -- we truly
16 embrace the Marcus Hook Police. I mean, if -- if
17 you were to go to them and say, well, what kind of
18 reputation does that establishment have, they'll be
19 very forefront and say, yeah, these guys abide by
20 the rules. That's what we do.
21 **Q      All right.**
22           MR. CLINTON: And, Nick, I don't
23      want to interject, but when I gave you
24      these documents, the Arbitman Bates

Examination under oath of Samuel Arbitman ~ February 13, 2025

11 (Pages 41 to 44)

41

1 specifically?
2 A     No.
3 Q     Okay.
4 A     No.
5 Q     All right.  So -- let me just see how --
6 I'm usually more organized, but I'm trying to insert
7 the new documents.
8           MR. CLINTON:  Take your time.  I
9      just dropped 30 pages on you, so...
10 BY MR. CUMMINS:
11 Q     So if we can look at Exhibit 2, which is
12 your packet of documents.
13 A     Yeah.
14 Q     And then go all the way back to the
15 document that's labeled Arbitman 25.  And so this
16 is -- it's an e-mail, it looks like, from
17 Mr. Saracino to you and Mr. Fattori on
18 February 22, 2023.
19 A     Great.
20 Q     All right.  So it looks like -- and you
21 tell me if you disagree.  This is Bob sending you
22 and Rich an insurance application in February 2023;
23 is that correct?
24           THE WITNESS:  This one here?

42

1           MR. CLINTON:  (Nods.)
2           THE WITNESS:  Okay.  It looks
3      like it.
4           MR. CUMMINS:  All right.
5 BY MR. CUMMINS:
6 Q     And then, if we turn to the next page, we
7 have an insurance application.  Would this be the
8 document that Bob had sent to you?
9 A     Seems that way.
10 Q     All right.  Now, the -- this is an
11 application, it looks like, for CTS Underwriters
12 Hospitality Program, which I assume, but I don't
13 know, is an insurance company.  Do you know one way
14 or the other?
15 A     I don't.
16 Q     All right.  Do you have a recollection,
17 one way or the other, if Bob was applying to
18 multiple insurance companies on your behalf?
19 A     That wasn't my issue, no.
20 Q     Okay.
21 A     I wanted the best price and I wanted the
22 best coverage.
23 Q     Fair enough.
24 A     I -- if you ask me and you say --

43

1           MR. CLINTON:  I think you've
2      answered the question.
3           THE WITNESS:  Okay.  I always
4      thought of -- Bob was the broker, Meehan
5      was the insurer.  There's -- I don't
6      understand the insurance industry.
7           MR. CUMMINS:  Fair enough.  Fair
8      enough.
9 BY MR. CUMMINS:
10 Q     So let's just look at the application that
11 is behind that e-mail then.
12 A     Mm-hmm.
13 Q     So first of all, I'll note that there's no
14 signature on this anywhere, and that's fine, but I
15 just have a couple of questions about it.
16 A     Yes, sir.
17 Q     So on the first page, about three quarters
18 of the way down, we've got a section called
19 operations section owner/shareholder must complete
20 to quote.  Do you see that?
21 A     Yes, sir.
22 Q     All right.  And listed here, they have
23 hours of operation, and it says 7A to 2A.  Number of
24 days per week, six days Sunday -- oh, six days,

44

1 Sunday 11:00 a.m. to 2:00 a.m.  Do you see that?
2 A     Yes, sir.
3 Q     Does that accurately state your hours in
4 February 2023 when Bob had filled this out?
5 A     They are the hours since I've operated
6 that bar.
7 Q     Okay.
8 A     Have not changed.
9 Q     All right.  And I think I already know the
10 answer to my next question is --
11 A     Uh-huh.
12 Q     -- you don't know who -- who or if Bob
13 ever submitted this application to anyone, right?
14 A     I have no idea.
15 Q     All right.  I can tell you that the first
16 communication that I have available to me --
17 A     Mm-hmm.
18 Q     -- is -- let me -- we'll mark this as an
19 exhibit.  Let me see what...
20           MR. CUMMINS:  Let's mark this as
21      Exhibit 3.
22           (At this time, Exhibit 3 was
23      marked for identification.)
24           MR. CUMMINS:  All right.  And

Examination under oath of Samuel Arbitman ~ February 13, 2025

14 (Pages 53 to 56)

53

1  Q      All right.  And so then, chronologically,
2  if you go to the very first page, 5 out of 22, at
3  the top, we have another e-mail from Bob to the
4  folks at Hospitality, and it says -- the highlighted
5  part says: this is to confirm closing is at midnight
6  and he will change the website.
7          So it seems to me, and tell me if you
8  disagree, Bob is at least saying that he confirmed
9  with somebody that your business closed at midnight.
10 A      And they're gonna change the website to
11 say midnight?
12 Q      Yes.
13 A      Never changed.
14 Q      All right.  Did -- did Bob discuss with
15 you, at any point in time, whether your hours were
16 midnight?
17 A      I never had -- no.
18 Q      Okay.
19 A      I never had a discussion -- I wouldn't
20 have discussed it.
21 Q      Okay.
22 A      They're -- we close at 2:00.
23 Q      All right.
24 A      That's the bottom line.

54

1  Q      All right.  And just so we're clear
2  because lawyers are funny about details, --
3  A      Okay.
4  Q      -- when I say discussion, I also mean text
5  message, e-mail, anything --
6  A      He may have --
7  Q      -- like that.
8  A      -- mentioned some things, hey, if we close
9  at -- earlier, you -- I'm like, no, Bob, this is
10 what time we close.  This is the coverage I need.
11 Anyone I do business with in the insurance industry
12 will testify this is what I want coverage for.
13 Q      Okay.  All right.  That's --
14 A      That's like saying, hey, I want you to
15 cover my car, but I don't want you to cover it after
16 midnight because I don't drive it.  When I do drive
17 it, I start driving my car at 1:00 in the morning,
18 so I want coverage because if something happens, I
19 want to be covered.  I wouldn't do this.  That's not
20 what I would do.  And as far as I could see, I'm not
21 privy to any of this.
22 Q      No, you're not and I --
23 A      This is Bob --
24         MR. CLINTON:  That's why he's

55

1  asking you.
2          THE WITNESS:  Okay.
3          MR. CUMMINS:  That's what I'm
4  trying to find out --
5          THE WITNESS:  Okay.  Yeah.
6          MR. CUMMINS:  -- because just so
7  you know, it's -- he makes it sound like
8  he's asking you.  That's why I'm asking
9  you.
10         THE WITNESS:  Okay.
11         MR. CUMMINS:  All right.
12         THE WITNESS:  I mean, it upsets
13 me, at this point.
14         MR. CUMMINS:  I totally
15 understand.
16         THE WITNESS:  Okay.
17         MR. CUMMINS:  I understand that.
18 BY MR. CUMMINS:
19 Q      So as you sit here right now, you don't
20 have any idea where Bob got the information
21 confirming that you close at midnight and you're
22 going to change your website?
23 A      No.  I have no idea where he is getting
24 any of this information.

56

1  Q      Okay.
2  A      I filled out one application to him and it
3  remained the application that I stood by the whole
4  time.
5  Q      All right.
6          MR. CUMMINS:  And this -- what
7  exhibit was this?  This is 4?
8          THE COURT REPORTER:  That's 4.
9          MR. CUMMINS:  All right.  Thank
10 you.
11 BY MR. CUMMINS:
12 Q      All right.  So then let's set that aside.
13 So this e-mail -- this last e-mail that I have here
14 is April 4th.  And then, Exhibit 5 is, I think, just
15 the last one I gave you that we haven't marked yet.
16 It should be that one.  Actually, can we have our
17 court reporter stamp that real quick?
18 A      Do I get another sticker?
19 Q      You do.  You get all the stickers.
20         (At this time, Exhibit 5 was
21         marked for identification.)
22 BY MR. CUMMINS:
23 Q      All right.  So Exhibit 5, this is an
24 e-mail from Bob to Ms. Yuille, Y-U-I-L-L-E, at

Examination under oath of Samuel Arbitman ~ February 13, 2025

25 (Pages 97 to 100)

97

1          MR. CUMMINS: -- when the HIC
2    policy --
3          THE WITNESS: That's right.
4          MR. CUMMINS: Okay.
5          THE WITNESS: So April.
6          MR. CUMMINS: Let me just look
7    at my notes. I may be finished. Give me
8    one second.
9          Sir, those are all the questions
10   I have for you, so unless your attorney
11   has any follow-up questions, we're all
12   finished.
13         MR. CLINTON: I have a few
14   questions.
15   BY MR. CLINTON:
16   Q     So can we go back to Arbitman 8. This is
17   a text from Bob to you, -- it looks like it's dated
18   April 4th -- where he says in the text change the
19   hours to closing at midnight. Did you ever change
20   your hours at that bar from 2:00 a.m. to any other
21   time for closing?
22   A     We've never operated anything other than
23   2:00 a.m.
24   Q     Okay. That text was April 4, 2023, at

98

1    1:50 p.m.
2    A     Mm-hmm.
3    Q     Did you respond to him?
4    A     No. I didn't see the text.
5    Q     Okay. The next day, which is
6    April 5th, --
7    A     Mm-hmm.
8    Q     -- he asks you to DocuSign -- excuse me --
9    April 5th at 10:23, Bob says: Sam, please e-sign the
10   DocuSign you just got ASAP. Thanks.
11   A     Right.
12   Q     Do you know what document you may have
13   gotten that he asked you to DocuSign?
14   A     So when I received that, I did receive a
15   document on DocuSign.
16   Q     Right.
17   A     I signed it, I hit the buttons, but all I
18   can tell you is I did not read it.
19   Q     Okay.
20   A     I didn't read the document. I went on my
21   business relationship with Bob hoping that he did
22   everything I've asked him to do and that's what the
23   document was. My -- I didn't read it.
24   Q     Do you know whether the application that

99

1    counsel showed you as part of Exhibit 5, that has a
2    DocuSign on the date that matches April 5th, could
3    this have been a DocuSign?
4    A     Doesn't -- that's not my signature.
5    Q     Okay.
6          MR. CLINTON: I'll just check my
7    notes.
8          I don't have anymore questions.
9          MR. CUMMINS: I just -- I just
10   have one or two and then we'll be all
11   finished.
12   BY MR. CUMMINS:
13   Q     So on the application that we've looked at
14   on --
15   A     Mm-hmm.
16   Q     -- Exhibit 5, I understand this is not --
17   you don't think it's your signature on here. Do I
18   also understand you to say that if it turns out that
19   you DocuSigned it, you also didn't -- you wouldn't
20   have read it before you did that; is that what
21   you're saying?
22   A     I never -- so I count on honesty from the
23   people I do business with, and I've DocuSigned stuff
24   in the past. I don't -- I don't read it.

100

1    Q     Okay. All right.
2    A     It's my fault I don't read it, and, I
3    mean, it's one of the things I surrender when I do
4    business.
5    Q     Is -- this particular application, is this
6    one of these documents that you would have had Rich
7    review before you DocuSigned it?
8    A     What application is this?
9    Q     This is the -- the April 5th application,
10   the one we've been talking about that has your hours
11   of operation incorrectly listed.
12   A     So I've went over this with Rich
13   already --
14   Q     Mm-hmm.
15   A     -- and Rich agrees totally that we've only
16   filled out one application. We've never filled out
17   a second application.
18   Q     Okay.
19   A     So these -- this document, we've never
20   filled out a second application. We've lived on one
21   application from the time we did business with them.
22   Q     Okay. All right.
23         MR. CUMMINS: That's all I have
24   for you, sir. Thank you very much.

# **Exhibit B**

To Complaint for Declaratory Judgment
Hospitality Insurance Company v. Sam 939 LLC, et al.

DocuSign Envelope ID: 127E5674-D1BD-4FCE-857F-65C7474CAE64



(Rev 06/2018)

# CTS Underwriters Hospitality Program Restaurant/Bar/Tavern Application

Name Insured (Corp): **SAM 939 LLC**    DBA (Name): **MAXI'S**

Location Address: **939-943 MARKET STREET**    City: **MARCUS HOOK**

County: **DELAWARE**    State: **PA**    Zip Code: **19061**    Email Address: **sam.arbitman@gmail.com**

Web Address: _____    Mailing Address (If Different): _____

---

Current Carrier: **AXIS**    Effective/Renewal Date: **4/09/2021**    Current/ Target Premium: _____

Has Current Policy Been Cancelled or Non-Renewed?    Yes ☐    No ☑    If Yes, Describe: **axis no longer writes hospitality**

**axis no longer writes hospitality**

---

### This Owners/Shareholders Information Must Be Entered To Bind Coverage

Owners Name (Principal): **SAM ARBITMAN**    SS #: _____    D/O/B: ███████

Home Address: _____

Home Phone #: ███████ **CELL**    Business Phone #: _____

If more than one owner, list all on back page. All owners/shareholders must complete to bind.

---

### Business Information

Applicant is a:    Corporation ☐    Partnership ☐    Individual ☐    Other: ☑ **LLC**

Applicant is a:    Restaurant ☐    Tavern ☐    Night Club ☑    Diner ☐    Banquet Hall ☐    Social Club ☐

Other (Please Specify): _____

# Years at this Location: **ONE**    # Years in the Restaurant/Tavern Business: **SINCE 1985**

If less than 3 years at this Location, list previous experience: **MOONSHINE PHILLY, CHUCKLES, CEDAR CRAFT & KITCHEN**

Federal EIN #: ███████    Liquor License #: **R967**    Legal Bldg. Occupancy: **125**

---

### Operations Section Owner/Shareholder Must Complete to Quote

Is Applicant Open Now?    Yes ☑    No ☐    If No, Explain: _____

Hours of Operation:    From **7A**    To **2A**    # of Days per Week: **6 DAYS, SUNDAY 11A-2A**

Is Applicant Seasonal?    Yes ☐    No ☑    If Yes, explain maintenance, security & hired caretaker operations on Page 5.

Does an owner manage the business directly?    Yes ☑    No ☐    Distance to ocean or nearest body of water: **1 MILE**

---

### Physical Plant Section

Age of:    Building: **1935**    Wiring: **2004**    Plumbing: **2011 AND ONGOING**    Heating: **2009**    Roofing: **2015**

Construction: **JM**    Protection Class: _____    # of Stories: **2**    Roof Shape:    Flat ☐    Gable ☐    Hip ☐

Roof Cladding:    Asphalt ☐    Built-Up ☐    Sheet/Metal ☐    Tile/Clay ☐    Wood Shingle ☐

Exterior Cladding:    Wood ☐    EIFS ☐    Other: _____

1

CONFIDENTIAL
MA00522

DocuSign Envelope ID: 127E5674-D1BD-4FCE-857F-65C7474CAE64

## Physical Plant Section (cont'd)

Other Occupants:  Yes ☒  No ☐  If Yes, Type:  7 BOARDING ROOMS

Smoke Detectors:  Yes ☒  No ☐  If Yes, Type:  Electric ☐     Battery Power ☒

Fire Alarm:  Yes ☒  No ☐  If Yes, Type:  Central Station ☒  Local ☐

Burglar Alarm:  Yes ☒  No ☐  If Yes, Type:  Central Station ☒  Local ☐  Surveillance Cameras:  Y ☒ N ☐

Inside?:  Y ☒ N ☐   Outside?:  Y ☒ N ☐   Central Monitor?:  Y ☒ N ☐   Archived for  2 WEEKS   #Mo's

Sprinkler System:  Yes ☐  No ☒  If Yes, Age: _____  Type of System:  Wet ☐  Dry ☐

Volunteer Fire Department:  Yes ☒  No ☐  Distance To:  Hydrant  20 FT.   Fire Dept.  MARCUS HOOK

Kitchen Fire Protection:  Y ☒ N ☐  U.L. Approved Automatic Extinguishing System under Semiannual Contract:  Y ☒ N ☐

Above System Covering All Cooking Surfaces:  Y ☒ N ☐  System Name:  RANGE GUARD   Wet ☒ Dry ☐

Automatic Gas or Electric Shut Offs for Cooking:  Y ☒ N ☐  Hood and Filters Cleaned Weekly by Staff:  Y ☒ N ☐

Hoods and Ducts Over all Cooking Equip.:  Y ☒ N ☐  Hoods and Ducts Maintenance Contract Schedule #Mo: 2/YR

Fire Extinguishers Tag Dates:  FEBRUARY 2021   Is Kitchen Sub-leased?:  Y ☐ N ☒  If Yes, Explain: _____

_____  Table Cooking or Tableside Cooking?:  Y ☐ N ☒  If Yes, Explain: _____

## Entertainment Section (ENTIRE Section MUST be Completed)

Entertainment:  Yes ☐  No ☒   Nights w/Ent.:  Fri ☐  Sat ☐  Sun ☐  Mon ☐  Tue ☐  Wed ☐  Thu ☐

Clientele Avg. Age:  40+   Type of Entertainment:  Rock Group ☐  DJ ☐  Band (Any Kind) ☐  Go-Go ☐

Karaoke ☐  Other (Please Describe): _____  #'s of TV's:  5   Stage Exist?:  Y ☐ N ☒

Cover Charge:  Yes ☐  No ☒  If Yes, Describe When & Why: _____

Dance Floor Exist?:  Yes ☐  No ☒  Dance Floor Sq. Feet: _____  If No, is dancing permitted?:  Yes ☐  No ☒

Amusement Devices (Pool Tables, Video Games, etc.):  Yes ☐  No ☐  If Yes, # and description: POOL TABLE, DART BOARD, VIDEO

## Liquor Legal Liability Section (ENTIRE Section MUST be Completed)

Does Applicant Serve Alcohol?:  Yes ☒  No ☐     If NO Liquor License is BYOB Permitted?:  Yes ☐  No ☒

Does Applicant Have Liquor License?:  Yes ☒  No ☐     If Yes, Type and #:  RESTAURANT R967

# of Bar Seats:  23   Max # of staff per shift:  Bartenders  1   Wait Staff  NO   Avg. Employment Exp.  20+  yrs.

Alcohol Server Training?:  Yes ☒  No ☐  If Yes, Explain Type and When Trained:  RAMP

Does Applicant Have Written Policy on Serving Alcohol to Customers?:  Yes ☒  No ☐

Is Management Notified Prior to Shutting Off Patrons?:  Yes ☒  No ☐

Is Documentation Kept on Each Incident?:  Yes ☒  No ☐

# of Bars on Premises:  ONE   Is There a Steady Bar Clientele?:  Yes ☒  No ☐

Is There a Happy Hour?:  Yes ☒  No ☐  Reduced Price Drinks?:  Yes ☒  No ☐  25 cents/drink

Is a Last Call Given?:  Yes ☒  No ☐  If Yes, What Time?  HALF HOUR BEFORE CLOSING

Are drink consumption games, contests, or drink enticing equipment permitted?:  Yes ☐  No ☒

Does or will the applicant offer Bottle Service sale of any alcohol products?:  Yes ☐  No ☒

CONFIDENTIAL
MA00523

DocuSign Envelope ID: 127E5674-D1BD-4FCE-857F-65C7474CAE64

## Property Section

Does Applicant Own Building?: Yes ☐ No ☒    Is Applicant Required by Lease to Insure Building: Yes ☐ No ☒

Building Limit $: _____ Co-Ins %: _____ ACV ☐ R/C ☒ Deductible $: _____ ($1,000 Min.)

Imp. & Betterments Limit $: _____ Co-Ins %: _____ ACV ☐ R/C ☐ Deductible $: _____ ($1,000 Min.)

Contents Limit $: _____ Co-Ins %: _____ ACV ☐ R/C ☒ Deductible $: _____ ($1,000 Min.)

Business Income Limit $: _____ Co-Ins %: _____ Waiting Period: 72 Hours    Extra Expense: Yes ☐ No ☒

Loss of Rents Limit $: _____ Co-Ins %: _____ Total Building Square Footage: 4800

If Applicant is a Tenant Sq. Ft. of Occupied Space: 3400    Cause of Loss: Basic ☐ Special ☐ Broad ☒

Property Enhancement Endorsement Requested: Yes ☒ No ☐

Other Property Coverage Requested: _____

_____

## Liability Section

General Liability Limit $: 1.0M    Aggregate $: 2.0M

Liquor Liability Limit $: 1.0M    Aggregate $: 2.0M

Is Lessors Risk Requested?: Yes ☒ No ☐    If Yes, Supply Sq. Ft.: _____    Business Occupant: _____

Receipts:  Food $: ~~████~~    Liquor $: ~~████~~    Admission $: _____    Other $: ~~████~~    Total $: ~~████~~

Are There Apartments?: Yes ☐ No ☒    If Yes, Number of Units: _____    Owner Occupied?: Yes ☐ No ☐

Are There Lodging Operations Other Than Apartments?: Yes ☒ No ☐    If Yes, Describe: 7 BOARDING ROOMS

Is there Waitress/Waiter Service?: Yes ☐ No ☒    If Restaurant, Table Seating Capacity: _____

Off Premise Parking?: Yes ☐ No ☒    If Yes, list address and square footage (or # of spaces): _____

Valet Parking by Owner?: Yes ☐ No ☒    By Valet Contractor?: Yes ☐ No ☒    If Yes Incl Cert w/RCA as named AI

On or Off Premise Catering/Banquet?: Yes ☐ No ☐    If Yes, % of total Receipts: _____ %

Any Teen Nites or Events Open to the Public?: Yes ☐ No ☒ **Describe Public Events and Operations on Page 5.**

Is there a Dock/Wharf?: Yes ☐ No ☒    If Yes, is there Water Taxi Service?: Yes ☐ No ☐

Describe Any Other On or Off Premise Exposure **NOT** Listed Above: _____

## Security

Any Persons Employed as Bouncers, Door Staff, ID Checker, Crowd Control or Security?:    Yes ☐ No ☒

If Yes, Number of Security/Bouncers on Any Shift: # _____    If Yes, Describe Type and Purpose: _____

_____    Any Non-Employee Security Services Hired or Contracted?: Yes ☐ No ☒

If Yes, Describe Type and Purpose: _____

Are Firearms Kept or Permitted on Premises by Anyone Other Than Police Officers:  Yes ☐ No ☒

In the Last 12 Months Have Any Emergency Services Been Called; i.e. Police, Ambulance, Fire?:  Yes ☐ No ☒

If Yes, Explain: _____

## Non-Owned Automobile (Hired Auto Not Available)

Is Non-Owned Automobile Requested?: Yes ☐ No ☒ **If Yes, Complete Entire Section** # of Employees: _____

Does Applicant have a Business Auto Policy?: Yes ☐ No ☒    Any Delivery Use?: Yes ☐ No ☐

List the Business Purposes the Non-Owned Auto will be Utilized for: _____

CONFIDENTIAL
MA00524

DocuSign Envelope ID: 127E5674-D1BD-4FCE-857F-65C7474CAE64

**Claims Section**

List **ALL** Claims for the Past 5 Years. If Yes, Describe Loss.

Property Claims:         Yes ☐   No ☒   If Yes, Explain: _____

General Liability Claims: Yes ☐   No ☒   If Yes, Explain: _____

Liquor Liability Claims:  Yes ☐   No ☒   If Yes, Explain: _____

---

**Violations Section**

Has the applicant been cited or incurred a violation for any health, fire or any other regulatory code/activity in the prior three years?         Yes ☐   No ☒   If Yes, List and Describe: _____

_____

Has the subject business, under the current or prior names, incurred any violations involving alcohol during or prior to your ownership?         Yes ☐   No ☒   If Yes, list **ALL** violations on page 5 under comments.

Has any business owned in part or whole by you or your current partners incurred any regulatory violations involving alcohol?         Yes ☐   No ☒   If Yes, list **ALL** violations on page 5 under comments.

---

**Additional Interests**

Mortgagees, Additional Insureds and Loss Payees are defined as Additional Interests.

☒ There are Additional Interests listed on this Application and are by this acknowledgement included in the information that is warranted by the signature(s) below.

*If the box above is not checked it is understood that there are no Additional Interests to this application.*

| | | |
|---|---|---|
| Additional Insured for type choice | Name: | MARGARET CONNOLLY |
| | Address: | ███████████ |
| | City, State and ZIP: | ███████████ |
| | Interest: | MORTGAGEE |
| Additional Insured for type choice | Name: | ZAC 939 LLC |
| | Address: | 939-943 MARKET STREET |
| | City, State and ZIP: | MARCUS HOOK, PA 19061 |
| | Interest: | PROPERTY OWNER |
| Additional Insured for type choice | Name: | |
| | Address: | |
| | City, State and ZIP: | |
| | Interest: | |
| Additional Insured for type choice | Name: | |
| | Address: | |
| | City, State and ZIP: | |
| | Interest: | |

CONFIDENTIAL
MA00525

DocuSign Envelope ID: 127E5674-D1BD-4FCE-857F-65C7474CAE64

**Financial Information**

Is Owner or Corporation now or ever involved in:    Bankruptcies   Yes ☐   No ☑      Foreclosures   Yes ☐   No ☑

Tax Liens   Yes ☐   No ☑      Business Failures   Yes ☐   No ☑      Any Litigations   Yes ☐   No ☑

If Yes, Explain: _____

_____

_____

---

**Additional Owners/Shareholders (Must Be Completed and Signed By All Owners/Shareholders To Bind)**

Name: _____   Soc. Sec. #: _____   Date of Birth: ████████

Name: _____   Soc. Sec. #: _____   Date of Birth: _____

Name: _____   Soc. Sec. #: _____   Date of Birth: _____

Name: _____   Soc. Sec. #: _____   Date of Birth: _____

---

**Fraud Statement**

The signing of this application does not bind the Applicant nor any company to complete the insurance, but it is agreed that the information contained herein, and on any additional pages, if any, shall be the basis of the acceptance of a contract. It is therefore the warranty of the undersigned that the information contained herein is true and correct, and it is hereby understood that the policy will be warranted based on this information. It is further understood that any per-son who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects the person to criminal and civil penalties.

---

**Credit Report Authorization**

I hereby authorize CTS Underwriters, Inc. to run any credit reference checks in accordance with the Fair Credit Reporting Act (91-508), should they deem necessary.

Insured's Signature: _____   Date: 4/7/2021

Insured's Signature: _____   Date: _____

Insured's Signature: _____   Date: _____

Insured's Signature: _____   Date: _____

Are you the controlling agent on this account?:   Yes ☑   No ☐

Agent: JOHN P MEEHAN AGENCY        Producer: Jason Ryan

Address: 1 N Belfield Ave        Phone #: 610-853-2220

Havertown, PA 19083        FAX #: _____

Agent Signature: _____   E-mail Address: jryan@meehaninsurance.com

---

**Comments/Notes**

INFORMATION IS BASED ON PRE COVID OPERATIONS.  ACTUAL RECEIPTS ARE SUBSTANTIALLY LOWER.

SAM ARBITMAN IS THE SOLE MEMBER OF BOTH  SAM 939 LLC AND ZAC 939 LLC

RECEIPTS "OTHER" ARE TAKE OUT BEER SALES

_____

_____

_____

CONFIDENTIAL
MA00526

# **Exhibit C**

To Complaint for Declaratory Judgment
Hospitality Insurance Company v. Sam 939 LLC, et al.

DocuSign Envelope ID: 849A62D7-D79B-49B4-8181-D712B5A57DAF



(Rev 06/2018)

# CTS Underwriters Hospitality Program
# Restaurant/Bar/Tavern Application

| | | | |
|---|---|---|---|
| Name Insured (Corp): SAM 939 LLC | | DBA (Name): MAXI'S | |
| Location Address: 939-943 MARKET STREET | | City: MARCUS HOOK | |
| County: DELAWARE | State: PA | Zip Code: 19061 | Email Address: sam.arbitman@gmail.com |
| Web Address: | | Mailing Address (If Different): | |

Current Carrier: Scottsdale/Ategrity    Effective/Renewal Date: 4/09/2022    Current/ Target Premium:

Has Current Policy Been Cancelled or Non-Renewed:    Yes ☐    No ■    If Yes, Describe:

## This Owners/Shareholders Information Must Be Entered To Bind Coverage

Owners Name (Principal): SAM ARBITMAN    SS #: _____    D/O/B: ███████

Home Address:

Home Phone #: ███████ CELL    Business Phone #:

If more than one owner, list all on back page. All owners/shareholders must complete to bind.

## Business Information

Applicant is a:    Corporation ☐    Partnership ☐    Individual ☐    Other: LLC ■

Applicant is a:    Restaurant ☐    Tavern ☐    Night Club ■    Diner ☐    Banquet Hall ☐    Social Club ☐

Other (Please Specify):

# Years at this Location: SINCE 2020    # Years in the Restaurant/Tavern Business: SINCE 1985

If less than 3 years at this Location, list previous experience: MOONSHINE PHILLY, CHUCKLES, CEDAR CRAFT & KITCHEN

Federal EIN #: ███████    Liquor License #: R967    Legal Bldg. Occupancy: 125

## Operations Section Owner/Shareholder Must Complete to Quote

Is Applicant Open Now?:    Yes ■    No ☐    If No, Explain:

Hours of Operation:    From 7A    To 2A    # of Days per Week: 6 DAYS, SUNDAY 11A-2A

Is Applicant Seasonal?:    Yes ☐    No ■    If Yes, explain maintenance, security & hired caretaker operations on Page 5.

Does an owner manage the business directly?    Yes ■    No ☐    Distance to ocean or nearest body of water: 1 MILE

## Physical Plant Section

Age of:    Building: 1935    Wiring: 2004    Plumbing: 2011 AND ONGOING    Heating: 2009    Roofing: 2015

Construction: JM    Protection Class:    # of Stories: 2    Roof Shape:    Flat ☐    Gable ☐    Hip ☐

Roof Cladding: Asphalt ☐    Built-Up ☐    Sheet/Metal ☐    Tile/Clay ☐    Wood Shingle ☐

Exterior Cladding:    Wood ☐    EIFS ☐    Other:

CONFIDENTIAL
MA00468

1

DocuSign Envelope ID: 849A62D7-D79B-49B4-8181-D712B5A57DAF

**Physical Plant Section (cont'd)**

Other Occupants:   Yes [■]   No [ ]   If Yes, Type:  7 BOARDING ROOMS

Smoke Detectors:   Yes [■]   No [ ]   If Yes, Type:   Electric [ ]   Battery Power [■]

Fire Alarm:   Yes [■]   No [ ]   If Yes, Type:   Central Station [■]   Local [ ]

Burglar Alarm:   Yes [■]   No [ ]   If Yes, Type:   Central Station [■]   Local [ ]   Surveillance Cameras:   Y [■] N [ ]

Inside?:   Y [■] N [ ]   Outside?:   Y [■] N [ ]   Central Monitor?:   Y [ ] N [ ]   Archived for  2 WEEKS   #Mo's

Sprinkler System:   Yes [ ]   No [■]   If Yes, Age: _____   Type of System:   Wet [ ]   Dry [ ]

Volunteer Fire Department:   Yes [■]   No [ ]   Distance To:   Hydrant  20 FT.   Fire Dept.  MARCUS HOOK

Kitchen Fire Protection: Y [■] N [ ]   U.L. Approved Automatic Extinguishing System under Semiannual Contract:  Y [■] N [ ]

Above System Covering All Cooking Surfaces:   Y [■] N [ ]   System Name:  RANGE GUARD   Wet [■] Dry [ ]

Automatic Gas or Electric Shut Offs for Cooking:   Y [■] N [ ]   Hood and Filters Cleaned Weekly by Staff:   Y [■] N [ ]

Hoods and Ducts Over all Cooking Equip.:   Y [■] N [ ]   Hoods and Ducts Maintenance Contract Schedule #Mo: 2/YR

Fire Extinguishers Tag Dates:  FEBRUARY 2022   Is Kitchen Sub-leased?:   Y [ ] N [■]   If Yes, Explain: _____

_____   Table Cooking or Tableside Cooking?:   Y [ ] N [■]   If Yes, Explain: _____

---

**Entertainment Section (*ENTIRE Section MUST be Completed*)**

Entertainment:   Yes [ ]   No [■]   Nights w/Ent.:   Fri [ ]   Sat [ ]   Sun [ ]   Mon [ ]   Tue [ ]   Wed [ ]   Thu [ ]

Clientele Avg. Age:  40+   Type of Entertainment:   Rock Group [ ]   DJ [ ]   Band (Any Kind) [■]   Go-Go [ ]

Karaoke [ ]   Other (Please Describe): _____   #'s of TV's:  5   Stage Exist?:   Y [ ] N [■]

Cover Charge:   Yes [ ]   No [ ]   If Yes, Describe When & Why: _____

Dance Floor Exist?:   Yes [ ]   No [ ]   Dance Floor Sq. Feet:  not designated   If No, is dancing permitted?:   Yes [■]   No [ ]

Amusement Devices (Pool Tables, Video Games, etc.):   Yes [■]   No [ ]   If Yes, # and description: POOL TABLE, DART BOARD, VIDEO

_____

---

**Liquor Legal Liability Section (*ENTIRE Section MUST be Completed*)**

Does Applicant Serve Alcohol?:   Yes [■]   No [ ]   If NO Liquor License is BYOB Permitted?:   Yes [ ]   No [ ]

Does Applicant Have Liquor License?:   Yes [■]   No [ ]   If Yes, Type and #:  RESTAURANT R967

# of Bar Seats:  23   Max # of staff per shift:   Bartenders  1   Wait Staff  NO   Avg. Employment Exp.  20+  yrs.

Alcohol Server Training?:   Yes [■]   No [ ]   If Yes, Explain Type and When Trained:  RAMP

Does Applicant Have Written Policy on Serving Alcohol to Customers?:   Yes [■]   No [ ]

Is Management Notified Prior to Shutting Off Patrons:   Yes [■]   No [ ]

Is Documentation Kept on Each Incident?:   Yes [■]   No [ ]

# of Bars on Premises:  ONE   Is There a Steady Bar Clientele?:   Yes [■]   No [ ]

Is There a Happy Hour?:   Yes [■]   No [ ]   Reduced Price Drinks?:   Yes [■]   No [ ]   25 cents off/drink

Is a Last Call Given?:   Yes [ ]   No [ ]   If Yes, What Time?:  HALF HOUR BEFORE CLOSING

Are drink consumption games, contests, or drink enticing equipment permitted?:   Yes [ ]   No [■]

Does or will the applicant offer Bottle Service sale of any alcohol products?:   Yes [ ]   No [■]

CONFIDENTIAL
MA00469

DocuSign Envelope ID: 849A62D7-D79B-49B4-8181-D712B5A57DAF

## Property Section

Does Applicant Own Building?: Yes ☐ No ■    Is Applicant Required by Lease to Insure Building?: Yes ☐ No ■

Building Limit $: _____ Co-Ins %: _____ ACV ☐ R/C ■ Deductible $: _____ ($1,000 Min.)

Imp. & Betterments Limit $: _____ Co-Ins %: _____ ACV ☐ R/C ☐ Deductible $: _____ ($1,000 Min.)

Contents Limit $: _____ Co-Ins %: _____ ACV ☐ R/C ■ Deductible $: _____ ($1,000 Min.)

Business Income Limit $: _____ Co-Ins %: _____ Waiting Period: _72 Hours_ Extra Expense: Yes ☐ No ■

Loss of Rents Limit $: _____ Co-Ins %: _____ Total Building Square Footage: 4800

If Applicant is a Tenant Sq. Ft. of Occupied Space: 3400    Cause of Loss: Basic ☐ Special ■ Broad ☐

Property Enhancement Endorsement Requested: Yes ■ No ☐

Other Property Coverage Requested: _____

_____

## Liability Section

General Liability Limit $: 1.0M    Aggregate $: 2.0M

Liquor Liability Limit $: 1.0M    Aggregate $: 2.0M

Is Lessors Risk Requested?: Yes ■ No ☐ If Yes, Supply Sq. Ft.: _____ Business Occupant: _____

Receipts: Food $: ▓▓▓▓ Liquor $: ▓▓▓▓ Admission $: _____ Other $: ▓▓▓▓ Total $: ▓▓▓▓

Are There Apartments?: Yes ☐ No ☐ If Yes, Number of Units: _____ Owner Occupied?: Yes ☐ No ☐

Are There Lodging Operations Other Than Apartments?: Yes ■ No ☐ If Yes, Describe: 7 BOARDING ROOMS

Is there Waitress/Waiter Service?: Yes ☐ No ■ If Restaurant, Table Seating Capacity: _____

Off Premise Parking?: Yes ☐ No ■ If Yes, list address and square footage (or # of spaces): _____

_____

Valet Parking by Owner?: Yes ☐ No ■ By Valet Contractor?: Yes ☐ No ■ If Yes Incl Cert w/RCA as named AI

On or Off Premise Catering/Banquet?: Yes ☐ No ■ If Yes, % of total Receipts: _____ %

Any Teen Nites or Events Open to the Public?: Yes ☐ No ■ **Describe Public Events and Operations on Page 5.**

Is there a Dock/Wharf?: Yes ☐ No ■ If Yes, is there Water Taxi Service?: Yes ☐ No ☐

Describe Any Other On or Off Premise Exposure **NOT** Listed Above: _____

_____

## Security

Any Persons Employed as Bouncers, Door Staff, ID Checker, Crowd Control or Security?: Yes ☐ No ■

If Yes, Number of Security/Bouncers on Any Shift: # _____ If Yes, Describe Type and Purpose: _____

_____ Any Non-Employee Security Services Hired or Contracted?: Yes ☐ No ■

If Yes, Describe Type and Purpose: _____

Are Firearms Kept or Permitted on Premises by Anyone Other Than Police Officers?: Yes ☐ No ■

In the Last 12 Months Have Any Emergency Services Been Called; i.e. Police, Ambulance, Fire?: Yes ☐ No ■

If Yes, Explain: _____

## Non-Owned Automobile (Hired Auto Not Available)

Is Non-Owned Automobile Requested?: Yes ☐ No ■ **If Yes, Complete Entire Section** # of Employees: _____

Does Applicant have a Business Auto Policy?: Yes ☐ No ■ Any Delivery Use?: Yes ☐ No ☐

List the Business Purposes the Non-Owned Auto will be Utilized for: _____

CONFIDENTIAL
MA00470

3

DocuSign Envelope ID: 849A62D7-D79B-49B4-8181-D712B5A57DAF

**Claims Section**

List **ALL** Claims for the Past 5 Years. If Yes, Describe Loss.

Property Claims:        Yes ☐   No ☒   If Yes, Explain: _____

_____

General Liability Claims:   Yes ☐   No ☒   If Yes, Explain: _____

_____

Liquor Liability Claims:    Yes ☐   No ☒   If Yes, Explain: _____

_____

**Violations Section**

Has the applicant been cited or incurred a violation for any health, fire or any other regulatory code/activity in the prior three years?        Yes ☐   No ☒   If Yes, List and Describe: _____

_____

Has the subject business, under the current or prior names, incurred any violations involving alcohol during or prior to your ownership?    Yes ☐   No ☒   If Yes, list **ALL** violations on page 5 under comments.

Has any business owned in part or whole by you or your current partners incurred any regulatory violations involving alcohol?        Yes ☐   No ☒   If Yes, list **ALL** violations on page 5 under comments.

**Additional Interests**

Mortgagees, Additional Insureds and Loss Payees are defined as Additional Interests.

☒ There are Additional Interests listed on this Application and are by this acknowledgement included in the information that is warranted by the signature(s) below.

*If the box above is not checked it is understood that there are no Additional Interests to this application.*

Additional Insured
for type choice

Name:   ZAC 939 LLC

Address:   939-943 MARKET STREET

City, State and ZIP:   MARCUS HOOK, PA 19061

Interest:   PROPERTY OWNER

Additional Insured
for type choice

Name: _____

Address: _____

City, State and ZIP: _____

Interest: _____

Additional Insured
for type choice

Name: _____

Address: _____

City, State and ZIP: _____

Interest: _____

Additional Insured
for type choice

Name: _____

Address: _____

City, State and ZIP: _____

Interest: _____

CONFIDENTIAL
MA00471

DocuSign Envelope ID: 849A62D7-D79B-49B4-8181-D712B5A57DAF

**Financial Information**

Is Owner or Corporation now or ever involved in:    Bankruptcies    Yes ☐  No ☒        Foreclosures    Yes ☐  No ☒

Tax Liens    Yes ☐  No ☒        Business Failures    Yes ☐  No ☒        Any Litigations    Yes ☐  No ☒

If Yes, Explain: _____

_____

_____

**Additional Owners/Shareholders (Must Be Completed and Signed By All Owners/Shareholders To Bind)**

Name: _____  Soc. Sec. #: _____  Date of Birth: ███████

Name: _____  Soc. Sec. #: _____  Date of Birth: _____

Name: _____  Soc. Sec. #: _____  Date of Birth: _____

Name: _____  Soc. Sec. #: _____  Date of Birth: _____

**Fraud Statement**

The signing of this application does not bind the Applicant nor any company to complete the insurance, but it is agreed that the information contained herein, and on any additional pages, if any, shall be the basis of the acceptance of a contract. It is therefore the warranty of the undersigned that the information contained herein is true and correct, and it is hereby understood that the policy will be warranted based on this information. It is further understood that any per-son who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects the person to criminal and civil penalties.

**Credit Report Authorization**

I hereby authorize CTS Underwriters, Inc. to run any credit reference checks in accordance with the Fair Credit Reporting Act (91-508), should they deem necessary.

Insured's Signature: _____  Date: 4/6/2022

Insured's Signature: _____  Date: _____

Insured's Signature: _____  Date: _____

Insured's Signature: _____  Date: _____

Are you the controlling agent on this account?:    Yes ☒  No ☐

Agent: JOHN P MEEHAN AGENCY        Producer: Jason Ryan

Address: 1 N Belfield Ave        Phone #: 610-853-2220

Havertown, PA 19083        FAX #: _____

Agent Signature: _____        E-mail Address: jryan@meehaninsurance.com

**Comments/Notes**

SAM ARBITMAN IS THE SOLE MEMBER OF BOTH  SAM 939 LLC AND ZAC 939 LLC

RECEIPTS "OTHER" ARE TAKE OUT BEER SALES

DJ Once/Month No STAGE, NO DANCE FLOOR, BEEBOPPING

_____

_____

CONFIDENTIAL
MA00472

# **Exhibit D**

To Complaint for Declaratory Judgment
Hospitality Insurance Company v. Sam 939 LLC, et al.

**From:** Robert Saracino <ars318@gmail.com>
**Sent:** Tuesday, April 4, 2023 2:51 PM
**To:** Lucinda Yuille <LYuille@hmic.com>
**Cc:** Jason Ryan <jryan@meehaninsurance.com>
**Subject:** Re: Sam 939 LLC dba Maxi's eff 4/9

**? EXTERNAL MESSAGE - Think before you click**
no problem, he will join the PRLA and we will be renewing with scottsdale, attached is the renewal quote, but i will send binder if you need that too.
also, i have total HIC premium for the GL and LL of $6,951 with the PRLA membership which he will join.
This is to confirm closing is at midnight and he will change on website.
insured confirmed and will provide central station cert.
there are no apartment exposure. As stated on the app, there is 7 boarding rooms. on second floor.

Thanks

On Tue, Apr 4, 2023 at 2:22 PM Lucinda Yuille <LYuille@hmic.com> wrote:

Hi Bob,

The insured must be a member of the PRLA.

Please keep in mind that we would like a copy of the declaration page indicating that there is coverage elsewhere for the boarding rooms. (this is on the same premises?)

Thanks

**From:** Robert Saracino <ars318@gmail.com>
**Sent:** Tuesday, April 4, 2023 1:02 PM
**To:** Lucinda Yuille <LYuille@hmic.com>; Sandra Haley <shaley@hmic.com>
**Subject:** Re: Sam 939 LLC dba Maxi's eff 4/9

**? EXTERNAL MESSAGE - Think before you click**

Hi Lucinda,

In order to bind

3

1)does HIC still require PRLA membership or can it be pa tavern assoc. or other membership?

2)would you still require interconnected in all the 7 boardking rooms on the 2nd floor even though they are not a part of this risk. In other words, where exactly do you need the interconnected? the building is owned by ZAC 939 LLC, SAM 939 LLC owns the liquor license and operates the tavern on the first floor.

3)there are no apartment exposures, there are 7 boarding rooms on 2nd floor that is not owned by SAM 939 LLC.

Please advise as would like to go with HIC for the GL LL but the above are concerns.

thanks

Bob

On Tue, Apr 4, 2023 at 11:54 AM Robert Saracino <ars318@gmail.com> wrote:

Hi Lucinda

Please provide quote without the property. he is with scottsdale now and your property premium is higher than theirs.

do you still require interconnected smoke alarms for this risk?

also, we never want the epl, so please exclude that on all quotes.

i will confirm closing midnight which is what he told me. often times they forget to change the hours on the website.

Thanks

Bob

4

PrintDocument

On Tue, Apr 4, 2023 at 11:05 AM Lucinda Yuille <LYuille@hmic.com> wrote:

The hours of operation indicate a 2 am close – Please advise

I quoted based on a 12 am close with $1M/$2M limits

**Address**: 939 Market St, Marcus Hook, PA 19061

**Hours**:

| | |
|---|---|
| **Tuesday** | **11 AM–1 AM** |
| Wednesday | 11 AM–1 AM |
| Thursday | 11 AM–1 AM |
| Friday | 11 AM–2 AM |
| | |
| (Good Friday) | Hours might differ |
| Saturday | 7 AM–2 AM |
| Sunday | 11 AM–12 AM |
| | |
| (Easter) | Hours might differ |
| Monday | 11 AM–1 AM |

Suggest new hours

**From:** Robert Saracino <ars318@gmail.com>
**Sent:** Tuesday, April 4, 2023 10:59 AM
**To:** Lucinda Yuille <LYuille@hmic.com>
**Subject:** Re: Sam 939 LLC dba Maxi's eff 4/9

**? EXTERNAL MESSAGE - Think before you click**

Nothing attached

5

On Tue, Apr 4, 2023, 10:54 AM Lucinda Yuille <LYuille@hmic.com> wrote:

Good Morning Bob

Quote for this risk was just released to you.

Please advise should you have any questions.

**From:** Robert Saracino <ars318@gmail.com>
**Sent:** Monday, April 3, 2023 2:09 PM
**To:** Lucinda Yuille <LYuille@hmic.com>
**Subject:** Re: Sam 939 LLC dba Maxi's eff 4/9

**? EXTERNAL MESSAGE - Think before you click**

Hi Lucinda,

I did send it to you last tuesday. Had to wait to get the sales verification letter or else it would have been sooner.

Please provide asap, we are running out of time here as there is much contacting and evaluation to do on our part to do the deal.

Thanks much

Bob

On Mon, Apr 3, 2023 at 2:04 PM Lucinda Yuille <LYuille@hmic.com> wrote:

Hey Bob

I am sorry for the delay but I have been out of the office Thursday and Friday last week attending a funeral in DC.

I hope getting this to you tomorrow will be okay?

6

**From:** Robert Saracino <ars318@gmail.com>
**Sent:** Monday, April 3, 2023 1:08 PM
**To:** Lucinda Yuille <LYuille@hmic.com>; Administration <Administration@hmicompany.onmicrosoft.com>
**Subject:** Re: Sam 939 LLC dba Maxi's eff 4/9

**? EXTERNAL MESSAGE - Think before you click**

Hi Lucinda

Please advise the status of quote for this insured. With the insurance offices closed for Good Friday and expiration for this account on Easter Sunday 4/9 we are running real tight on this one.

Thanks

Bob

On Fri, Mar 31, 2023 at 10:46 AM Robert Saracino <ars318@gmail.com> wrote:

Hi Lucinda,

Hope you have been well. Please advise status of quote for this one.

Thanks

Bob

---------- Forwarded message ---------
**From: Robert Saracino** <ars318@gmail.com>
Date: Tue, Mar 28, 2023 at 1:28 PM
Subject: Sam 939 LLC dba Maxi's eff 4/9

7

To: <Administration@hmic.com>
Cc: Jason Ryan <jryan@meehaninsurance.com>

HIC

Attached for quoting are HIC new LL app, acord apps, loss runs and sales verification.

Sam 939 LLC is a tenent of ZAC 939 LLC. Both LLC's owned 100% by Sam Arbitman.

Thanks

Bob

--

**A. Robert Saracino**

*Commercial and Personal Insurance Producer*

610-453-0276 - Cell

John P. Meehan Agency

1 N. Belfield Ave.

Havertown, PA 19083

610-853-2220 - Office

**610-853-4720** - Office Fax

--

**A. Robert Saracino**

8

*Commercial and Personal Insurance Producer*

610-453-0276 – Cell

John P. Meehan Agency

1 N. Belfield Ave.

Havertown, PA 19083

610-853-2220 - Office

610-853-4720 – Office Fax

--

## A. Robert Saracino

*Commercial and Personal Insurance Producer*

610-453-0276 – Cell

John P. Meehan Agency

1 N. Belfield Ave.

Havertown, PA 19083

610-853-2220 - Office

610-853-4720 – Office Fax

--

## A. Robert Saracino

*Commercial and Personal Insurance Producer*

9

PrintDocument

610-453-0276 – Cell

John P. Meehan Agency

1 N. Belfield Ave.

Havertown, PA 19083

610-853-2220 - Office

610-853-4720 – Office Fax

--

## A. Robert Saracino

*Commercial and Personal Insurance Producer*

610-453-0276 – Cell

John P. Meehan Agency

1 N. Belfield Ave.

Havertown, PA 19083

610-853-2220 - Office

610-853-4720 – Office Fax

--

## A. Robert Saracino

*Commercial and Personal Insurance Producer*

610-453-0276 – Cell

10

John P. Meehan Agency

1 N. Belfield Ave.

Havertown, PA 19083

610-853-2220 – Office

610-853-4720 – Office Fax

--
**A. Robert Saracino**
*Commercial and Personal Insurance Producer*
610-453-0276 – Cell

John P. Meehan Agency
1 N. Belfield Ave.
Havertown, PA 19083
610-853-2220 – Office
610-853-4720 – Office Fax



11

# **Exhibit E**

To Complaint for Declaratory Judgment
Hospitality Insurance Company v. Sam 939 LLC, et al.



Hospitality Insurance Group
106 Southville Road
Southborough, MA 01772
HMIC.com
877-366-1140

## Liquor Liability Application: NEW BUSINESS

*All contact fields marked with an asterisk (*) are required for processing.*

### POLICY INFORMATION

*Named Insured: SAM 939 LLC
D/B/A: Maxi's                                                                                                  ○ Same as Named Insured
*Mailing Address: SAME                         City/Town:              State:           Zip:
*Premises Address: 939-943 MARKET STREET        City/Town: MARCUS HOOK   State: PA   Zip: 19061
*Applicant is: ○ Individual   ○ Corporation   ● LLC   ○ Partnership   ○ Other (Specify):
*Contact Name: SAM ARBITMAN          *FEIN: ███████     *Telephone: ███████
*Email:                              Date Business Started: 2020    Occupancy Capacity: 125
*Member of Association: ■    *Name of Association: PRLA
*Policy Term Requested:    from 4/9/2023    to 4/9/2024          New Venture ○
Additional Quote:   Include Quote for General Liability ■   (Please attach ACORDs 125 & 126)
                    Additional Location(s) ☐   (Please attach additional app per location)

**Hours of Operation:**
Earliest Hour Open -  NOON
Latest Hour Open -  MIDNIGHT

### CLASSIFICATION OF RISK

| Class Code | | Description |
|---|---|---|
| 11 | ☐ | Manufacturers - including wineries - with or without hospitality rooms |
| 12 | ☐ | Wholesale Distributors - including importers; no consumption on premises |
| 21 | ☐ | Retail Stores - including package stores, markets and gas stations; no consumption on premises |
| 31 | ■ | Bars - sports bars, taverns; greater than 60% liquor |
| 32 | ☐ | Club - golf, civic, fraternal and social: ○ **Public**  ○ **Non-Profit**  ○ **Members Only**   # of Members: _____ |
| 34 | ☐ | Restaurants - liquor sales less than 40% of total food and liquor sales |
| 35 | ☐ | Restaurants, Pubs and Taverns - liquor sales exceed 40% of total food and liquor sales, but less than 60% liquor |
| 36 | ☐ | Nightclubs; gentleman's clubs |
| 37 | ☐ | BYOB - based on annual number of adult attendees; on-premises consumption* *(See below requirement)* |
| | | **Estimated # of annual adult attendees:** _____ |
| 37 | ☐ | Caterers - based on the number of adult attendees, annual policy* *(See below requirement)* |
| | | **Estimated # of annual adult attendees:** _____ |
| 38 | ☐ | Annual Temporary Events - based on the number of annual adult attendees, annual policy* *(See below requirement)* |
| | | **Estimated # of annual adult attendees:** _____ |
| 41 | ☐ | Temporary Event - for single or multi-day events, weddings, parties, etc. |

***For Classes 37 & 38 – A schedule of completed events with attendee counts from past 12 months is required with application.***

### POLICY LIMITS REQUESTED

- ○ $100,000 per person/ $200,000 per occurrence/ $200,000 aggregate **(applicable to Class Code 41 only)**
- ○ $250,000 per person/ $500,000 per occurrence/ $500,000 aggregate
- ○ $300,000 per person/ $600,000 per occurrence/ $600,000 aggregate *(applicable to RI only)*
- ○ $500,000 per person/ $1,000,000 per occurrence/ $1,000,000 aggregate
- ● $1,000,000 per person/ $1,000,000 per occurrence/ $2,000,000 aggregate

HMIC.COM
877-366-1140

## BUSINESS SALES*

| | Projected |
|---|---|
| Liquor Sales - On Premises Consumption | $ ▉ |
| Liquor Sales - Off Premises Consumption | $ ▉ |
| Food Sales - On Premises Consumption | $ ▉ |
| Food Sales - Off Premises / Catering | $ ▉ |
| Price Of Domestic Bottle of Beer: $ ▉ | ☐ Bottle Service Available |

## *SALES VERIFICATION DOCUMENTATION OPTIONS

Required for all quotes - select one of the below

☐ Print out of the insured's POS system for the past 12 months

☐ MassConnect – must provide % of liquor and food sales (MA Only)

☑ Accounting statement for the past 12 months (signed by licensed accountant)

☐ Pro Forma business plan (new ventures only)

## ENTERTAINMENT INFORMATION

Are any of the following provided at this premises? (Check all that apply)     ☐ No Entertainment

☑ Darts          ☐ DJ with Dancing          ☐ Karaoke          ☐ Dancing          ☑ Other (please specify):

☑ Pool Tables    ☐ Live Bands               ☐ Mechanical Bulls ☐ Dance Floor      OCCASIONAL DJ, WITHOUT DANCING

☐ Pub Crawls     ☐ Drinking Games/Tournaments ☐ Happy Hour     ☐ Exotic Dancing

Number of days with live entertainment per week: 0          Number of days open per week: 7

## ALCOHOL TRAINING / SECURITY TRAINING INFORMATION

Are any bouncers, doorpersons or security used?     ☐ Yes  ☑ No     If yes, are they:  ☐ Company Employees  ☐ Contracted

Name of Alcohol Training Program (if applicable): RAMP

Have 100% of management and 100% of non-management servers been certified?     ☑ Yes  ☐ No     Written alcohol serving policy in place?  ☑ Yes  ☐ No

Name of Security Training Program (if applicable):

Have 100% of management and 100% of non-management servers been certified?     ☐ Yes  ☐ No

## OPTIONAL ENDORSEMENTS

**Assault & Battery Endorsement**          **Property Damage Endorsement** ☑          **Terrorism** ☐
**Select A&B Sublimits**

$100,000/$200,000/$200,000 ☐     $300,000/$600,000/$600,000 **(applicable to RI only)** ☐     $1,000,000/$1,000,000/$2,000,000 ☐

$250,000/$500,000/$500,000 ☑     $500,000/$1,000,000/$1,000,000 ☐

I decline to purchase Assault & Battery Coverage ☐

**Additional Insured (applicable to liquor liability):**

Name:_____  Address:_____  Interest:_____

Name:_____  Address:_____  Interest:_____

## CITATIONS AND / OR HEARINGS

Has applicant had any citations or hearings with their local liquor licensing board?     ☐ Yes  ☑ No

If yes, please provide details:_____

Are employees permitted to consume alcohol on the applicant's premises, prior to, during or after their shift ends?     ☐ Yes  ☑ No

## ALL NEW APPLICANTS MUST COMPLETE THE INFORMATION BELOW

Has business operated under any other name(s)? If so, please provide prior names: CONNOLLY'S PUB

Has applicant been fined or cited for ABC violations of law or ordinances related to illegal activities or the sale of alcohol?

☐ Yes  ☑ No     If yes, please provide: Date:_____  Fine:_____  Penalty Assessed:_____

Has applicant or any active partner filed for bankruptcy?  ☐ Yes  ☑ No

Within the past 5 years has the applicant's General Liability or Liquor Liability coverage been canceled or non-renewed?

☐ Yes  ☑ No     If yes, please provide details:_____

Applicant's year of experience owning or managing similar type of operation: SINCE 1985

HMIC.COM
877-366-1140

## SECURITY INFORMATION

Security Camera's Outside Premises    ● Yes  ○ No    Length of time video is saved  14 DAYS

Security Camera's Inside Premises    ● Yes  ○ No    Length of time video is saved  14 DAYS

## PRIOR COVERAGE HISTORY

Has the applicant had any losses, claims, lawsuits or incidents in the past 3 years?    ○ Yes  ● No

If yes, please provide detailed loss explanation: _____

Has the insured had prior coverage?    ● Yes  ○ No

If yes, please provide prior carrier information:

| Year | Company | Premium |
|---|---|---|
| 2021-2023 | ATEGRITY | $ 7800 |
| 2018-2021 | AXIS | $ |

## RESTAURANT / TAVERN / BAR SUPPLEMENT

*The following information is only required if requesting General Liability Coverage and/or Property along with the ACORD 125 Commercial Insurance Application. ACORD 126 Commercial General Liability Application and ACORD 140 Property Section.*

Square Footage of Building: 4800    Seating Capacity of Restaurant: 44

Square Footage of Restaurant: 3400    Seating Capacity of Bar: 23

Number of Apartments (if applicable): 0    **Hours of Operation:** NOON TO MIDNIGHT

Number of Bartenders Employed: 5 PT    **Kitchen Closes at:** 9P

Check all that apply:

| | | | |
|---|---|---|---|
| ☐ Stairwell(s) | ■ Grilling | ☐ Open Broiling | ☐ Catering/Banquet Operations |
| ☐ Elevator | ■ Deep Fat Frying | ☐ Valet Parking | % of total receipts: _____ |
| ☐ Escalator(s) | ☐ Tableside Cooking | ☐ Off Premises Parking | ○ On Premises |
| | | Square footage of parking lot:_____ | ○ Off Premises |

**Any deliveries?**  ○ Yes  ● No    **Is there table service?**  ○ Yes  ● No

Are adequate Emergency Exits provided and equipped with panic hardware?    ● Yes  ○ No

How many means of egress are there per floor?  2    Are the exits clearly marked and illuminated?  ● Yes  ○ No

Adequate smoke alarms installed?  ● Yes  ○ No    Are they hardwired and interconnected?  ● Yes  ○ No

Any other on or off premises exposures not listed above? _____

Central Alarms?  ○

## KITCHEN FIRE PROTECTION

Volume of Cooking:    ☐ None    ● Limited    ☐ Full

UL 300 approved automatic extinguishing system covering all cooking surfaces?    ● Yes  ○ No

If no, please provide details: _____

Name of System: RANGE GUARD    ● Wet  ○ Dry

UL 300 system under maintenance contract?  ● Yes  ○ No

How often is the system serviced? 2/YEAR

HMIC.COM
877-366-1140

---

**PAYMENT OPTION & DEPOSIT PREMIUM**

Check a Payment Option

○ Payment in Full

○ Monthly (7) Installments (available only if total policy premium >$1,000) 25% deposit required

**For Insureds located in MA, RI, PA, NC and CT**
A finance charge of 1.25% of the remaining balance is applied per installment.

**For Insureds located in New Hampshire or Vermont**
A $10.00 installment fee is applied per installment.

**PAY YOUR BILL ONLINE at www.HMIC.com. All major credit cards and e-checks accepted.**

○ Pay as you pour – financed premium through First Insurance Funding (FIF). Selecting this option authorizes Hospitality to provide FIF with your information to provide a quote.

---

**Third Party Exclusion Acknowledgement**

I acknowledge the liquor liability policy has an Exclusion for Third Party or Contracted Security. Anyone that I hire (other than my employees) are not covered under this policy. We will have no duty to defend or to pay damages for any claims or suits seeking damages. In order to protect your interests, you need to be added to your third party or contracted security companies insurance policy as an additional insured.

**Insured Signature:** _____    **Date:** _____

---

**AGENT'S / APPLICANT'S CERTIFICATION & AUTHORIZED SIGNATURES**

Whereupon the agent/applicant, under the pain and penalty of perjury, hereby acknowledges this application to be true and complete to the best of the agent's/applicant's knowledge and belief. By signing this application, we certify that the information contained herein is true and accurate to the best of our knowledge and belief, and we acknowledge that providing truthful and accurate information is a condition precedent to obtaining liquor liability insurance. We further acknowledge that any insurance which may be issued upon receipt of this application will be issued based upon the company's reliance on the information we have provided, and if such information is misleading or false, the company may void the insurance issued pursuant to this application. By signing this application, the applicant also hereby authorizes and directs each entity from whom the applicant purchases alcoholic beverages to provide to the company or its designated auditor all information regarding the applicant's retail and wholesale purchases of alcoholic beverages.

**1. APPLICANT'S SECTION**

Applicant's Name:_____    Title:_____

Fed ID# / Soc. Sec. #:_____    Telephone:_____

Email Address:_____

**Applicant's Signature: X**_____    **Date:** _____

**2. AGENT / BROKER'S SECTION**

Name of Agency: JOHN P. MEEHAN AGENCY    Address:_____

Name of Agent: _____

Telephone:_____    Fax:_____

Email Address: _____

**Agent's Signature: X**_____    **Date:**_____

**Fraud Statement:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

---

# **Exhibit F**

To Complaint for Declaratory Judgment
Hospitality Insurance Company v. Sam 939 LLC, et al.



**New Message**                    Cancel

To: Bob Ins Cell

Apr 3, 2023 at 5:14 PM

sam, the underwriter promised me her liability quote tomorrow. hopefully it will be better than what we have. you insruance expires sunday at 1201a (essentially saturday night at midnight). the insurance offices are closed for good friday. so be available to esign docusign applications, and advising how much you want to put down, etc., if of course you stay with me. thanks i already have  a blank check of yours from before. i assume you did not change banks.

Apr 4, 2023 at 5:41 AM

Same bank pal

Apr 4, 2023 at 1:50 PM

sam, call me, crunch time now. thanks

you have 2 means of egress on the second floor, correct?

Text Message · SMS

ARBITMAN 000007



8:36

**New Message**                    Cancel

To: Bob Ins Cell

Yes

change the hours to closing at midnight, get a copy of the central station fire and burglar certficate and text or email to me, ask each bartender to take pic of their ramp cert. dont pay pa tavern for their dues at renewal. i will tell you how to pay the prla.

i will use the sam 939 LLC to pay the down and set up the monthly automatic ach payments. that is the one with santander account ▮▮▮▮▮, correct?

Apr 5, 2023 at 10:23 AM

sam, please esign the docusign you just got asap. thanks

the docusign came from john meehan

Done

thanks sam, you will get another

+    Text Message • SMS

# **<u>Exhibit G</u>**

To Complaint for Declaratory Judgment
<u>Hospitality Insurance Company v. Sam 939 LLC, et al.</u>

## Lucinda Yuille

| | |
|---|---|
| **From:** | Robert Saracino <ars318@gmail.com> |
| **Sent:** | Wednesday, April 5, 2023 1:12 PM |
| **To:** | Lucinda Yuille |
| **Cc:** | John Jr. Meehan; Erin McCaffrey; Jason Ryan |
| **Subject:** | Sam 939 LLC dba Maxi's esigned apps for binding |
| **Attachments:** | image002.jpg; Maxi's'23 HIC NewBusiness LL App.pdf; Maxi's'23 SAM939 GL acords.pdf |

**? EXTERNAL MESSAGE - Think before you click**

Hi Lucinda,

See attached and please bind this account effective 4/9/2023 for the GL and LL only.
Total premium $6,951.
Please confirm.

Thanks
Bob

--
**A. Robert Saracino**
*Commercial and Personal Insurance Producer*
610-453-0276 - Cell

John P. Meehan Agency
1 N. Belfield Ave.
Havertown, PA 19083
610-853-2220 - Office
**610-853-4720** - Office Fax



1

# **Exhibit H**

To Complaint for Declaratory Judgment
<u>Hospitality Insurance Company v. Sam 939 LLC, et al.</u>

DocuSign Envelope ID: D1FB3EA0-2C39-42EE-8191-2F42F33E53C7


HOSPITALITY®
INSURANCE Group
Taking the Risk Out of Hospitality

Hospitality Insurance Group
106 Southville Road
Southborough, MA 01772
HMIC.com
877-366-1140

## Liquor Liability Application: NEW BUSINESS

*All contact fields marked with an asterisk (*) are required for processing.*

### POLICY INFORMATION

*Named Insured: SAM 939 LLC

D/B/A: Maxi's                                                                                  ○ Same as Named Insured

*Mailing Address: SAME          City/Town:          State:          Zip:

*Premises Address: 939-943 MARKET STREET          City/Town: MARCUS HOOK          State: PA          Zip: 19061

*Applicant is:    ○ Individual    ○ Corporation    ● LLC    ○ Partnership    ○ Other (Specify):

*Contact Name: SAM ARBITMAN          *FEIN          *Telephone

*Email:          Date Business Started: 2020          Occupancy Capacity: 125

*Member of Association: ■          *Name of Association: PRLA

*Policy Term Requested:          from 4/9/2023          to 4/9/2024          New Venture □

Additional Quote:    Include Quote for General Liability ■    (Please attach ACORDs 125 & 126)    **Hours of Operation:**
                     Additional Location(s) □    (Please attach additional app per location)    Earliest Hour Open - **NOON**
                                                                                                Latest Hour Open - **MIDNIGHT**

### CLASSIFICATION OF RISK

| Class Code | Description |
|---|---|
| 11 □ | Manufacturers - including wineries - with or without hospitality rooms |
| 12 □ | Wholesale Distributors - including importers; no consumption on premises |
| 21 □ | Retail Stores - including package stores, markets and gas stations; no consumption on premises |
| 31 ■ | Bars - sports bars, taverns; greater than 60% liquor |
| 32 □ | Club - golf, civic, fraternal and social: ○ Public    ○ Non-Profit    ○ Members Only    # of Members: |
| 34 □ | Restaurants - liquor sales less than 40% of total food and liquor sales |
| 35 □ | Restaurants, Pubs and Taverns - liquor sales exceed 40% of total food and liquor sales, but less than 60% liquor |
| 36 □ | Nightclubs; gentleman's clubs |
| 37 □ | BYOB - based on annual number of adult attendees; on-premises consumption* *(See below requirement)* <br> Estimated # of annual adult attendees: |
| 37 □ | Caterers - based on the number of adult attendees, annual policy* *(See below requirement)* <br> Estimated # of annual adult attendees: |
| 38 □ | Annual Temporary Events - based on the number of annual adult attendees, annual policy* *(See below requirement)* <br> Estimated # of annual adult attendees: |
| 41 □ | Temporary Event - for single or multi-day events, weddings, parties, etc. <br> Estimated # of annual adult attendees: |

*For Classes 37 & 38 – A schedule of completed events with attendee counts from past 12 months is required with application.*

### POLICY LIMITS REQUESTED

○ $100,000 per person/ $200,000 per occurrence/ $200,000 aggregate **(applicable to Class Code 41 only)**

○ $250,000 per person/ $500,000 per occurrence/ $500,000 aggregate

○ $300,000 per person/ $600,000 per occurrence/ $600,000 aggregate *(applicable to RI only)*

○ $500,000 per person/ $1,000,000 per occurrence/ $1,000,000 aggregate

● $1,000,000 per person/ $1,000,000 per occurrence/ $2,000,000 aggregate

DocuSign Envelope ID: D1FB3EA0-2C39-42EE-8191-2F42F33E53C7

HMIC.COM
877-366-1140

| **BUSINESS SALES\*** | Projected | **\*SALES VERIFICATION DOCUMENTATION OPTIONS** |
|---|---|---|

**\*SALES VERIFICATION DOCUMENTATION OPTIONS**
Required for all quotes - select one of the below

Liquor Sales - On Premises Consumption $ ▮
Liquor Sales - Off Premises Consumption $ ▮
Food Sales - On Premises Consumption $ ▮
Food Sales - Off Premises / Catering $ ▮
Price Of Domestic Bottle of Beer: $ ▮        ☐ Bottle Service Available

☐ Print out of the insured's POS system for the past 12 months
☐ MassConnect – must provide % of liquor and food sales (MA Only)
☑ Accounting statement for the past 12 months (signed by licensed accountant)
☐ Pro Forma business plan (new ventures only)

---

**ENTERTAINMENT INFORMATION**

Are any of the following provided at this premises? (Check all that apply)                    ○ No Entertainment

☑ Darts        ☐ DJ with Dancing        ☐ Karaoke        ☐ Dancing        ☑ Other (please specify):
☑ Pool Tables  ☐ Live Bands             ☐ Mechanical Bulls ☐ Dance Floor   OCCASIONAL DJ, WITHOUT DANCING
☐ Pub Crawls   ☐ Drinking Games/Tournaments ☐ Happy Hour   ☐ Exotic Dancing

Number of days with live entertainment per week: 0          Number of days open per week: 7

---

**ALCOHOL TRAINING / SECURITY TRAINING INFORMATION**

Are any bouncers, doorpersons or security used?    ○ Yes  ● No    If yes, are they:  ○ Company Employees    ○ Contracted

Name of Alcohol Training Program (if applicable): RAMP

Written alcohol serving policy in place?
Have 100% of management and 100% of non-management servers been certified?    ● Yes ○ No     ● Yes ○ No

Name of Security Training Program (if applicable): _____

Have 100% of management and 100% of non-management servers been certified?    ○ Yes ○ No

---

**OPTIONAL ENDORSEMENTS**

**Assault & Battery Endorsement**                    **Property Damage Endorsement** ▮       **Terrorism** ☐
**Select A&B Sublimits**

☐ $100,000/$200,000/$200,000    ☐ $300,000/$600,000/$600,000 *(applicable to RI only)*    ☐ $1,000,000/$1,000,000/$2,000,000
☑ $250,000/$500,000/$500,000    ☐ $500,000/$1,000,000/$1,000,000

☐ I decline to purchase Assault & Battery Coverage

Additional Insured (applicable to liquor liability):

Name: _____ Address: _____ Interest: _____
Name: _____ Address: _____ Interest: _____

---

**CITATIONS AND / OR HEARINGS**

Has applicant had any citations or hearings with their local liquor licensing board?    ○ Yes  ● No

If yes, please provide details: _____

Are employees permitted to consume alcohol on the applicant's premises, prior to, during or after their shift ends?    ○ Yes  ● No

---

**ALL NEW APPLICANTS MUST COMPLETE THE INFORMATION BELOW**

Has business operated under any other name(s)? If so, please provide prior names: CONNOLLY'S PUB

Has applicant been fined or cited for ABC violations of law or ordinances related to illegal activities or the sale of alcohol?

○ Yes  ● No    If yes, please provide: Date: _____ Fine: _____ Penalty Assessed: _____

Has applicant or any active partner filed for bankruptcy?  ○ Yes  ● No

Within the past 5 years has the applicant's General Liability or Liquor Liability coverage been canceled or non-renewed?

○ Yes  ● No    If yes, please provide details: _____

Applicant's year of experience owning or managing similar type of operation: SINCE 1985

---

DocuSign Envelope ID: D1FB3EA0-2C39-42EE-8191-2F42F33E53C7

HMIC.COM
877-366-1140

## SECURITY INFORMATION

Security Camera's Outside Premises    ◉ Yes  ○ No    Length of time video is saved 14 DAYS

Security Camera's Inside Premises    ◉ Yes  ○ No    Length of time video is saved 14 DAYS

## PRIOR COVERAGE HISTORY

Has the applicant had any losses, claims, lawsuits or incidents in the past 3 years?    ○ Yes  ◉ No

If yes, please provide detailed loss explanation: _____

Has the insured had prior coverage?    ◉ Yes  ○ No

If yes, please provide prior carrier information:

| Year | Company | Premium |
|------|---------|---------|
| 2021-2023 | ATEGRITY | $7800 |
| 2018-2021 | AXIS | $ |

## RESTAURANT / TAVERN / BAR SUPPLEMENT

*The following information is only required if requesting General Liability Coverage and/or Property along with the ACORD 125 Commercial Insurance Application. ACORD 126 Commercial General Liability Application and ACORD 140 Property Section.

Square Footage of Building: 4800 _____    Seating Capacity of Restaurant: 44 _____

Square Footage of Restaurant: 3400 _____    Seating Capacity of Bar: 23

Number of Apartments (if applicable): 0 _____    Hours of Operation: NOON TO MIDNIGHT

Number of Bartenders Employed: 5 PT _____    Kitchen Closes at: 9P _____

Check all that apply:

☐ Stairwell(s)    ■ Grilling    ☐ Open Broiling    ☐ Catering/Banquet Operations
☐ Elevator    ■ Deep Fat Frying    ☐ Valet Parking    % of total receipts: _____
☐ Escalator(s)    ☐ Tableside Cooking    ☐ Off Premises Parking    ○ On Premises
                                            Square footage of    ○ Off Premises
                                            parking lot: _____

Any deliveries?  ○ Yes  ◉ No    Is there table service?  ○ Yes  ◉ No

Are adequate Emergency Exits provided and equipped with panic hardware?  ◉ Yes  ○ No

How many means of egress are there per floor? 2 _____ Are the exits clearly marked and illuminated? ◉ Yes  ○ No

Adequate smoke alarms installed? ◉ Yes  ○ No    Are they hardwired and interconnected?    ◉ Yes  ○ No

Any other on or off premises exposures not listed above? _____

Central Alarms? ◉

### KITCHEN FIRE PROTECTION

Volume of Cooking:    ☐ None    ◉ Limited    ☐ Full

UL 300 approved automatic extinguishing system covering all cooking surfaces?    ◉ Yes  ○ No

If no, please provide details: _____

Name of System: RANGE GUARD _____    ◉ Wet    ○ Dry

UL 300 system under maintenance contract? ◉ Yes  ○ No

How often is the system serviced? 2/YEAR _____

DocuSign Envelope ID: D1FB3EA0-2C39-42EE-8191-2F42F33E53C7

HMIC.COM
877-366-1140

## PAYMENT OPTION & DEPOSIT PREMIUM

### Check a Payment Option

◉ Payment in Full

○ Monthly (7) Installments (available only if total policy premium >$1,000) 25% deposit required
**For Insureds located in MA, RI, PA, NC and CT**
A finance charge of 1.25% of the remaining balance is applied per installment.

**For Insureds located in New Hampshire or Vermont**
A $10.00 installment fee is applied per installment.

**PAY YOUR BILL ONLINE at www.HMIC.com. All major credit cards and e-checks accepted.**

○ Pay as you pour – financed premium through First Insurance Funding (FIF). Selecting this option authorizes Hospitality to provide FIF
with your information to provide a quote.

---

### Third Party Exclusion Acknowledgement

I acknowledge the liquor liability policy has an Exclusion for Third Party or Contracted Security. Anyone that I hire (other than my employees) are not
covered under this policy. We will have no duty to defend or to pay damages for any claims or suits seeking damages. In order to protect your
interests, you need to be added your third party or contracted security companies insurance policy as an additional insured.

**Insured Signature:** _____  **Date:** 4/5/2023
EAC41475D3A340E

---

## AGENT'S / APPLICANT'S CERTIFICATION & AUTHORIZED SIGNATURES

Whereupon the agent/applicant, under the pain and penalty of perjury, hereby acknowledges this application to be true and complete to the best of the
agent's/applicant's knowledge and belief. By signing this application, we certify that the information contained herein is true and accurate to the best of
our knowledge and belief, and we acknowledge that providing truthful and accurate information is a condition precedent to obtaining liquor liability insur-
ance. We further acknowledge that any insurance which may be issued upon receipt of this application will be issued based upon the company's reliance
on the information we have provided, and if such information is misleading or false, the company may void the insurance issued pursuant to this applica-
tion. By signing this application, the applicant also hereby authorizes and directs each entity from whom the applicant purchases alcoholic beverages to
provide to the company or its designated auditor all information regarding the applicant's retail and wholesale purchases of alcoholic beverages.

### 1. APPLICANT'S SECTION
Sam Arbitman

Applicant's Name: _____  Title: _____

Fed ID# / Soc. Sec. #: _____  Telephone: _____

Email Address: _____

**Applicant's Signature: X** _____  **Date:** 4/5/2023
EAC41475D3A340E

### 2. AGENT / BROKER'S SECTION

Name of Agency: JOHN P. MEEHAN AGENCY  Address: _____

Name of Agent: _____

Telephone: _____  Fax: _____

Email Address: _____

**Agent's Signature:** X *John J Meehan*  **Date:** 4/5/2023
CF74552A95A145B

**Fraud Statement:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance
or statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact
material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

---

# **Exhibit I**

To Complaint for Declaratory Judgment
Hospitality Insurance Company v. Sam 939 LLC, et al.

**DocuSign**

## Certificate Of Completion

Envelope Id: D1FB3EA02C3942EE81912F42F33E53C7                                    Status: Completed
Subject: SAM 939 LLC & ZAC 939 LLC -- Insurance Renewal Application
Source Envelope:
Document Pages: 31                          Signatures: 18                         Envelope Originator:
Certificate Pages: 3                        Initials: 0                            John J Meehan
AutoNav: Enabled                                                                   1254 W Chester Pike
EnvelopeId Stamping: Enabled                                                       Suite 102
Time Zone: (UTC-08:00) Pacific Time (US & Canada)                                  Havertown, PA  19083
                                                                                   jjmeehan@meehaninsurance.com
                                                                                   IP Address: 205.216.28.102

## Record Tracking

Status: Original                            Holder: John J Meehan                  Location: DocuSign
         4/5/2023 7:15:04 AM                        jjmeehan@meehanInsurance.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| John J Meehan<br>jjmeehan@meehaninsurance.com<br>Security Level:<br>.Email<br>4/5/2023 7:21:37 AM | *John J Meehan*<br>CF74552A95A145B...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 108.52.242.58 | Sent: 4/5/2023 7:21:20 AM<br>Viewed: 4/5/2023 7:21:41 AM<br>Signed: 4/5/2023 7:21:52 AM |

**Electronic Record and Signature Disclosure:**
    Accepted: 8/31/2017 7:04:42 AM
    ID: 1a7fc635-b7d7-466a-b725-c510cfbabe29

| | | |
|---|---|---|
| Sam Arbitman<br>sam.arbitman@gmail.com<br>Security Level:<br>.Email<br>4/5/2023 7:26:39 AM | *[signature]*<br>EAC41475D3A340E...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: 174.198.0.63<br>Signed using mobile | Sent: 4/5/2023 7:21:20 AM<br>Viewed: 4/5/2023 7:26:48 AM<br>Signed: 4/5/2023 7:27:10 AM |

**Electronic Record and Signature Disclosure:**
    Accepted: 4/9/2020 1:36:31 PM
    ID: 7fd9fd4b-871d-405f-b4db-5b70b16f5456

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Saracino, Robert<br>ars318@gmail.com<br>Security Level: Email, Account Authentication<br>(None) | **COPIED** | Sent: 4/5/2023 7:27:12 AM |

**Electronic Record and Signature Disclosure:**
    Accepted: 4/4/2022 11:53:09 AM
    ID: 7f21a419-d05a-4b9e-8a47-2d5d4f6b662f

CONFIDENTIAL
MA00284

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 4/5/2023 7:21:20 AM |
| Certified Delivered | Security Checked | 4/5/2023 7:26:48 AM |
| Signing Complete | Security Checked | 4/5/2023 7:27:10 AM |
| Completed | Security Checked | 4/5/2023 7:27:12 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

| Electronic Record and Signature Disclosure |
|---|

CONFIDENTIAL
MA00285

# Exhibit J

To Complaint for Declaratory Judgment
Hospitality Insurance Company v. Sam 939 LLC, et al.

## **CERTIFICATION**

I, Stephanie Connon, as representative of <u>Hospitality  Insurance Company</u>, certify that the attached documents are a true and correct copy of Policy Number CPP3702631, with policy effective dates of 04/09/2023 to 04/09/2024.


Signature: _Stephanie Coe_

Title: Senior Vice President of Claim Operations, General Counsel and Secretary

Date: 11/17/2025


SUBSCRIBED and SWORN TO before me on this _17th_ day of _November 2025_.


_Susan B. Holland_
Notary Public in and for the
State of _Massachusetts_
County of _Worcester_

My Commission Expires: _March 23, 2029_



106 Southville Road - Southborough, MA 01772
Toll Free (877) 366-1140 – FAX: (508)836-4940

# COMMON POLICY DECLARATIONS
# Hospitality Insurance Company

NEW BUSINESS DECLARATIONS

| POLICY NO:  CPP3702631 |
| --- |

| NAMED INSURED AND MAILING ADDRESS | AGENT AND MAILING ADDRESS |
| --- | --- |
| **SAM 939 LLC DBA Maxi's**<br>939 MARKET ST # 943<br>MARCUS HOOK, PA 19061-4504 | **John P. Meehan Agency, Inc.**<br>1 N. Belfield Ave<br>Havertown, PA 19083 |

Agent Code:  1904

POLICY PERIOD: FROM  **04/09/2023** TO  **04/09/2024** AT 12:00 AM STANDARD TIME
AT THE INSURED'S MAILING ADDRESS SHOWN ABOVE

**DESCRIPTION OF BUSINESS:**       Bar
**FORM OF BUSINESS:**              **Limited Liability Company**

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT. | |
| --- | --- |
| COMMERCIAL GENERAL LIABILITY COVERAGE PART | $1,823 |
| LIQUOR LIABILITY COVERAGE PART | $5,128 |
| **TOTAL** | **$6,951** |

**FORMS AND ENDORSMENTS APPLICABLE TO ALL COVERAGE PARTS**

Applicable Forms and Endorsements are omitted if shown in specific Coverage Part/Coverage Form Declarations.

| Number | Edition | Description |
|---|---|---|
| IL P 001 | 01 04 | U.S. Treasury Department's Office of Foreign Assets Control (OFAC) - Advisory Notice to Policyholders |
| IL 00 03 | 09 08 | Calculation of Premium |
| IL 00 17 | 11 98 | Common Policy Conditions |
| TS 01 15 | HIC | Terrorism Insurance Premium Disclosure and Opportunity to Reject |
| IL 02 46 | 09 07 | PA Cancellation and NonRenewal |
| IL 09 10 | 07 02 | PA Notice |
| CG 21 73 | 01 15 | Exclusion of Certified Acts of Terrorism |
| CG 21 75 | 01 15 | Exclusion of Certified Acts of Terrorism and Exclusion of Other Acts of Terrorism Committed Outside the United States |
| CG 21 76 | 01 15 | Exclusion of Punitive Damages Related to a Certified Act of Terrorism |
| IL 00 21 | 09 08 | Nuclear Energy Liability Exclusion |

**COUNTERSIGNED AT:** Southborough, MA      **DATE:** 04/10/2023      **BY:**

**THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.**



106 Southville Road- Southborough, MA 01772
Toll Free (877) 366-1140 – FAX: (508)836-4940

# COMMERCIAL GENERAL LIABILITY COVERAGE
# Hospitality Insurance Company
NEW BUSINESS DECLARATIONS

| POLICY NO:  CPP3702631 |
|---|

| NAMED INSURED AND MAILING ADDRESS | AGENT AND MAILING ADDRESS |
|---|---|
| **SAM 939 LLC DBA Maxi's**<br>939 MARKET ST # 943<br>MARCUS HOOK, PA 19061-4504 | **John P. Meehan Agency, Inc.**<br>1 N. Belfield Ave<br>Havertown, PA 19083 |

Agent Code:  1904

POLICY PERIOD: FROM **04/09/2023**  TO **04/09/2024** AT 12:00 AM STANDARD TIME
AT THE INSURED'S MAILING ADDRESS SHOWN ABOVE

**DESCRIPTION OF BUSINESS:**      **Bar**
**FORM OF BUSINESS:**               **Limited Liability Company**

**IN RETURN FOR THE PAYMENT OF PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY,
WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| LIMITS OF INSURANCE | |
|---|---:|
| Each Occurrence Limit | $1,000,000 |
| Legal Liability to Premises Rented to You Limit – Any one premises | $100,000 |
| Medical Expense Limit – Any one person | $5,000 |
| Personal and Advertising Injury Limit – Any one person or organization | $1,000,000 |
| General Aggregate Limit | $2,000,000 |
| Products/Completed Operations Aggregate Limit | $2,000,000 |

COMMERCIAL GENERAL LIABILITY COVERAGE
DECLARATIONS PAGE (Continued)

**POLICY FORMS AND ENDORSEMENTS**

Applicable Forms and Endorsements are omitted if shown in specific Coverage Part/Coverage Form Declarations.

| Number | Edition | Description |
|---|---|---|
| HIC CG 00 01 | 04 13 | Commercial General Liability Coverage Form |
| CG 200 | 10 08 | Assault and Battery Exclusion |
| CG 24 07 | 01 96 | Products/Completed Operations Hazard Redefined |
| CG 21 01 | 11 85 | Exclusion - Athletic or Sports Participants |
| CG 21 32 | 05 09 | Communicable Disease Exclusion |
| CG 202 | 11 20 | Exclusion - Lead Liability |
| CG 203 | 11 20 | Exclusion - Asbestos |
| CG 204 | 11 20 | Exclusion - Contractors, Subcontractors and Entertainers |
| CG 205 | 11 20 | Exclusion - Infringement of Copyright, Patent, Trademark or Trade Secrets - Revised |
| CG 21 47 | 12 07 | Employment - Related Practices Exclusion |
| CG 21 49 | 09 99 | Total Pollution Exclusion Endorsement |
| CG 21 67 | 12 04 | Fungi or Bacteria Exclusion |
| CG 21 71 | 01 15 | Exclusion of Other Acts of Terrorism Committed Outside the United States; Cap on Losses from Certified Acts of Terrorism |
| CG 21 90 | 01 06 | Exclusion of Terrorism |
| CG 21 96 | 03 05 | Silica or Silica-Related Dust Exclusion |
| CG 22 31 | 07 98 | Exclusion - Riot, Civil Commotion or Mob Action - Governmental Subdivisions |

COMMERCIAL GENERAL LIABILITY COVERAGE
DECLARATIONS PAGE (Continued)

| | |
|---|---|
| LOCATION NUMBER: | 1 |
| LOCATION ADDRESS: | 939 MARKET ST # 943, MARCUS HOOK, PA 19061-4504 |
| LOCATION DESCRIPTION: | Bar |

| CLASSIFICATION | CODE NO. | EXPOSURE/ PREMIUM BASE |
|---|---|---|
| Restaurants - with sale of alcoholic beverages that 75% or more of total annual receipts of the restaurants - bar service only (no tables): without dance floor | 16941 | ▉ / Gross Sales |
| Beverage Stores - soft drinks and beer | 10146 | ▉ / Gross Sales |
| Coverage | | Premium |
| General Liability | | $1,823 |
| **Total Location Premium** | | **$1,823** |

**LOCATION FORMS AND ENDORSEMENTS**

| Number | Edition | Description |
|---|---|---|
| CG 21 44 | 04 17 | Limitation of Coverage To Designated Premises or Project |

# COMMERCIAL GENERAL LIABILITY INSURANCE POLICY

**(Occurrence Form)**



106 Southville Road
Southborough, MA 01772
(508) 366-1140

THIS POLICY JACKET WITH THE COMMERCIAL GENERAL LIABILITY POLICY FORM, DECLARATIONS PAGE AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETES THIS POLICY.

FORM # CGL-PJ-100 04/13

# Commercial General Liability Insurance Policy

## Table of Contents

Page

Section I - Coverages

Coverage A - Bodily Injury and Property Damage Liability                1

Coverage B - Personal and Advertising Injury Liability                6

Coverage C - Medical Payments                8

Supplemental Payments- Coverage A and B                8

Section II -Who is an Insured                9

Section III - Limits of Insurance                10

Section IV - Commercial General Liability Conditions                10

Section V - Definitions                13

COMMERCIAL GENERAL LIABILITY
CG 00 01 04 13

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** - Definitions.

## SECTION I − COVERAGES

## COVERAGE A − BODILY INJURY AND PROPERTY DAMAGE LIABILITY

### 1. Insuring Agreement

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

    **(1)** The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

    **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B.**

**b.** This insurance applies to "bodily injury" and "property damage" only if:

    **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

    **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

    **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

    **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

    **(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

    **(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

(a) The supervision, hiring, employment, training or monitoring of others by that insured; or

(b) Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1), (2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© Insurance Services Office, Inc., 2012

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

 © Insurance Services Office, Inc., 2012

**(2)** Any loss, cost or expense arising out of any:

    **(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

    **(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

    However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

    **(a)** Less than 26 feet long; and

    **(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

    **(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

    **(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

© Insurance Services Office, Inc., 2012

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

    © Insurance Services Office, Inc., 2012

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

© Insurance Services Office, Inc., 2012

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of web sites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

## COVERAGE C – MEDICAL PAYMENTS

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(a) The accident takes place in the "coverage territory" and during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A.**

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

© Insurance Services Office, Inc., 2012

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

  **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

    **(1)** "Bodily injury" or "personal and advertising injury":

      **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

      **(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

      **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

      **(d)** Arising out of his or her providing or failing to provide professional health care services.

    **(2)** "Property damage" to property:

      **(a)** Owned, occupied or used by;

      **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

    you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

  **b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

  **c.** Any person or organization having proper temporary custody of your property if you die, but only:

    **(1)** With respect to liability arising out of the maintenance or use of that property; and

    **(2)** Until your legal representative has been appointed.

  **d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

  **a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

  **b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

  **c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

  **a.** Insureds;

  **b.** Claims made or "suits" brought; or

  **c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

  **a.** Medical expenses under Coverage **C;**

  **b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

  **c.** Damages under Coverage **B.**

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

a. Damages under Coverage **A;** and

b. Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

### 1. Bankruptcy

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

### 2. Duties In The Event Of Occurrence, Offense, Claim Or Suit

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

### 3. Legal Action Against Us

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

(i)   That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(ii)  That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(iii) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(iv)  If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

c. All other parts of the world if the injury or damage arises out of:

(1) Goods or products made or sold by you in the territory described in Paragraph **a.** above;

(2) The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

(3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

**9.** "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

(2) The providing of or failure to provide warnings or instructions.

© Insurance Services Office, Inc., 2012

As provided by statute, Hospitality Insurance Company maintains a complaint policy which provides that, should you or a consumer have a complaint against HIC, you should write Hospitality Insurance Company, 106 Southville Rd., Southborough, MA  01772 – Attention Office Manager who will forward it to the appropriate Sr. Vice President of the Company for a timely response.

**In Witness Whereof, we have caused this Policy to be executed and attested, and if required by state law, this policy shall not be valid unless countersigned by our authorized representative.**

**William T. McGrail**
**Chairman of the Board**

**Richard E. Welch Jr.**
**President and CEO**

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")
# ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

© ISO Properties, Inc., 2004

**Hospitality Insurance Company**

## Assault and/or Battery Exclusion

**The coverage under this policy does not apply to any claim, suit, cost or expense arising out of assault and/or battery, or out of any act or omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of any Insured or Insured's employees, patrons, or any other person.  Nor does this insurance apply with respect to any charges or allegations of negligent hiring, training, placement or supervision. Furthermore, assault and/or battery includes "bodily injury" resulting from the use of reasonable force to protect persons or property.  The sentence "This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property" is deleted from the Commercial General Liability Coverage Form, Section I – Coverage's, Item 2. Exclusions, a. Expected or Intended Injury.**

Includes copyrighted material of Insurance Services Office, Inc. with its permission

IL 00 03 09 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

      CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
      COMMERCIAL AUTOMOBILE COVERAGE PART
      COMMERCIAL GENERAL LIABILITY COVERAGE PART
      COMMERCIAL INLAND MARINE COVERAGE PART
      COMMERCIAL PROPERTY COVERAGE PART
      CRIME AND FIDELITY COVERAGE PART
      EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
      EQUIPMENT BREAKDOWN COVERAGE PART
      FARM COVERAGE PART
      MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
      OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
      POLLUTION LIABILITY COVERAGE PART
      PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
      RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

© ISO Properties, Inc., 2007
□

POLICY NUMBER:                                          **COMMERCIAL GENERAL LIABILITY**
                                                                   **CG 21 44 04 17**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITATION OF COVERAGE TO DESIGNATED PREMISES, PROJECT OR OPERATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Premises: |
| --- |
| Project Or Operation: |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A.** If this endorsement is attached to Commercial General Liability Coverage Form **CG 00 01**, the provisions under this Paragraph **A.** apply:

1. Paragraph **1.b.** under **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

   **b.** This insurance applies to "bodily injury" and "property damage" caused by an "occurrence" that takes place in the "coverage territory" only if:

   **(1)** The "bodily injury" or "property damage":

   **(a)** Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

   **(b)** Arises out of the project or operation shown in the Schedule;

   **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

   **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

2. Paragraph **1.b.** under **Section I – Coverage B – Personal And Advertising Injury Liability** is replaced by the following:

   **b.** This insurance applies to "personal and advertising injury" caused by an offense committed in the "coverage territory" but only if:

   **(1)** The offense arises out of your business:

   **(a)** Performed on the premises shown in the Schedule; or

**(b)** In connection with the project or operation shown in the Schedule; and

**(2)** The offense was committed during the policy period.

However, with respect to Paragraph **1.b.(1)(a)** of this Insuring Agreement, if the "personal and advertising injury" is caused by:

**(1)** False arrest, detention or imprisonment; or

**(2)** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

then such offense must arise out of your business performed on the premises shown in the Schedule and the offense must have been committed on the premises shown in the Schedule or the grounds and structures appurtenant to those premises.

**3.** Paragraph **1.a.** under **Section I – Coverage C – Medical Payments** is replaced by the following:

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident that takes place in the "coverage territory" if the "bodily injury":

**(1)** Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

**(2)** Arises out of the project or operation shown in the Schedule;

provided that:

**(a)** The accident takes place during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**B.** If this endorsement is attached to Commercial General Liability Coverage Form **CG 00 02,** the provisions under this Paragraph **B.** apply:

**1.** Paragraph **1.b.** under **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**b.** This insurance applies to "bodily injury" and "property damage" caused by an "occurrence" that takes place in the "coverage territory" only if:

**(1)** The "bodily injury" or "property damage":

**(a)** Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

**(b)** Arises out of the project or operation shown in the Schedule;

**(2)** The "bodily injury" or "property damage" did not occur before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and

**(3)** A claim for damages because of the "bodily injury" or "property damage" is first made against any insured, in accordance with Paragraph **1.c.** of this Insuring Agreement, during the policy period or any Extended Reporting Period we provide under Section **V** – Extended Reporting Periods.

**2.** Paragraph **1.b.** under **Section I – Coverage B – Personal And Advertising Injury Liability** is replaced by the following:

**b.** This insurance applies to "personal and advertising injury" caused by an offense committed in the "coverage territory" but only if:

**(1)** The offense arises out of your business:

**(a)** Performed on the premises shown in the Schedule; or

**(b)** In connection with the project or operation shown in the Schedule;

**(2)** The offense was not committed before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and

 © Insurance Services Office, Inc., 2016 CG 21 44 04 17

**(3)** A claim for damages because of the "personal and advertising injury" is first made against any insured, in accordance with Paragraph **1.c.** of this Insuring Agreement, during the policy period or any Extended Reporting Period we provide under Section **V – Extended Reporting Periods.**

However, with respect to Paragraph **1.b.(1)(a)** of this Insuring Agreement, if the "personal and advertising injury" is caused by:

**(1)** False arrest, detention or imprisonment; or

**(2)** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

then such offense must arise out of your business performed on the premises shown in the Schedule and the offense must have been committed on the premises shown in the Schedule or the grounds and structures appurtenant to those premises.

**3.** Paragraph **1.a.** under **Section I – Coverage C – Medical Payments** is replaced by the following:

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident that takes place in the "coverage territory" if the "bodily injury":

**(1)** Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

**(2)** Arises out of the project or operation shown in the Schedule;

provided that:

**(a)** The accident takes place during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

 © Insurance Services Office, Inc., 2016

POLICY NUMBER:                                    **COMMERCIAL GENERAL LIABILITY**
                                                              **CG 24 07 01 96**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PRODUCTS/COMPLETED OPERATIONS HAZARD REDEFINED

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

**Description of Premises and Operations:**

Applies to all operations described in the Declarations.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to "bodily injury" or "property damage" arising out of "your products" manufactured, sold, handled or distributed:

**1.** On, from or in connection with the use of any premises described in the Schedule, or

**2.** In connection with the conduct of any operation described in the Schedule, when conducted by you or on your behalf,

Paragraph **a.** of the definition of "Products-completed operations hazard" in the DEFINITIONS Section is replaced by the following:

"Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" that arises out of "your products" if the "bodily injury" or "property damage" occurs after you have relinquished possession of those products.

POLICY NUMBER:                                         **COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – ATHLETIC OR SPORTS PARTICIPANTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

**SCHEDULE**

**Description of Operations:**

Applies to all operations described in the Declarations.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any operations shown in the Schedule, this insurance does not apply to "bodily injury" to any person while practicing for or participating in any sports or athletic contest or exhibition that you sponsor.

COMMERCIAL GENERAL LIABILITY
CG 21 32 05 09

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# COMMUNICABLE DISEASE EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Communicable Disease**

"Bodily injury" or "property damage" arising out of the actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**a.** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

**b.** Testing for a communicable disease;

**c.** Failure to prevent the spread of the disease; or

**d.** Failure to report the disease to authorities.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Communicable Disease**

"Personal and advertising injury" arising out of the actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**a.** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

**b.** Testing for a communicable disease;

**c.** Failure to prevent the spread of the disease; or

**d.** Failure to report the disease to authorities.

 © Insurance Services Office, Inc., 2008 ☐

CG 202 11 20

**Hospitality Insurance Company**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – LEAD LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The following is added to **Section I – Coverages, Coverage A – Bodily Injury and Property Damage Liability, 2. Exclusions; Section I – Coverages, Coverage B – Personal And Advertising Injury Liability, 2. Exclusions; and Section I – Coverages, Coverage C – Medical Payments, 2. Exclusions:**

This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury", "medical payments" or any other loss, cost or expense:

    (1)  caused by, related to, arising out of or in any way connected to the actual, alleged, suspected or threatened exposure to, presence or existence of, or ingestion, inhalation or absorption of lead in any form or quantity; or

    (2)  arising out of any request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, remediate or dispose of, or in any way respond to, or assess the effects of lead in any form; or

    (3)  arising out of any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of lead in any form.

All other terms and conditions of this policy shall remain unchanged.

CG 203 11 20

**Hospitality Insurance Company**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ASBESTOS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The following is added to **Section I – Coverages, Coverage A – Bodily Injury and Property Damage Liability, 2. Exclusions; Section I – Coverages, Coverage B – Personal And Advertising Injury Liability, 2. Exclusions; and Section I – Coverages, Coverage C – Medical Payments, 2. Exclusions:**

This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury", "medical payments" or any other loss, cost or expense:

(1) caused by, related to, arising out of or in any way connected to the actual, alleged, suspected or threatened exposure to, presence or existence of, or ingestion, inhalation or absorption of asbestos in any form or quantity; or

(2) arising out of any request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, remediate or dispose of, or in any way respond to, or assess the effects of asbestos in any form; or

(3) arising out of any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of asbestos in any form.

As used in this exclusion, asbestos includes but is not limited to any substance, regardless of its form or state, containing asbestos.

All other terms and conditions of this policy shall remain unchanged.

Includes copyrighted material of ISO, Inc. with its permission.          CG 203 11 20

CG 204 11 20

**Hospitality Insurance Company**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – CONTRACTORS, SUBCONTRACTORS AND ENTERTAINERS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The following is added to **Section I – Coverages, Coverage A – Bodily Injury and Property Damage Liability, 2. Exclusions; Section I – Coverages, Coverage B – Personal And Advertising Injury Liability, 2. Exclusions; and Section I – Coverages, Coverage C – Medical Payments, 2. Exclusions:**

This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury", "medical payments" or any other loss, cost or expense arising out of:

(1) operations performed, acts or omissions by any independent contractor, subcontractor or any "employee" of any contractor or subcontractor.

Operations performed include security, door person, crowd control, entertainers of any kind or promoters of any kind.

This exclusion applies whether the insured may be liable as an employer or in any other capacity.

All other terms and conditions of this policy shall remain unchanged.

CG 205 11 20

**Hospitality Insurance Company**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – INFRINGEMENT OF COPYRIGHT, PATENT, TRADEMARK OR TRADE SECRETS - REVISED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**Section I – Coverages, Coverage B – Personal And Advertising Injury Liability, 2. Exclusions, i. Infringement Of Copyright, Patent, Trademark or Trade Secret** is replaced by the following:

**i. Infringement Of Copyright, Patent, Trademark or Trade Secret**

This insurance does not apply to any loss, cost or expense arising out of or in any way connected to the theft, misappropriation, misuse, violation, infringement or contributory infringement to any form of intellectual property, including but not limited to:

(1)  Copyright, slogan or title;
(2)  Patent;
(3)  Trademark, service mark, collective mark, or certification mark, including without limitation any word, name, symbol, device or any combination thereof used to identify or distinguish the origin of a good, product or service;
(4)  Trade secret;
(5)  Trade dress including without limitation, any shape, color, design or appearance used to distinguish the origin of a good, product or service;
(6)  False designation of the origin of a good, product or service;
(7)  The right of privacy;
(8)  The use of another's advertising idea in your "advertisement";
(9)  Any unauthorized use of a person's image or identity;
(10) Reputation;
(11) Actual or alleged failure to pay any royalties, fees, commissions or charges; or
(12) Any other intellectual property rights recognized or implied by law.

All other terms and conditions of this policy shall remain unchanged.

COMMERCIAL GENERAL LIABILITY
CG 21 47 12 07

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

COMMERCIAL GENERAL LIABILITY
CG 21 49 09 99

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

<div align="right">

**COMMERCIAL GENERAL LIABILITY**
**CG 21 67 12 04**

</div>

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

COMMERCIAL GENERAL LIABILITY
CG 21 71 01 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE UNITED STATES; CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of an "other act of terrorism" that is committed outside of the United States (including its territories and possessions and Puerto Rico), but within the "coverage territory". However, this exclusion applies only when one or more of the following are attributed to such act:

**1.** The total of insured damage to all types of property exceeds $25,000,000 (valued in U.S. dollars). In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**2.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

**a.** Physical injury that involves a substantial risk of death; or

**b.** Protracted and obvious physical disfigurement; or

**c.** Protracted loss of or impairment of the function of a bodily member or organ; or

**3.** The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**4.** The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**5.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs **1.** and **2.** describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

  © Insurance Services Office, Inc., 2015

2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

   a. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act;

   b. The act resulted in damage:

      (1) Within the United States (including its territories and possessions and Puerto Rico); or

      (2) Outside of the United States in the case of:

         (a) An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

         (b) The premises of any United States mission; and

   c. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

3. "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "certified act of terrorism".

   Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

C. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

D. If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

  © Insurance Services Office, Inc., 2015  CG 21 71 01 15

<div align="right">

**COMMERCIAL GENERAL LIABILITY**
**CG 21 90 01 06**

</div>

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following definitions are added and apply under this endorsement wherever the term terrorism, or the phrase any injury or damage, are enclosed in quotation marks:

**1.** "Terrorism" means activities against persons, organizations or property of any nature:

**a.** That involve the following or preparation for the following:

**(1)** Use or threat of force or violence; or

**(2)** Commission or threat of a dangerous act; or

**(3)** Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

**b.** When one or both of the following applies:

**(1)** The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

**(2)** It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

**2.** "Any injury or damage" means any injury or damage covered under any Coverage Part or Policy to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part or Policy.

**B.** The following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for "any injury or damage" caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". "Any injury or damage" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage. **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":**

**1.** The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

**2.** Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

**3.** The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**4.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials; or

**5.** The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**6.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

  **a.** Physical injury that involves a substantial risk of death; or

  **b.** Protracted and obvious physical disfigurement; or

  **c.** Protracted loss of or impairment of the function of a bodily member or organ.

Multiple incidents of "terrorism" which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the thresholds in Paragraphs **B.5.** or **B.6.** are exceeded.

With respect to this Exclusion, Paragraphs **B.5.** and **B.6.** describe the threshold used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of "terrorism", there is no coverage under this Coverage Part or Policy.

In the event of any incident of "terrorism" that is not subject to this Exclusion, coverage does not apply to "any injury or damage" that is otherwise excluded under this Coverage Part or Policy.

© ISO Properties, Inc., 2004

**CG 21 90 01 06**    ◻

COMMERCIAL GENERAL LIABILITY
CG 21 96 03 05

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

   **2. Exclusions**

   This insurance does not apply to:

   **Silica Or Silica-Related Dust**

   **a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

   **b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

   **c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

   **2. Exclusions**

   This insurance does not apply to:

   **Silica Or Silica-Related Dust**

   **a.** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

   **b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

   **1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

   **2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

COMMERCIAL GENERAL LIABILITY
CG 22 31 07 98

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – RIOT, CIVIL COMMOTION OR MOB ACTION – GOVERNMENTAL SUBDIVISIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

1. Riot, civil commotion or mob action; or
2. Any act or omission in connection with the prevention or suppression of a riot, civil commotion or mob action.

Copyright, Insurance Services Office, Inc.,  1997     ☐



**HOSPITALITY®**
Insurance Company
Taking the Risk Out of Hospitality

106 Southville Road- Southborough, MA 01772
Toll Free (877) 366-1140 – FAX: (508)836-4940

# LIQUOR LIABILITY COVERAGE
### NEW BUSINESS DECLARATIONS

| POLICY NO:  CPP3702631 |
|---|

| NAMED INSURED AND MAILING ADDRESS | AGENT AND MAILING ADDRESS |
|---|---|
| **SAM 939 LLC DBA Maxi's**<br>939 MARKET ST # 943<br>MARCUS HOOK, PA 19061-4504 | **John P. Meehan Agency, Inc.**<br>1 N. Belfield Ave<br>Havertown, PA 19083 |

Agent Code:  1904

POLICY PERIOD: FROM **04/09/2023** TO **04/09/2024** AT 12:00 AM STANDARD TIME
AT THE INSURED'S MAILING ADDRESS SHOWN ABOVE

**IN RETURN FOR THE PAYMENT OF PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**DESCRIPTION OF BUSINESS:**     **Bar**
**FORM OF BUSINESS:**          **Limited Liability Company**

| Liquor Liability Total Premium | $5,128 |
|---|---|

### POLICY FORMS AND ENDORSEMENTS

Applicable Forms and Endorsements are omitted if shown in specific Coverage Part/Coverage Form Declarations.

| Number | Edition | Description |
|---|---|---|
| LL 100 | 2023 | Liquor Liability Coverage Form |
| LL 210 PA | 06 19 | Pennsylvania Policy Amendment |

LIQUOR LIABILITY COVERAGE
DECLARATIONS PAGE (Continued)

| DESCRIPTON OF BUSINESS | | | | |
|---|---|---|---|---|
| LOCATION NUMBER: | 1 | | | |
| LOCATION ADDRESS: | 939 MARKET ST # 943, MARCUS HOOK, PA, 19061-4504 | | | |
| LOCATION DESCRIPTION: | Bar | | | |
| **LIMITS OF INSURANCE** | | | | |
| Per Person Occurrence Limit | | | | $1,000,000 |
| Per Occurrence Limit | | | | $1,000,000 |
| Aggregate Limit | | | | $2,000,000 |
| CLASSIFICATION | CODE | PREMIUM BASE | EXPOSURE | PREMIUM |
| Bar/Taverns | 31 | Liquor Sales | ███████ | $3,489 |
| Retail Store | 21 | Liquor Sales | ███████ | $700 |
| **Coverage** | | | | **Premium** |
| Liquor Liability | | | | $4,189 |
| Assault and Battery Endorsement | | | | $735 |
| Property Damage Endorsement (Included within the Policy Limits) | | | | $204 |
| | | | **Total Location Premium** | **$5,128** |
| This premium includes the following modifications:<br>Association Discount<br>Alcohol Awareness Discount<br>GL Coverage Discount | | | | |

### LOCATION FORMS AND ENDORSEMENTS

| Number | Edition | Description |
|---|---|---|
| LL 205 2 | 05 19 | Limited Coverage for Assault & Battery - $250,000/$500,000/$500,000 |
| LL 201 | 05 19 | Property Damage Endorsement |
| LL 217 | 2023 | Exclusion – Contractors, Subcontractors And Entertainers |
| LL 214 | 2023 | Exclusion - Third Party or Contracted Security |



# LIQUOR

# LIABILITY

# INSURANCE POLICY

**(Occurrence Form)**

**A nonparticipating policy**

**THIS POLICY JACKET WITH THE LIQUOR LIABILITY POLICY FORM, DECLARATIONS PAGE AND
ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF; COMPLETES THIS POLICY**

**Hospitality Insurance Company
106 Southville Road
Southborough, MA 01772
877-366-1140**

LL – 100 (ed 2023)

# Liquor Liability Insurance Policy

## Table of Contents

|  | Page |
|---|---|
| **Introduction** | **3** |
| **Liquor Liability Coverage** | **3** |
| **Who Is an Insured** | **6** |
| **Limits of Insurance** | **6** |
| **Conditions** | **7** |
| **Definitions** | **10** |

LL – 100 (ed 2023)

**LIQUOR LIABILITY INSURANCE POLICY**

**HOSPITALITY INSURANCE COMPANY**

In consideration of the payment of the premium, in reliance upon the statements in the Declarations made a part hereof, and subject to all the terms of this Policy, Hospitality Insurance Company agrees with the Insured as follows:

**Introduction**

Various provisions in this Policy define and restrict your coverage.  Read the entire Policy carefully to determine your rights and duties and what is and is not covered.

Throughout this Policy the words "you" and "your" refer to the Insured designated in the Declarations. The words "we" and "us" and "our" and "the Company" refer to Hospitality Insurance Company which provides this insurance.

The word "Insured" means any person or organization qualifying as such under SECTION II – WHO IS AN INSURED.

Other words and phrases that appear in quotation marks also have special meaning, which are explained in SECTION V – DEFINITIONS.

**SECTION I – LIQUOR LIABILITY COVERAGE**

    **A.  INSURING AGREEMENT.**

        We will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as "damages" because of "bodily injury" to any person, caused by an "occurrence",  if such liability is imposed upon the Insured by reason of the negligence of the Insured in the distribution, sale or serving of any alcoholic beverage at the "Insured premises" to an intoxicated person or minor, or in violation of any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.  We shall have the right and duty to defend any "suit" against the Insured seeking such "damages", even if the allegations of the "suit" are groundless, false or fraudulent, and may make such investigation and settlement of any claim or "suit" as we deem expedient.  However, we will have no duty to defend the Insured against any "suit" seeking damages for "bodily injury" to which this insurance does not apply.  This insurance applies only to "occurrences" which result in "bodily injury" during the Policy period in the "coverage territory".  We have no other obligation or liability to pay any other sums or perform any other acts or services unless they are explicitly provided for under SUPPLEMENTARY PAYMENTS.

3

Includes copyrighted material of Insurance Services, Office Inc. with its permission

**B.   EXCLUSIONS**

This insurance **DOES NOT APPLY** to:

1.   **Your Product**

     "Bodily injury" arising out of "your product", or reliance upon a representation or warranty made at any time with respect to "your product".  This exclusion does not apply to "bodily injury" for which the Insured may be held liable by reason of:
     (a)  causing or contributing to the intoxication of any person;
     (b)  the distribution, sale or serving of alcoholic beverages to any person under the legal drinking age or under the influence of alcohol; or
     (c)  except as otherwise provided in this Policy, violation of any statute, ordinance or regulation relating to the distribution, sale, service or use of alcoholic beverages.

2.   **Liquor License Not in Effect**

     "Bodily injury" arising out of the distribution, sale or serving of any alcoholic beverage while any required license is suspended or is not in effect, or after such license expires, is cancelled or revoked.

3.   **Expected or Intended "Bodily Injury"**

     "Bodily injury" expected or intended from the standpoint of any insured.  This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

4.   **Workers' Compensation and Similar Laws**

     Any obligation of the Insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

5.   **Employer's Liability**

     Bodily injury" to an employee of the Insured or to the spouse, child, parent, brother or sister of that employee, arising out of and in the course of employment of the employee by the Insured, or arising out of and in the course of performing duties related to the conduct of the Insured's business.

     This exclusion applies:

     (a)  whether the Insured may be liable as an employer or in any other capacity; and
     (b)  to any obligation to share "damages" with or repay someone else who must pay "damages" because of the injury.

4

Includes copyrighted material of Insurance Services, Office Inc. with its permission

**6.  Other Insurance**

Any "bodily injury" with respect to which other insurance is afforded to the Insured. This exclusion does not apply if the other insurance provides coverage for "bodily injury" imposed on the Insured by reason of the distribution, sale or serving of any alcoholic beverage.  In that case, our obligations under this Policy will be determined in accordance with Section IV – Conditions, C. Other Insurance.

**7.  War**

Any "bodily injury", however caused, arising, directly or indirectly, out of:
a.  War, including undeclared or civil war;
b.  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
c.  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.


**C.  Supplementary Payments**

We will pay with respect to any claim or "suit" we defend:

1.  All expenses we incur.

2.  The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance.  We do not have to furnish these bonds.

3.  All reasonable expenses incurred by the Insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $100 a day because of time off from work.

4.  All costs taxed against the Insured in the "suit".

5.  All interest on that portion of any judgment we owe that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

6.  Expenses incurred by the Insured for first aid to others at the time of an "occurrence" to which this insurance applies.


These payments will not reduce the limits of insurance of this Policy.

5

Includes copyrighted material of Insurance Services, Office Inc. with its permission

### SECTION II – WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

    **a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

    **b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

    **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

    **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

    **e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

    **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

    **(1)** "Bodily injury"

        **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

        **(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

        **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

        **(d)** Arising out of his or her providing or failing to provide professional health care services.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

### SECTION III – LIMITS OF INSURANCE

**A. The Limits of Insurance designated in the Declarations and in paragraphs B, C and D below fix the maximum amount we will pay regardless of the number of:**

    1. Insureds;

    2. Claims made, or "suits" brought;

    3. Persons or organizations making claims or bringing "suits"; or

    4. "Occurrences".

LL – 100 (ed 2023)

Includes copyrighted material of Insurance Services, Office Inc. with its permission

**B.** The Per Person limit stated in the Declarations is the most we will pay to one or more persons as the result of "bodily injury" to any one person in any one "occurrence".

**C.** Subject to the Per Person limit described above, the Per Occurrence limit stated in the Declarations is the most we will pay for "bodily injury" to two or more persons arising out of any one "occurrence".

**D.** The Aggregate limit stated in the Declarations is the most we will pay regardless of the number of:

1. Insureds;
2. Claims made, or "suits" brought arising out of any one "occurrences";
3. Persons or organization's making claims or bringing "suits"; or
4. "Occurrences".

## SECTION IV – CONDITIONS

**A. Duties in the Event of "Bodily Injury", Claim or "Suit".**

1. You must notify us promptly as soon as you become aware of any "bodily injury" which may result in a claim.  Notice should include:
   (a) How, when and where the "bodily injury" took place; and
   (b) The names and addresses of any injured persons and witnesses.

2. If a claim is made or "suit" is brought against any Insured, you must give us prompt written notice of the claim or "suit".

3. You and any other involved Insured must:
   (a) Immediately send us copies of any demands, notices, summons or legal papers received in connection with the claim or "suit";
   (b) authorize us to obtain records and other information;
   (c) cooperate with us in the investigation, settlement or defense of the claim or "suit" including but not limited to the prosecution of an appeal from an adverse judgement against you: and
   (d) assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the Insured because of "bodily injury" to which this insurance may also apply.

4. Your duty to cooperate with us in the investigation, settlement or defense of a "suit", including but not limited to the prosecution of an appeal from an adverse judgment against you, shall continue until the "suit", including any appellate proceedings, is finally concluded. You may not, without our consent, assign any rights you may have against us with respect to the investigation, settlement or defense of a "suit" for which you claim we are obligated to indemnify you, until all appellate proceedings are concluded or until we notify you that we will no longer pay the costs of such defense or appeal.

7

Includes copyrighted material of Insurance Services, Office Inc. with its permission

5. You will not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

6. We will notify the first Insured designated in the Declarations within twenty days of any judgment or settlement paid under this Policy.


**B. Legal Action Against Us.**

1. No person or organization has a right under this Policy:
   (a) to join us as a party or otherwise bring us into a "suit" asking for "damages" from an Insured; or
   (b) to sue us on this Policy unless all its terms have been fully complied with.

2. A person or organization may sue us to recover on an agreed settlement or on a final judgment against an Insured obtained after an actual trial; but we will not be liable for "damages" that are not payable under the terms of this Policy and/or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the Insured and the claimant or the claimant's legal representative.

3. The rights and obligations of the Hospitality Insurance Company under this Policy shall be determined in accordance with the laws of the State where this policy is issued.


**C. Other Insurance.**

If other valid and collectible insurance is available to the Insured for a loss we cover under this Policy, our obligations are limited as follows:

1. Primary Insurance
   This insurance is Primary. Our obligations are not affected unless any other available insurance is also Primary. Then, we will share with that other insurance by the method described in 2. below.

2. Method of Sharing
   If all the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

   If any of the other insurance does not permit contributions by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**D. Premium Audit and Inspection**

1. We shall be permitted but not obligated to audit the policy. We will compute the premiums for this Policy in accordance with rules and rates approved by the Division of Insurance.

LL – 100 (ed 2023)

Includes copyrighted material of Insurance Services, Office Inc. with its permission

2. If we determine that the policy shall be audited, the following rating rules will apply.
At the close of the period we will compute the earned premium for that period, which will constitute the premium for that period.  Earned premiums are due and payable on notice to the first Insured designated in the Declarations.  If the sum of the Deposit Premium and Estimated Annual Premium paid for the policy term are greater than the earned premium, we will return the excess to the first Insured designated in the Declarations, and if it is less than the earned premium, you will be obligated to pay us the balance within 10 days of receiving notice thereof.

3. The first Insured designated in the Declarations must maintain records of the information we need for premium computation for three (3) years following termination of this Policy or any extension thereof, send us copies of such records or information at such times as we may request and make such records and information available to us at the "insured premises" at such times during the Policy period and thereafter as we may determine.

4. We shall be permitted but not obligated to inspect the "insured premises" at any time. Neither our right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the Insured or any other person, to determine or warrant that such property or operations is safe or healthful or is in compliance with law, rule or regulation.

**E. Representations.**
By accepting this Policy, you agree that:

1. The statements in the Declarations are accurate and complete;

2. Those statements are based upon representations made by you or on your behalf in your application for Liquor Liability Insurance and otherwise; and

3. We have issued this Policy in reliance upon the representations made by you or on your behalf.  These representations are a condition precedent to issuance of the Policy and the Company shall have the right to void this Policy in which case we shall have no obligation under this Policy if those representations are false or materially incomplete.

**F. Separation of Insureds.**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned to the first Insured designated in the Declarations, this insurance applies:

1. As if each Insured designated in the Declarations were the only Insured; and

2. Separately to each Insured against whom claim is made or "suit" is brought.

LL – 100 (ed 2023)

Includes copyrighted material of Insurance Services, Office Inc. with its permission

**G.  Transfer of Rights of Recovery Against Others to Us.**

If the Insured has any rights to recover all or part of any payment we have made under this Policy, those rights are transferred to us.  The Insured must do nothing after loss to impair them.  At our request, the Insured will bring "suit" or transfer those rights to us and help us enforce them.

**H.  Cancellation.**

1.  The first Insured designated in the Declarations may cancel this Policy by mailing or delivering to us written notice of cancellation, in advance of the requested date of cancellation.

2.  We may cancel this Policy by mailing to the first Insured designated in the Declarations at the address designated in the Policy, written notice of cancellation:

    (a)  at least 10 days prior to the effective date of cancellation, if cancellation is for non-payment of premium for this policy or for any previous policy issued by the Company to the Named Insured or for failure to provide the Company with alcoholic beverage sales information sufficient to calculate a premium due under a prior policy issued by the Company; or
    (b)  at least 60 days prior to the effective date of cancellation in all cases except as set forth in paragraph 2(a) above or in paragraph 3 below.

3.  This Policy and the coverage provided hereunder shall be automatically canceled without further notice to the Insured if the license for the "insured premises" is revoked or the Insured ceases for any reason to hold a valid license for the "insured premises".

**I.  Renewal.**

1.  This Policy will NOT be automatically renewed.  If you want to renew or continue this Policy, you must submit a completed application.

2.  If we decide not to renew or continue this Policy, we will mail notice to the first Insured designated in the Declarations at the address designated in this Policy at least 60 days before the end of the Policy period.

**J.  Bankruptcy.**

Bankruptcy or insolvency of the Insured or of the Insured's estate will not relieve us of our obligations under this Policy.

### SECTION V – DEFINITIONS

A.  "Bodily Injury" means bodily injury, sickness or disease sustained by a person, which occurs during the policy period, including death resulting from any of these at any time.

LL – 100 (ed 2023)

Includes copyrighted material of Insurance Services, Office Inc. with its permission

B.  "Coverage Territory" means the United States of America (including its territories and possessions), Puerto Rico and Canada.

C.  "Damages" means all monetary sums which the Insured is legally obligated to pay as "damages" including judgments, awards and settlements entered into with our prior written consent.  "Damages" also include prejudgment interest, awarded against an Insured. "Damages" does not include expenses relating to the defense of a claim, or to fines, penalties or taxes, punitive, exemplary, doubled, trebled or multiplied "damages", or the refund, restitution or disgorgement of sums paid to or earned by the Insured.

D.  "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

E.  "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

F.  "Insured Premises" means the premises designated in the Declarations.

G.  "Leased worker" means a person leased to you by a labor leasing firm under a written agreement between you and the labor leasing firm, to perform duties related to the conduct of your business.  "Leased worker" does not include a "temporary worker".

H.  "Occurrence" means an accident, including injurious exposure to conditions, which results during the policy period, in "bodily injury", neither expected nor intended from the standpoint of the Insured.  For the purpose of determining the limit of the Company's liability, all "bodily injury" arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

I.  "Suit" means any lawsuit in which "damages" are sought because of "bodily injury" to which this insurance applies.  "Suit" also includes an arbitration proceeding alleging such "damages" to which you must submit or submit with our consent.  "Suit" does not include any proceeding or any lawsuit where injunctive relief or relief for other than money damages is the only relief sought.

J.  "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

K.  "Your Product" means goods or products manufactured, sold, handled, served, or distributed by the Insured, including all forms of alcoholic beverages and foodstuffs, whether or not in their original container and whether or not mixed with other substances.

L.  "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

LL – 100 (ed 2023)

Includes copyrighted material of Insurance Services, Office Inc. with its permission

As provided by statute, Hospitality Insurance Company maintains a complaint policy which provides that, should you or a consumer have a complaint against HIC, you should write Hospitality Insurance Company, 106 Southville Rd., Southborough, MA 01772 – Attention Office Manager who will forward it to the appropriate Sr. Vice President of the Company for a timely response.

In Witness Whereof, we have caused this Policy to be executed and attested, and if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

**William T. McGrail**
**Chairman of the Board**

**Richard E. Welch, Jr.**
**President and CEO**

12

Includes copyrighted material of Insurance Services, Office Inc. with its permission

Hospitality Mutual Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITED COVERAGE FOR ASSAULT & BATTERY
# $250,000/$500,000/$500,000

In consideration of the additional premium charged for this endorsement, this endorsement modifies the insurance provided under the Liquor Liability Insurance Policy.  Except as modified in this endorsement, all other terms, conditions, exclusions, agreements or declarations of the policy to which this endorsement is attached will apply.

SECTION I - LIQUOR LIABILITY COVERAGE – A. INSURING AGREEMENT is amended and the following added:

In consideration of the additional premium charged, it is understood and agreed that this insurance applies to "damages" because of "bodily injury" arising from an assault or battery or out of any act or omission in connection with the prevention, suppression or failure to protect or suppress such acts, including the failure to warn, train, or supervise,  whether caused by or at the instigation or direction of the Insured, his employees, patrons or any other person, subject to the limits stated below.

I.      Under SECTION I – LIQUOR LIABILITY COVERAGE – B. EXCLUSIONS, the following exclusions are added to Section 1(B) of the Liquor Liability Insurance Policy:

8.    "Bodily injury" arising out of any actual, alleged or threatened discrimination, sexual abuse, harassment or molestation by any person.

9.    "Bodily injury" to:

       a.      A person arising out of any:

              (1)      refusal to employ that person;

              (2)      termination of that person's employment; or

              (3)      Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

       b.      The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in paragraphs (a) (1), (2) or (3) above is directed.

LL – 205 – 2 (05 19)

Hospitality Mutual Insurance Company

This exclusion applies:

(a) Whether the injury-causing event described in paragraphs (a) (1), (2) or (3) above occurs before employment, during employment or after employment of that person;

(b) Whether the insured may be liable as an employer or in any other capacity; and

(c) To any obligation to share "damages" with or repay someone else who must pay "damages" because of the "bodily injury."

10. Assault and/or battery to:

(1)    Any of your employees arising out of and in the course of:

      (a)    Employment by you;

      (b)    Performing duties related to the conduct of your business; or

(2)    The spouse, child, parent, brother or sister of that employee as a consequence of (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share "damages" with or repay someone else who must pay "damages" because of the injury.

II.    For purposes of this endorsement only, SECTION IV – CONDITIONS – C.  Other Insurance is deleted and replaced with the following:

If there is other valid and collectible insurance available to the Insured for a loss we cover under this endorsement, the insurance provided under this endorsement is excess over, and not contributing with, any of that other insurance.

When this insurance is excess, we will have no duty to defend the Insured against any "suit" if any other insurer has a duty to defend the Insured against the "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the Insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

Hospitality Mutual Insurance Company

    1.   The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

    2.   The total amount of all deductible and self-insured amounts under that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the insurance provided by this endorsement.

III.    For purposes of this endorsement only form LL-205 – Assault and/or Battery Exclusion is hereby deleted.

The Limit of Insurance for this Assault & Battery coverage is $250,000 per Person, $500,000 per Occurrence, and $500,000 Aggregate for the policy. The Assault & Battery per Person Limit, the Assault & Battery per Occurrence Limit, and the Assault & Battery Aggregate limit are included in and not in addition to the Liquor Liability Insurance Policy per Person Limit, the Liquor Liability Insurance Policy per Occurrence Limit and the Liquor Liability Insurance Policy Aggregate Limit shown in the Declarations.

All other terms, conditions, and exclusions remain unchanged.

**Hospitality Mutual Insurance Company**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**PROPERTY DAMAGE ENDORSEMENT**

In consideration of the additional premium charged for this endorsement, this endorsement modifies the insurance provided under the Liquor Liability Insurance Policy.  Except as modified in this endorsement, all other terms, conditions, exclusions, agreements or declarations of the policy to which this endorsement is attached will apply.

A.    Under Section I – LIQUOR LIABILITY COVERAGE – A INSURING AGREEMENT the following is added:

We will pay on behalf of the Insured all sums which the Insured shall become obligated to pay as "damages" because of "property damage" caused by an "occurrence", if such liability is imposed upon the Insured by reason of the negligence of the Insured in the distribution, sale or serving of any alcoholic beverage at the "insured premises", to an intoxicated person or minor, or in violation of any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.   We shall have the right and duty to defend any "suit" against the Insured seeking such "damages", even if the allegations of the "suit" are groundless, false or fraudulent, and may make such investigation and settlement of any claim or "suit" as we deem expedient.    However, we will have no duty to defend the insured against any "suit" seeking damages for "property damage" to which this insurance does not apply.  This insurance applies only to "occurrences" which result in "property damage", during the Policy period in the "coverage territory".  We have no other obligation or liability to pay any other sums or perform any other acts or services unless they are explicitly provided for under SUPPLEMENTARY PAYMENTS.

B.    Under Section III – LIMITS OF INSURANCE is hereby deleted and replaced with the following:

**A. The Limits of Insurance designated in the Declarations and in paragraphs B, C and D below fix the maximum amount we will pay regardless of the number of:**

1. Insureds;
2. Claims made, or "suits" brought;
3. Persons or organizations making claims or bringing "suits"; or
4. "Occurrences".

**B. The Per Person limit stated in the Declarations is the most we will pay to one or more persons as the result of "bodily injury" or "property damage" to any one person in any one "occurrence".**

Property Damage Form # LL-201 05 19                    1

**Hospitality Mutual Insurance Company**

**C.** **Subject to the Per Person limit described above, the Per Occurrence limit stated in the Declarations is the most we will pay for "bodily injury" or "property damage" to two or more persons arising out of any one "occurrence".**

**D.** **The Aggregate limit stated in the Declarations is the most we will pay regardless of the number of:**

1. Insureds;
2. Claims made, or "suits" brought arising out of any one "occurrences";
3. Persons or organization's making claims or bringing "suits"; or
4. "Occurrences".

This endorsement does not alter or amend the limits of liability under the policy. Therefore, the most we will pay for both "property damage" and "bodily injury" to any one person arising from one "occurrence" is the "per person" limit of liability stated on the Declarations page of this Policy. Subject to the "per person" limit, the most we will pay for "property damage" and "bodily injury" to two or more persons arising from any one "occurrence" is the "per occurrence" limit stated in the Declarations page of this policy. The Aggregate limit stated in the Declarations page of this policy is the total limit of our liability for "bodily injury" and "property damage" in any policy period.

C.    Our payment for "property damage" will only be for the account of the owner of the property.

D.    **EXCLUSIONS**

The insurance provided by this Endorsement **DOES NOT APPLY** to:

1. **Your Product**

"Property damage" arising out of "your product", or reliance upon a representation or warranty made at any time with respect to "your product". This exclusion does not apply to "property damage" for which the Insured may be held liable by reason of:
   (a) causing or contributing to the intoxication of any person;
   (b) the distribution, sale or serving of alcoholic beverages to any person under the legal drinking age or under the influence of alcohol; or
   (c) except as otherwise provided in this Policy, violation of any statute, ordinance or regulation relating to the distribution, sale, service or use of alcoholic beverages.

2. **Liquor License Not in Effect**

Includes copyrighted material of Insurance Services Office, Inc. with its permission

**Hospitality Mutual Insurance Company**

"Property damage" arising out of the distribution, sale or serving of any alcoholic beverage while any required license is suspended or is not in effect, or after such license expires, is cancelled or revoked.

**3. Expected or Intended "Property Damage"**

"Property damage" expected or intended from the standpoint of any insured. This exclusion does not apply to "property damage" resulting from the use of reasonable force to protect persons or property.

**4. Other Insurance**

Any "property damage" with respect to which other insurance is afforded to the Insured. This exclusion does not apply if the other insurance provides coverage for "property damage" imposed on the Insured by reason of the distribution, sale or serving of any alcoholic beverage. In that case, our obligations under this Policy will be determined in accordance with Section IV – Conditions, C. Other Insurance, as set forth in paragraph G of this endorsement below.

**5. War**

Any "property damage", however caused, arising, directly or indirectly, out of:
a. War, including undeclared or civil war;
b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

E.    SECTION IV – CONDITIONS – Paragraph A (1) is modified as follows:

**A. Duties in the Event of "Bodily Injury", "Property Damage", Claim or "Suit".**

1. You must notify us promptly as soon as you become aware of any "bodily injury" or "property damage" which may result in a claim. Notice should include:
(a) How, when and where the "bodily injury" or "property damage" took place; and
(b) The names and addresses of any injured persons and witnesses

F.    SECTION IV – CONDITIONS – Paragraph A 3(d) is modified as follows:

Includes copyrighted material of Insurance Services Office, Inc. with its permission

**Hospitality Mutual Insurance Company**

      d.   Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the Insured because of "bodily injury" or "property damage" to which this insurance may apply.

G.     For purposes of this endorsement only, SECTION IV – CONDITIONS – C. Other Insurance is deleted and replaced with the following:

If there is other insurance against a loss also covered under this endorsement, whether or not the Insured under this policy is an Insured under such other insurance, the insurance provided under this endorsement shall be excess over, and not contributing with, any other valid and collectible insurance.

When this insurance is excess, we will have no duty to defend the Insured against any "suit" if any other insurer has a duty to defend the Insured against the "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the Insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss if any, that exceeds the sum of:

      1.   The total amount that all such other insurance would pay for the loss in the absence of this insurance; and
      2.   The total amount of all deductible and self-insured amounts under that other insurance.

We shall share the remaining loss, if any, with any other insurance that is not described in the Excess Insurance provision and was not bought specifically to apply in excess of the Insurance provided by his endorsement.

H.     The following definitions are added to SECTION V – DEFINITIONS:

      1.   "Occurrence" means an accident, including injurious exposure to conditions, which results during the policy period, in "bodily injury" or "property damage", neither expected nor intended from the standpoint of the Insured. For purposes of determining the limit of the Company's liability, all "bodily injury" or "property damage" arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

      2.   "Property damage" means:
         a.   Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that cause it; or

Includes copyrighted material of Insurance Services Office, Inc. with its permission

**Hospitality Mutual Insurance Company**

       b.  Loss of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the occurrence that caused it.

    3.  "Suit" means any lawsuit in which "damages" are sought because of "bodily injury" or "property damage" to which this insurance applies. "Suit" also includes an arbitration proceeding alleging such "damages" to which you must submit or submit with our consent.  "Suit" does not include any proceeding or any lawsuit where injunctive relief or relief for other than money damages is the only relief sought.

All other terms, conditions, exclusions, agreements or declarations remain unchanged.

Includes copyrighted material of Insurance Services Office, Inc. with its permission

LL 217 (01 23)

**Hospitality Insurance Company**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – CONTRACTORS, SUBCONTRACTORS AND ENTERTAINERS

This endorsement modifies insurance provided under the following:

LIQUOR LIABILITY COVERAGE FORM

The following is added to Section 1 – Liquor Liability Coverage, B. Exclusions

This insurance does not apply to: 'bodily injury' arising out of operations performed for you by independent contractors or arising out of the acts or omissions of your independent contractors, their employees, and subcontractors, or arising out of your acts or omissions in connection with your general supervision of the operations of your independent contractors.

We have no duty to defend any insured against any claims or "suits" seeking damages for "bodily injury" or "injury" in regard to the matters covered by this exclusion and we have no duty to pay damages in regard to the matters covered by this exclusion. If a "suit" or claim is brought against any insured which contains allegations relating in any way to the matters covered by this exclusion, we will have no obligation or liability to pay sums or perform acts or services. Such lack of coverage, lack of duty to defend and lack of duty to pay damages may result in financial loss to the named insured and/or to those persons insured under this policy.

"Operations performed for you by independent contractors include, but are not limited to, security, door person, crowd control, cleaners, entertainers of any kind or promoters of any kind."

This exclusion applies whether the insured may be liable as an employer or in any other capacity.

All other terms and conditions of this policy shall remain unchanged.

LL 217 (01 23)

Includes copyrighted material of ISO, Inc. with its permission.

LL 214 (01 23)

**Hospitality Insurance Company**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# Exclusion - Third Party or Contracted Security

This endorsement modifies insurance provided under the following:

LIQUOR LIABILITY COVERAGE FORM

The following is added to Section 1 – Liquor Liability Coverage, B. Exclusions

1. This insurance does not apply to any loss, claim, "suit", cost, expense, or liability for damages, directly or indirectly based on, attributable to, arising out of, involving, resulting from or in any way related to the acts, omissions, or operations of any third party or contracted security services provider or vendor or its employees, personnel, staff or representatives, including but not limited to:
   a. defense, safety, protective, barricade or security fencing operations or activities; or
   b. crowd, patron or audience control, supervision or management operations or activities; or
   c. T-shirt security, patron search, patron pat down, security wand, patron property search, patron ejection, door supervision, line control, bouncer activities or security guarding.

2. This insurance does not apply to any loss, claim, "suit", cost, expense, or liability for damages, directly or indirectly based on, attributable to, arising out of, involving, resulting from or in any way related to the, hiring, contracting of, investigation, supervision, management, training or retention of any entity or non-employee individuals engaged in any of the operations or activities in Number 1 above.

3. This insurance does not apply to any loss, claim, "suit", cost, expense, or liability for damages, directly or indirectly based on, attributable to, arising out of, involving, resulting from or in any way related to the alleged failure to provide or inadequate provision of any of the operations or activities in Numbers 1 or 2 above.

   We have no duty to defend any insured against any claims or "suits" seeking damages for "bodily injury" or "injury" in regard to the matters covered by this exclusion and we have no duty to pay damages in regard to the matters covered by this exclusion. If a "suit" or claim is brought against any insured which contains allegations relating in any way to the matters covered by this exclusion, we will have no obligation or liability to pay sums or perform acts or services. Such lack of coverage, lack of duty to defend and lack of duty to pay damages may result in financial loss to the named insured and/or to those persons insured under this policy.

   All other terms and conditions of this policy shall remain unchanged.

   **Insured Signature _____**          **Date:_____**

LL 214 (01 23)

Includes copyrighted material of ISO, Inc. with its permission.

**Hospitality Insurance Company**             **Form-LL-210-PA 0619**


## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ CAREFULLY.


### Pennsylvania Policy Amendment

This endorsement modifies insurance provided under the Liquor Liability Insurance Policy. Except as modified in this endorsement, all other terms, conditions, exclusions, agreements or declarations of the policy to which this endorsement is attached will apply.

   Under SECTION IV. Conditions; Subsection H. Cancellation.  Item 2. (a)  is hereby revised to read: (a.) at least 15 days prior to the effective date of cancellation, if cancellation is for non-payment of premium for this policy or for any previous policy issued by the Company to the Named Insured or failure to provide the Company with alcoholic beverage sales information sufficient to calculate a premium due under a prior policy issued by the Company; or

**Form - LL -210 PA** Includes copyrighted material of Insurance Services Office, Inc. with its permission.

IL 00 17 11 98

# COMMON POLICY CONDITIONS

Coverage Parts, except Liquor Liability Coverage Part, included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

 Copyright, Insurance Services Office, Inc., 1998 ☐

## TERRORISM INSURANCE PREMIUM DISCLOSURE

### AND OPPORTUNITY TO REJECT

**This notice contains important information about the Terrorism Risk Insurance Act and your option to reject terrorism insurance coverage.  Please read it carefully.**


### THE TERRORISM RISK INSURANCE ACT

The Terrorism Risk Insurance Act, including all amendments ("TRIA" or the Act"), establishes a program to spread the risk of catastrophic losses from certain acts of terrorism between insurers and the federal government.  If an individual insurer's losses from a "certified act of terrorism" exceed a specified deductible amount, the government will reimburse the insurer for 15% to 20% over the course of five years, in one-percent increments beginning on January 1, 2016, for losses paid in excess of the deductible, but only if aggregate industry losses from such an act exceed $100 million to $200 million in $20 million annual increments over five years beginning in calendar year 2016.

### MANDATORY AVAILABILITY OF COVERAGE FOR "CERTIFIED ACTS OF TERRORISM"

TRIA requires insurers to make coverage available for any loss that occurs within the United States (or outside of the U.S. in the case of U.S. missions and certain air carriers and vessels), results from a "certified act of terrorism": AND that is otherwise covered under your policy.

A "certified act of terrorism" means:
Any act that is certified by the Secretary {of the Treasury}, in accordance with the provisions of the federal Terrorism Risk Insurance Act,

|       |                                                                 |
|-------|-----------------------------------------------------------------|
| (i)   | to be an act of terrorism pursuant to such Act:                 |
| (ii)  | to be a violent act or an act that is dangerous to-             |
| (I)   | human life;                                                     |
| (II)  | property; or                                                   |
| (III) | infrastructure;                                                 |

|       |                                                                 |
|-------|-----------------------------------------------------------------|
| (iii) | to have resulted in damage with the United States, or outside of the United States in the case of- |
| (I)   | an air carrier (as defined in section 40102 of the title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States); or |
| (II)  | the premises of a United States mission; and                   |
| (iv)  | to have been committed by an individual or individuals as part of an effort to coerce the civilian population if the United States or to influence the policy of affect the conduct of the United States Government by coercion. |

TS- 01 15

**REJECTING TERRORISM INSURANCE COVERAGE- WHAT YOU MUST DO**

We have included in your policy coverage for losses resulting from "certified acts of terrorism" as defined above. THE PREMIUM CHARGE FOR THIS COVERAGE APPREARS ON THE DECLARATION PAGE OF THE POLICY AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT. If we are providing you with a quote, the premium charge will also appear on your quote as a separate line item charge.

Note: With respect to Excess or Umbrella policies, this offer of coverage pertains only to those lines of business covered by TRIA and, more specifically, does not apply to commercial automobile insurance. In addition, this offer of TRIA coverage is expressly conditioned upon your acceptance of coverage for "certified acts of terrorism": on all underlying insurance policies that are subject to TRIA. If you reject such coverage on your primary liability policies, you must also reject it on your Excess or Umbrella policy.

**IF YOU CHOOSE TO REJECT THIS COVERAGE, PLEASE CHECK THE BOX BELOW, SIGN THE ACKNOWLEDGEMENT, AND RETURN IT TO US.**

**Please ensure any rejection is received within thirty (30) days of the effective date of your policy.**

_____I hereby reject this offer of coverage. I understand that by rejecting this offer, I will have no coverage for losses arising from a "certified acts of terrorism: and my policy will be endorsed accordingly.

Note that certain states (currently CA, GA, IA, IL, MA, ME, MO, NY, NC, NJ, OR, RI, WA, and WI) mandate coverage for loss caused by fire following a "certified act of terrorism": in certain types of insurance policies. If you reject TRIA coverage in these states on those policies, you will not be charged any additional premium for that state mandated coverage.

**Policyholder/Applicant Signature:**                    **Date:**

_____        _____

_____

Print Name

**The summary of the Act and the coverage under your policy contained in this notice is necessarily general in nature. Your policy contains specific terms, definitions, exclusions and conditions. In case of any conflict, your policy language will control the resolution of all coverage questions. Please read your policy carefully.**

If you have any question regarding this notice, please contact your agent.

Hospitality Insurance Company
106 Southville Road
Southborough, MA 01772

TS- 01 15

IL 02 46 09 07

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PENNSYLVANIA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** The **Cancellation** Common Policy Condition is replaced by the following:

**CANCELLATION**

**1.** The first Named Insured shown in the Declarations may cancel this policy by writing or giving notice of cancellation.

**2. Cancellation Of Policies In Effect For Less Than 60 Days**

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 30 days before the effective date of cancellation.

**3. Cancellation Of Policies In Effect For 60 Days Or More**

If this policy has been in effect for 60 days or more or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**a.** You have made a material misrepresentation which affects the insurability of the risk. Notice of cancellation will be mailed or delivered at least 15 days before the effective date of cancellation.

**b.** You have failed to pay a premium when due, whether the premium is payable directly to us or our agents or indirectly under a premium finance plan or extension of credit. Notice of cancellation will be mailed at least 15 days before the effective date of cancellation.

**c.** A condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the policy period. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**d.** Loss of reinsurance or a substantial decrease in reinsurance has occurred, which loss or decrease, at the time of cancellation, shall be certified to the Insurance Commissioner as directly affecting in-force policies. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**e.** Material failure to comply with policy terms, conditions or contractual duties. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**f.** Other reasons that the Insurance Commissioner may approve. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us.

**4.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us. Notice of cancellation will state the specific reasons for cancellation.

**5.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**6.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata and will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, the refund may be less than pro rata and will be returned within 30 days after the effective date of cancellation. The cancellation will be effective even if we have not made or offered a refund.

**7.** If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

**B.** The following are added and supersede any provisions to the contrary:

**1. Nonrenewal**

If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal, stating the specific reasons for nonrenewal, to the first Named Insured at least 60 days before the expiration date of the policy.

**2. Increase Of Premium**

If we increase your renewal premium, we will mail or deliver to the first Named Insured written notice of our intent to increase the premium at least 30 days before the effective date of the premium increase.

Any notice of nonrenewal or renewal premium increase will be mailed or delivered to the first Named Insured's last known address. If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

          © ISO Properties, Inc., 2006          **IL 02 46 09 07**    □

IL 09 10 07 02

# PENNSYLVANIA NOTICE

An Insurance Company, its agents, employees, or service contractors acting on its behalf, may provide services to reduce the likelihood of injury, death or loss. These services may include any of the following or related services incident to the application for, issuance, renewal or continuation of, a policy of insurance:

**1.** Surveys;

**2.** Consultation or advice; or

**3.** Inspections.

The "Insurance Consultation Services Exemption Act" of Pennsylvania provides that the Insurance Company, its agents, employees or service contractors acting on its behalf, is not liable for damages from injury, death or loss occurring as a result of any act or omission by any person in the furnishing of or the failure to furnish these services.

The Act does not apply:

**1.** If the injury, death or loss occurred during the actual performance of the services and was caused by the negligence of the Insurance Company, its agents, employees or service contractors;

**2.** To consultation services required to be performed under a written service contract not related to a policy of insurance; or

**3.** If any acts or omissions of the Insurance Company, its agents, employees or service contractors are judicially determined to constitute a crime, actual malice, or gross negligence.

---

**Instruction to Policy Writers**

Attach the Pennsylvania Notice to all new and renewal certificates insuring risks located in Pennsylvania.

---

© ISO Properties, Inc.,  2001

**COMMERCIAL GENERAL LIABILITY**
**CG 21 73 01 15**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

COMMERCIAL GENERAL LIABILITY
CG 21 75 01 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM AND EXCLUSION OF OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE UNITED STATES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism", or out of an "other act of terrorism" that is committed outside of the United States (including its territories and possessions and Puerto Rico), but within the "coverage territory". However, with respect to an "other act of terrorism", this exclusion applies only when one or more of the following are attributed to such act:

**1.** The total of insured damage to all types of property exceeds $25,000,000 (valued in US dollars). In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**2.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

**a.** Physical injury that involves a substantial risk of death; or

**b.** Protracted and obvious physical disfigurement; or

**c.** Protracted loss of or impairment of the function of a bodily member or organ; or

**3.** The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**4.** The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**5.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs **1.** and **2.** describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

 © Insurance Services Office, Inc., 2015

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

   **a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act;

   **b.** The act resulted in damage:

   **(1)** Within the United States (including its territories and possessions and Puerto Rico); or

   **(2)** Outside of the United States in the case of:

   **(a)** An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

   **(b)** The premises of any United States mission; and

   **c.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**3.** "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "certified act of terrorism".

Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

© Insurance Services Office, Inc., 2015
**CG 21 75 01 15**

COMMERCIAL GENERAL LIABILITY
CG 21 76 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF PUNITIVE DAMAGES RELATED TO A CERTIFIED ACT OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM PUNITIVE DAMAGES**

Damages arising, directly or indirectly, out of a "certified act of terrorism" that are awarded as punitive damages.

**B.** The following definition is added:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

 © ISO Properties, Inc., 2007    ☐

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc., 2007                **IL 00 21 09 08**    □

# **Exhibit K**

## To Complaint for Declaratory Judgment
### Hospitality Insurance Company v. Sam 939 LLC, et al.

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

SEPTEMBER 2024
01327

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| DEANDRE HOPSON | SAM 939 LLC D/B/A MAXI'S |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 1430 FRESNO ROAD<br>WILMINGTON DE 19803 | 939 MARKET STREET<br>MARCUS HOOK PA 19061 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | SAMUEL ARBITMAN |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | 100 N 22ND STREET, #112<br>PHILADELPHIA PA 19103 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | JACQUELINE DONLAN |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | 3764 RIDGEWOOD LANE<br>BROOKHAVEN PA 19015 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 1 | 3 | [X] Complaint  [ ] Petition Action  [ ] Notice of Appeal<br>[ ] Writ of Summons  [ ] Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | |
|---|---|---|---|
| [ ] $50,000.00 or less | [ ] Arbitration | [ ] Mass Tort | [ ] Commerce  [ ] Settlement |
| [X] More than $50,000.00 | [X] Jury | [ ] Savings Action | [ ] Minor Court Appeal  [ ] Minors |
| | [ ] Non-Jury | [ ] Petition | [ ] Statutory Appeals  [ ] W/D/Survival |
| | [ ] Other: | | |

**CASE TYPE AND CODE**

2V - MOTOR VEHICLE ACCIDENT

**STATUTORY BASIS FOR CAUSE OF ACTION**

**RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)**

FILED
PRO PROTHY

SEP 13 2024

L. BREWINGTON

IS CASE SUBJECT TO
COORDINATION ORDER?
YES        NO

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: DEANDRE HOPSON

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| ALEXANDER C. HYDER | 2005 MARKET STREET<br>SUITE 350<br>PHILADELPHIA PA 19103 |

| PHONE NUMBER | FAX NUMBER | |
|---|---|---|
| (267)780-2985 | (267)780-2920 | |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 320939 | ahyder@forthepeople.com |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| ALEXANDER HYDER | Friday, September 13, 2024, 10:57 am |

FINAL COPY (Approved by the Prothonotary Clerk)

**MORGAN & MORGAN PHILADELPHIA PLLC**
Alexander C. Hyder, Esquire #320939
2005 Market Street, Suite 350
Philadelphia, PA 19103
t. 267.780.2985
f. 267.780.2920
ahyder@forthepeople.com
Our File No. 14989829



*Filed and Attested by the
Office of Judicial Records
13 ... ... am*

*Attorneys for Plaintiff*

| | |
|---|---|
| **DEANDRE HOPSON**<br>1430 Fresno Road<br>Wilmington, DE 19803<br><div align=right>Plaintiff,</div><br>vs.<br><br>**SAM 939 LLC d/b/a MAXI'S**<br>939 Market Street<br>Marcus Hook, PA 19061<br>*and*<br>**SAMUEL ARBITMAN**<br>100 N. 22nd Street, #112<br>Philadelphia, PA 19103<br>*and*<br>**JACQUELINE DONLAN**<br>3764 Ridgewood Lane<br>Brookhaven, PA 19015<br><div align=right>Defendants.</div> | **PHILADELPHIA COUNTY<br>COURT OF COMMON PLEAS<br>CIVIL DIVISION**<br><br>_____ **TERM, 2024**<br><br>**No.:** _____<br><br><br>**JURY TRIAL DEMANDED** |

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by an attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgement may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.<br><br>YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.<br><br>THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER. IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.<br><br><div align=center>PHILADELPHIA BAR ASSOCIATION<br>LAWYER REFERRAL and INFORMATION SERVICE<br>One Reading Center<br>Philadelphia, Pennsylvania 19107<br>(215) 238-1701</div> | Le han demandado en corte. Si usted quiere defenderse contra las demandas nombradas en las páginas siguientes, tiene veinte (20) días, a partir de recibir esta demanda y la notificación para entablar personalmente o por un abogado una comparecencia escrita y tambien para entablar con la corte sus defensas y objeciones a las demandas contra usted. Sea avisado que si usted no se defiende, el caso puede continuar sin usted y la corte puede incorporar un juicio contra usted sin previo aviso para conseguir el dinero demandado en el pleito o para conseguir cualquier otra demanda o alivio solicitados por el demandante. Usted puede perder dinero o propiedad u otros derechos importantes para usted.<br><br>USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE. SI USTED NO TIENE ABOGADO (O NO TIENE DINERO SUFICIENTE PARA PAGAR A UN ABOGADO), VAYA EN PERSONA O LLAME POR TELEFONO LA OFICINA NOMBRADA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.<br><br>ESTA OFICINA PUEDE PROPORCIONARLE LA INFORMACION SOBRE CONTRATAR A UN ABOGADO. SI USTED NO TIENE DINERO SUFICIENTE PARA PAGAR A UN ABOGADO, ESTA OFICINA PUEDE PROPORCIONARLE INFORMACION SOBRE AGENCIAS QUE OFRECEN SERVICIOS LEGALES A PERSONAS QUE CUMPLEN LOS REQUISITOS PARA UN HONORARIO REDUCIDO O NINGUN HONORARIO.<br><br><div align=center>ASSOCIACION DE LICENDIADOS DE FILADELFIA<br>SERVICO DE REFERENCIA E INFORMACION LEGAL</div> |

Case ID: 240901327

| | One Reading Center<br>Filadelfia, Pennsylvania 19107<br>Teléfono: (215) 238-1701 |
|---|---|

## CIVIL ACTION COMPLAINT

AND NOW COMES the Plaintiff DeAndre Hopson (hereinafter "Plaintiff"), by and through their counsel, Morgan & Morgan Philadelphia, PLLC, and hereby files this Complaint against the above-named Defendants, and in support thereof avers as follows:

## THE PARTIES

1.    The Plaintiff, DeAndre Hopson (hereinafter "Plaintiff") is an adult individual who resides at the above-captioned address.

2.    The Defendant, Jaqueline Donlan (hereinafter "Defendant Donlan") is an adult individual who resides at the above-captioned address.

3.    The Defendant, Sam 939 LLC d/b/a Maxi's (hereinafter "Defendant Sam 939 LLC" or "Sam 939 LLC") is a Pennsylvania business registered at the above-captioned address. For all times relevant herein, Defendant Sam 939 LLC engaged in the retail sale of liquor, malted and/or brewed beverages in the Commonwealth of Pennsylvania, and regularly conducts business in Philadelphia County.

4.    The Defendant, Samuel Arbitman (hereinafter "Defendant Arbitman"), is an adult individual who resides at the above-captioned address.

5.    Upon information and belief, Defendant Arbitman is the owner and/or an executive of Sam 939 LLC and is the owner of a Pennsylvania liquor license used to operate Sam 939 LLC (Maxi's).

6.    At all times relevant, Defendant Sam 939 LLC owned, operated, controlled, and/or

Case ID: 240901327

maintained a bar/establishment located at 939 Market Street, Marcus Hook, PA 19061 (hereinafter "Maxi's"), in which this bar/establishment is the focus of the negligence and/or recklessness described herein.

7.    At all times relevant hereto, Defendant Sam 939 LLC acted by and through its employees and/or agents and/or managers and/or owners acting within the course and scope of their employment, and/or by contractors working within their contract and/or assignment and regularly conducted a substantial part of its regular business in the Commonwealth of Pennsylvania and Philadelphia County.

8.    At all times relevant hereto, Defendant Sam 939 LLC, as holder of a liquor License utilized to manage a bar serving alcoholic beverages as set forth above and herein, had a duty and an obligation to formulate and disseminate rules, regulations, policies, procedures, protocols, and guidelines with regard to identifying and refusing the service of alcohol to visibility intoxicated patrons.

9.    Defendant Sam 939 LLC had further responsibility to hire, monitor, and supervise the employees to ensure that they had appropriate experience, training, and know-how to recognize and identify, and refuse service to visibly intoxicated persons, and to serve alcoholic beverages in a safe and responsible manner.

10.    Defendant Sam 939 LLC had the responsibility to hire, train, supervise, and monitor security personnel/employees to ensure the safety of business invitees from visibly intoxicated patrons.

11.    It is believed and therefore averred that at all times relevant hereto the Defendants

acted or failed to act individually and/or jointly and severally, and at all times relevant hereto, each Defendant acted or failed to act vicariously through its employees, agents, servants, workmen, and/or contractors.

## FACTUAL BACKGROUND

12.     On or about the night of January 25, 2024, Defendant Donlan was visibly intoxicated while being furnished, served, sold and/or given excessive amounts of intoxicating beverages at Defendant's establishment, Maxi's.

13.     On the above-mentioned date, Defendant Donlan was drinking, among other things, numerous shots, beers, malt beverages, and spirits at Maxi's.

14.     On or about the night of January 25, 2024, Defendant Donlan had been consuming intoxicating beverages at said bar/establishment prior to exiting the establishment.

15.     Her behavior over the period of time that he was served by Maxi's deteriorated, exhibiting signs of visible intoxication/impairment such as but not limited to bloodshot and glassy eyes, slurred speech, unsteady gait, and/or swaying, which individually and/or collectively amounted to visible intoxication/impairment.

16.     Despite Defendant Donlan being visibly intoxicated and Defendant Sam 939 LLC d/b/a Maxi's possessing actual and constructive knowledge of same, at no time was Defendant Donlan refused the service of alcoholic beverage by any employee and/or agent of Sam 939 LLC d/b/a Maxi's in violation of Pennsylvania law.

17.     On or about January 26, 2024, at approximately 2:39 a.m., Defendant Donlan left Maxi's in an intoxicated state, and as a result of her impaired judgment, she intended to operate her 2020 Mitsubishi Mirage automobile after being furnished, served, sold, and/or given excessive amounts of intoxicating beverages, while visibly intoxicated, by Defendant Sam 939 LLC d/b/a

Maxi's' bartender, agents, servants, and employees of Defendant Sam 939 LLC d/b/a Maxi's, so as to render her incapable of operating a motor vehicle in a safe manner.

18.    At no time prior to exiting Maxi's was Defendant Donlan stopped or even questioned by employees and/or agents of Sam 939 LLC d/b/a Maxi's regarding her fitness to operate a motor vehicle in a safe manner.

19.    Plaintiff was also a patron of Maxi's and was served alcoholic beverages while visibly intoxicated, of which impaired his judgment.

20.    On January 26, 2024, at approximately 2:39 a.m., Defendant Donlan departed Maxi's and was operating a 2020 Mitsubishi Mirage, with Plaintiff as a passenger, northbound on Market Street in Marcus Hook, PA, approaching the intersection with West Ridge Road. Defendant Donlan then struck a traffic pole in the intersection, causing Plaintiff's personal injuries described herein.

21.    Maxi's is approximately a one (1) minute drive from the location of the crash.

22.    Officer Christopher Houpt deemed Defendant Donlan to be driving under the influence of alcohol based on observations made shortly after the crash and her having been served large amounts of alcohol at Maxi's.

23.    Defendant Donlan was charged with DUI at the highest rate of alcohol.

24.    Defendant Donlan's BAC exceeded .16%.

25.    At all relevant times hereto, the Plaintiff acted in a safe, prudent and reasonable manner and in no way contributed to his injuries or damages.

## DAMAGES

26.    Following the crash, Plaintiff was quickly rushed to Crozer-Chester Medical Center

Case ID: 240901327

with a myriad of physical injuries and was transferred to Penn Presbyterian Medical Center, where he was admitted for fourteen (14) days.

     27.    Plaintiff remains under the care of several medical professionals for various injuries related to this incident, and it is likely that he will remain under their care for the foreseeable future.

     28.    As a direct and proximate result of the collective negligence, carelessness and recklessness of Defendants, Plaintiff sustained, among other injuries, the following:

         a.    Displaced fracture of the left posterior acetabulum wall requiring an open reduction and internal fixation (ORIF) surgery;

         b.    Left hip dislocation;

         c.    Left sciatic neuropathy;

         d.    Loss of consciousness;

         e.    Additional injuries to his left leg, neck, and back, some or all of which are permanent and may endure for the remainder of his life;

         f.    Neurological, psychological, psychiatric, and orthopedic injuries;

         g.    Great physical, conscious pain, suffering, and terror, past, present and future;

         h.    The loss of life's pleasures, past, present and future;

         i.    Loss of earnings and wages and loss of earnings capacity, past, present and future; and

         j.    Hospital, rehabilitation and medical expenses, past, present and into the future.

     29.    As a result of the aforesaid injuries, the Plaintiff sustained physical pain and suffering, all of which have required or will require medical care and treatment.

Case ID: 240901327

30.    The Plaintiff continues to require treatment for the aforesaid injuries.

31.    Plaintiff alleges that all of the aforesaid injuries are serious and/or permanent in nature and were a result of a serious impairment of a bodily function, as defined in Pa. C.S.A. §1702.

32.    Plaintiff also makes claims hereinafter for injuries, damages, or consequences of which he has no present knowledge.

33.    All of the aforementioned treatment for the Plaintiff's injuries have been deemed reasonable and necessary.

34.    As a result of the aforesaid injuries, Plaintiff sustained a loss of the everyday pleasures and enjoyments of life and may continue to suffer the same for an indefinite period of time into the future.

35.    As a result of the aforesaid injuries, Plaintiff suffered embarrassment and humiliation, and may continue to suffer the same for an indefinite period of time into the future.

36.    As a result of the aforesaid injuries, Plaintiff has been obligated to expend various sums of money and incur various expenses for medical treatment and may be obligated to do so into the future.

37.    As a result of the aforesaid injuries, the Plaintiff sustained an impairment of her earning capacity/potential.

38.    At all relevant times hereto, the Plaintiff acted in a safe, prudent and reasonable manner and in no way contributed to her injuries or damages.

## COUNT I
### PENNSYLVANIA DRAM SHOP ACT – NEGLIGENCE *PER SE*
### DEANDRE HOPSON v. SAM 939 LLC d/b/a MAXI'S, INC.

39.    Plaintiff incorporates by reference the preceding paragraphs as if same were set

Case ID: 240901327

forth herein at length.

40.    On October 14, 2023, Defendant Donlan was a business invitee of the business premises of Maxi's during regular business hours.

41.    At all relevant times hereto, Sam 939 LLC d/b/a Maxi's, as a licensed furnisher of liquor, had a duty to comply with all statutory and regulatory provisions of the Pennsylvania Liquor Code.

42.    At all material times hereto, Sam 939 LLC d/b/a Maxi's violated the Pennsylvania Dram Shop law in serving Defendant Donlan while he was visibly intoxicated. Which conduct was a breach of the aforementioned legal duty relative to the sale of alcoholic beverages as such sale created an unreasonable risk of harm to Plaintiff.

43.    Defendant, jointly, severally, and/or singularly by and through their managers, bartenders, employees, agents, servants and/or work persons, furnished and/or gave alcohol to Defendant Donlan, a visibly intoxicated person, who inflicted damage on the Plaintiff by operating a motor vehicle while intoxicated and Defendant is therefore liable for the harm suffered by the Plaintiff pursuant to Pennsylvania's Dram Shop Act.

44.    The Pennsylvania's Dram Shop Act violations by Sam 939 LLC d/b/a Maxi's, by and through their manager, bartender, agents, servants, workmen and/or employees, constitutes negligence *per se* and were careless and reckless as follows:

  a.    Serving, selling, furnishing, and/or giving liquor and/or malted and/or brewed beverages to Defendant Donlan while she was visibly intoxicated;

  b.    Serving, selling, furnishing, and/or giving liquor and/or brewed beverages to Defendant Donlan when she had slurred speech, unsteady gait, glassy and/or bloodshot eyes;

Case ID: 240901327

c.      Permitting liquor and/or malted and/or brewed beverages to be sold, furnished, or given to Defendant Donlan while she was visibly intoxicated;

d.      Failing to follow state law, including the Pennsylvania Liquor Code, 47 Pa. C.S. §4-493(1) and 4-497 by not refraining from serving alcoholic beverages to persons, such as Defendant Donlan, who was visibly intoxicated;

e.      Serving liquor and/or malted and/or brewed beverages to Defendant Donlan in such a quantity that they caused her to become visibly intoxicated;

f.      Serving liquor and/or malted and/or brewed beverages to Defendant Donlan while she was visibly intoxicated to such a degree and in such a quantity that they caused her to be unable to safely operate a motor vehicle;

g.      Continuing to serve liquor and/or malted and/or brewed beverages to Defendant Donlan when they knew, or should have known, that she was visibly intoxicated;

h.      Failing to stop serving liquor and/or malted and/or brewed beverages to Defendant Donlan when they knew, or should have known that she was intoxicated;

i.      Selling, providing, supplying, furnishing, serving and/or giving liquor and/or malted and/or brewed beverages to Defendant Donlan who was incompetent to handle alcohol due to her intoxications, which she was exhibiting visible signs and symptoms of;

j.      Permitting their employees, agents, and servants to provide, supply, furnish, serve, and/or sell liquor and/or malted and/or brewed beverages to

Defendant Donlan while she was visibly intoxicated;

k.    Intentionally providing, supplying, furnishing, serving, selling, and giving liquor and/or malted and/or brewed beverages to Defendant Donlan despite her clear visible intoxication;

l.    Violating the terms and conditions of the liquor license issued to Defendant and/or responsibility for agents, servants, and/or employees who violate applicable laws and regulations;

m.    Failing to perform an adequate and necessary investigation to determine whether or not alcohol was being served to persons while visibly intoxicated;

n.    Failing to enact, implement, and/or enforce policies and procedures to prevent visibly intoxicated persons from being served alcoholic beverages;

o.    Being reckless, outrageous, and engaging in intentional misconduct by serving alcoholic beverages to Defendant Donlan, despite knowing that she was visibly intoxicated and knowing the high risk that this visibly intoxicated person might pose and the highly probable harm that would follow;

p.    Acting deliberately and unreasonably by placing the public in a perilous situation; and

q.    Failing to train and hire competent personnel to serve alcoholic beverages.

45.    Sam 939 LLC d/b/a Maxi's jointly, severally and/or singularly, and/or by and through its managers, bartenders, agents, servants, work persons and/or employees, served and continued to serve alcoholic beverages to a patron/customer who was visibly intoxicated in direct

violation of Pennsylvania's Dram Shop Act whereby that patron/customer caused severe and permanent injuries to Plaintiff through the unlawful operation of a motor vehicle while under the influence of a controlled substance furnished by Sam 939 LLC d/b/a Maxi's.

46.    The aforementioned conduct of Sam 939 LLC d/b/a Maxi's – notably overserving alcoholic beverages to the visibly intoxicated Defendant Donlan – was outrageous in that such conduct exhibits a reckless disregard for the interests of others and, as such, punitive damages are justified.

47.    As a direct and proximate result of Sam 939 LLC d/b/a Maxi's negligence and recklessness, Plaintiff suffered the injuries described in detail in the Complaint

**WHEREFORE**, the Plaintiff, DeAndre Hopson, hereby seeks all damages allowed under the laws of the Commonwealth of Pennsylvania, including punitive damages from the Defendants, in an amount in excess of the jurisdictional threshold, under the applicable statutes of the Commonwealth of Pennsylvania and the Local Rules of Court.

<div align="center">

**COUNT II**
**NEGLIGENCE / RECKLESSNESS**
**DEANDRE HOPSON v. SAM 939 LLC d/b/a MAXI'S, SAMUEL ARBITMAN, and**
**JACQUELINE DONLAN**

</div>

48.    Plaintiff incorporates by reference the preceding paragraphs as if the same were set forth herein at length.

49.    Sam 939 LLC d/b/a Maxi's, by and through their agents, servants, employees, officers, bartenders, cocktail servers, waiters and waitresses, beverage servers, staff, administrators, managers, and security personnel breached a legal duty owed to lawful business invitees by committing one or more of the following negligent and/or reckless acts and/or omissions:

        a.    Providing alcoholic beverages to Defendant Donlan to the point of visible

intoxication and continuing to serve this intoxicated patron thereafter;

b. Continuing to provide alcoholic beverages to Defendant Donlan despite her visual intoxication;

c. Failing to remove Defendant Donlan from the drinking establishment despite her visible intoxication;

d. Intentionally selling and serving alcohol to Defendant Donlan despite her visible intoxication;

e. Serving and selling excessive quantities of alcohol to Defendant Donlan;

f. Failing to provide necessary safeguards to prevent the above-described incident with respect to detecting, observing, supervising, and/or properly handling intoxicated patrons;

g. Failing to establish adequate alcohol management standards and failing to provide proper and adequate training and instruction, including TIPS (Training for Intervention Procedures) and RAMP (Responsible Alcohol Management Program) training to this Defendants' agents, servants, and employees in connection with the safe operation and management of the restaurant/bar with respect to detecting, observing, monitoring, supervising, and/or properly dealing with intoxicated patrons; and

h. Creating and/or exposing Plaintiff to a foreseeable and unreasonable risk of harm or bodily injury by failing to detect, observe, monitor, supervise and/or properly deal with an intoxicated person.

50.    The aforementioned conduct of Sam 939 LLC d/b/a Maxi's – notably overserving alcoholic beverages to the visibly intoxicated Defendant Donlan – was outrageous in that such

conduct exhibits a reckless disregard for the interests of others and, as such, punitive damages are justified.

51.    As a direct and proximate result of the acts and/or omissions of Sam 939 LLC d/b/a Maxi's, Plaintiff suffered the serious and permanent injuries described in greater detail above in this Complaint.

**WHEREFORE**, the Plaintiff, DeAndre Hopson, hereby seeks all damages allowed under the laws of the Commonwealth of Pennsylvania, including punitive damages from Defendants, in an amount in excess of the jurisdictional threshold, under the applicable statutes of the Commonwealth of Pennsylvania and the Local Rules of Court.

<div align="center">

**COUNT III**
**PARTICIPATION THEORY OF PERSONAL LIABILITY AND PIERCING THE CORPORATE VEIL**
**DEANDRE HOPSON v. SAMUEL ARTBITMAN**

</div>

52.    Plaintiff incorporates by reference all of the averments contained in the preceding paragraphs of the Complaint as though fully set forth at length herein.

53.    Defendant Arbitman substantially and individually participated in the wrongful, injury-producing acts alleged herein as follows:

      a.    Preparing policies and procedures without a mechanism to ensure that they were being enforced;

      b.    Knowingly allowing managers and employees to violate the policies and procedures set forth in the Visibly Intoxicated Patron Policy;

      c.    Providing inappropriate instructions to Maxi's managers insofar as the instructions did not conform with the bar's written policies and procedures;

      d.    Allowing Maxi's to operate despite knowing that its employees were not following the policies and procedures;

e.    Failing to appropriately instruct Maxi's employees with respect to the proper handling of visibly intoxicated patrons;

f.    Allowing Maxi's to operate without functioning surveillance cameras, which would have assisted in identifying visibly intoxicated patrons;

g.    Allowing Maxi's and its employees to operate without providing clear and appropriate instructions on how to handle visibly intoxicated patrons;

h.    Operating Maxi's with an emphasis of liquor sales over customer safety;

i.    Allowing Maxi's and its managers, bartenders, bouncers, doormen, and employees to engage in business practices contrary to the Dram Shop Act;

j.    Entrusting owner responsibilities to Maxi's managers who were neither properly trained nor qualified;

k.    Allowing activities at Maxi's that were prohibited by the duties and responsibilities of a liquor license owner in Pennsylvania;

l.    Knowingly allowing the sale of liquor to intoxicated patrons;

m.    Hiring and retaining bartenders and bouncers who were neither qualified nor competent;

n.    Failing to staff Maxi's with an adequate number of employees to monitor patrons for the signs of visible intoxication; and

o.    Failing to staff Maxi's with an adequate number of doormen and bouncers.

54.    In addition to the foregoing allegations, Defendant Arbitman exercised complete control and dominion of the finances, policies, and business practices of Sam 939 LLC d/b/a Maxi's.

55.    Corporate formalities were not observed by the agents, servants, and employees,

and the other officers of these entities did not play any functioning role with respect to the operation of Maxi's.

56.     Sam 939 LLC d/b/a Maxi's was operated as the alter ego of Defendant Arbitman, and the corporate entity should be disregarded, and the corporation should be treated as one in the same person for purposes of liability due to the following:

      a.     Defendant held themselves out to others as the owners of Sam 939 LLC d/b/a Maxi's;

      b.     Defendant held themselves out as personally responsible for the debts of Sam 939 LLC d/b/a Maxi's;

      c.     Defendant used Sam 939 LLC d/b/a Maxi's to conduct personal business;

      d.     Defendant used Sam 939 LLC d/b/a Maxi's as a conduit to procure business and services for related entities;

      e.     Defendant failed to adhere to legal formalities necessary to maintain corporate status; and

      f.     Defendant failed to maintain records of Sam 939 LLC d/b/a Maxi's corporate and business activities.

57.     Defendants through their individual affirmative actions, or alternatively, through their failure to act, negligently and irresponsibly caused the furnishing of alcohol to Defendant Donlan while he was visibly intoxicated, of which resulted in the severe, permanent, and catastrophic injuries to an innocent victim, Plaintiff Natasha Braswell.

**WHEREFORE,** the Plaintiff, DeAndre Hopson, hereby seeks all damages allowed under the laws of the Commonwealth of Pennsylvania, including punitive damages from Defendants, in an amount in excess of the jurisdictional threshold, under the applicable statutes of the

Commonwealth of Pennsylvania and the Local Rules of Court.

## COUNT III
### DEANDRE HOPSON vs. JAQUELINE DONLAN

58.    The Plaintiff herein incorporates by reference the preceding paragraphs as if same were set forth at length herein.

59.    The collision resulted in part from the negligence, carelessness, recklessness, and/or gross negligence of Defendant Donlan.

60.    The accident herein was in no way due to any act or failure to act on the part of Plaintiff, DeAndre Hopson.

61.    The negligence, carelessness, and recklessness of Defendant Donlan consisted inter alia, of the following:

   a.    Failing to have said motor vehicle under proper and adequate control;

   b.    Operating said motor vehicle at a high rate of speed;

   c.    Operating said motor vehicle improperly under the circumstances;

   d.    Operating said motor vehicle while under the influence of alcohol;

   e.    Operating said motor vehicle in violation of the Motor Vehicle Code and applicable ordinances of the Commonwealth of Pennsylvania;

   f.    Failing to give proper and sufficient warning of the approach of said vehicle;

   g.    Failing to operate said vehicle with due care and regard to the rights, safety, and position of the Plaintiff;

   h.    Operating said vehicle with knowledge the Plaintiff was in danger of being injured;

   i.    Consciously choosing to drive at a high rate of speed;

j.    Consciously choosing to drive while under the influence;

k.    Otherwise failing to exercise due care under the circumstances; and

l.    Such other liability producing conduct as discovery shall disclose.

62.    The conduct of Defendant Donlan rises to the level of outrageous conduct in that Defendant Donlan willingly and recklessly ignored the known safety hazards associated with driving a vehicle while under the influence of alcohol and/or drugs, which caused Plaintiff's serious and permanent injuries.

63.    As a result of the negligence, carelessness, recklessness, and/or gross negligence of said Defendant, Plaintiff was caused to suffer various severe physical injuries as more fully hereinbefore described.

**WHEREFORE**, the Plaintiff, DeAndre Hopson, hereby seeks all damages allowed under the laws of the Commonwealth of Pennsylvania, including punitive damages from the Defendant Jaqueline Donlan, in an amount in excess of the jurisdictional threshold, under the applicable statutes of the Commonwealth of Pennsylvania and the Local Rules of Court.

Respectfully submitted,

**MORGAN & MORGAN PHILADELPHIA PLLC**

BY:    _____
ALEXANDER C. HYDER, ESQUIRE
*Trial Counsel for Plaintiff*

DATE: 09/13/2024

Case ID: 240901327

**MORGAN & MORGAN PHILADELPHIA PLLC**
Alexander C. Hyder, Esquire #320939
2005 Market Street, Suite 350
Philadelphia, PA 19103
t. 267.780.2985
f. 267.780.2920
ahyder@forthepeople.com
Our File No. 14989829                                           *Attorneys for Plaintiff*

| | |
|---|---|
| DEANDRE HOPSON<br>1430 Fresno Road<br>Wilmington, DE 19803<br><br>               **Plaintiff,**<br><br>    vs.<br><br>SAM 939 LLC d/b/a MAXI'S<br>939 Market Street<br>Marcus Hook, PA 19061<br>      *and*<br>SAMUEL ARBITMAN<br>100 N. 22nd Street, #112<br>Philadelphia, PA 19103<br>      *and*<br>JACQUELINE DONLAN<br>3764 Ridgewood Lane<br>Brookhaven, PA 19015<br>              **Defendants.** | PHILADELPHIA COUNTY<br>COURT OF COMMON PLEAS<br>CIVIL DIVISION<br><br>_____ **TERM, 2024**<br><br>**No.:** _____<br><br>**JURY TRIAL DEMANDED** |

<u>**NOTICE OF PRESERVATION OF EVIDENCE**</u>

      PLAINTIFF HEREBY DEMANDS AND REQUESTS THAT DEFENDANT(S) TAKE

NECESSARY ACTION TO ENSURE THE PRESERVATION OF ALL DOCUMENTS,

COMMUNICATIONS, WHETHER ELECTRONIC OR OTHERWISE, ITEMS AND THINGS

IN THE POSSESSION OR CONTROL OF ANY PARTY TO THIS ACTION, OR ANY ENTITY

OVER WHICH ANY PARTY TO THIS ACTION HAS CONTROL, OR FROM WHOM ANY

PARTY TO THIS ACTION HAS ACCESS TO, ANY DOCUMENTS, ITEMS, OR THINGS

WHICH MAY IN ANY MANNER BE RELEVANT TO OR RELATE TO THE SUBJECT

MATTER OF THE CAUSES OF ACTION AND/OR THE ALLEGATIONS CONTAINED IN

Case ID: 240901327

THIS COMPLAINT. SPECIFICALLY, ALL VIDEO FOOTAGE FROM JANUARY 25, 2024, AND JANUARY 26, 2024, AT MAXI'S, ALONG WITH ALL P.O.S. (POINT OF SALE) DATA, RECEIPTS, CREDIT CARD RECEIPTS, INVOICES, AND BANKING AND CREDIT/DEBIT CARD STATEMENTS MUST BE PRESERVED BY ALL DEFENDANTS. FAILURE TO DO SO WILL RESULT IN THE SEEKING OF SANCTIONS AND ADVERSE INFERENCES AT TRIAL.

MORGAN & MORGAN
PHILADELPHIA PLLC

BY: _____

ALEXANDER C. HYDER, ESQUIRE
*Trial Counsel for Plaintiff*

DATE: 09/13/2024

Case ID: 240901327

## VERIFICATION

I, DEANDRE HOPSON, hereby state that I am the Plaintiff in the within action and that the facts set forth in this CIVIL ACTION COMPLAINT are true and correct to the best of my knowledge, information, and belief.  To the extent that the language contained in the responses is that of counsel, Plaintiff has relied upon counsel in executing this verification.

I understand that the statements in this Verification are made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.


*[signature]*


DATE: 09/13/2024

# **Exhibit L**

To Complaint for Declaratory Judgment
Hospitality Insurance Company v. Sam 939 LLC, et al.

From: **Robert Saracino** <ars318@gmail.com>
Date: Fri, Mar 31, 2023 at 1:09 PM
Subject: Re: SAM 939 LLC DBA MAXI'S eff 4/9/2023
To: Nancy Puzo <npuzo@specialtyagency.com>

Nancy

just for your information, hours of operation are noon-midnight, 7 days as per the
specialty app submitted earlier this week and attached.
It was my bad those old hours were not updated but no more. hardly anybody stays
open past midnight anymore mainly cause nobody wants to work that late and the
patrons are older now. the younger patrons do not go to places like maxi's, they go to
fancier sports bars and the like.

they are in a neighborhood so the vast majority of patrons walk there and home. steady
clientele.  there has been no claims there for at least 8 years, none since the current
owner bought it.

just thought this would work for specialty.

thanks
bob

On Fri, Mar 31, 2023 at 12:16 PM Nancy Puzo <npuzo@specialtyagency.com> wrote:

    Bob,

    The hours of operation are unacceptable. They are serving alcohol for 19 hours a day-6 days a week.
    They are open at 7am and just about 100% liquor. This is not an exposure we want.

CONFIDENTIAL
MA00288

We do write restaurants and bars but some have exposures we are not comfortable with.

Besides the hours of operation not being acceptable, the receipts do not meet our guidelines.

Nancy

Nancy J. Puzo
Specialty Insurance Agency
1610 Route 88
Brick, NJ, 08724
Senior Underwriter/Clerical Supervisor
npuzo@specialtyagency.com
732-701-8915 - Direct Line
1-800-836-1400 Toll Free
732-458-3728 Fax

**From:** Robert Saracino <ars318@gmail.com>
**Sent:** Friday, March 31, 2023 11:53 AM
**To:** Nancy Puzo <npuzo@specialtyagency.com>
**Subject:** Re: SAM 939 LLC DBA MAXI'S eff 4/9/2023

the boarding occupants have been there for years.

On Fri, Mar 31, 2023 at 11:52 AM Nancy Puzo <npuzo@specialtyagency.com> wrote:

Bob,

Even if the boarding room exposure is written elsewhere, we still are not comfortable with a risk that has that exposure.
The occupants of the boarding rooms could enter our risk and unfortunately occupants of boarding rooms do not always bring the best element seeing that they are transient.

Nancy J. Puzo
Specialty Insurance Agency
1610 Route 88
Brick, NJ, 08724
Senior Underwriter/Clerical Supervisor
npuzo@specialtyagency.com
732-701-8915 - Direct Line
1-800-836-1400 Toll Free
732-458-3728 Fax

**From:** Robert Saracino <ars318@gmail.com>
**Sent:** Friday, March 31, 2023 11:48 AM
**To:** Nancy Puzo <npuzo@specialtyagency.com>
**Subject:** Re: SAM 939 LLC DBA MAXI'S eff 4/9/2023

nancy

CONFIDENTIAL
MA00289

would you be interested in quoting just for sam 939 llc dba maxi's which is just the tavern. I already have lro building coverage which includes the GL for the boarding rooms with scottsdale. then there would not be any exposure for the boarding rooms which are on the second floor. the building is owned by zac 939 llc

thanks
Bob

On Fri, Mar 31, 2023 at 11:40 AM Nancy Puzo <npuzo@specialtyagency.com> wrote:

> Robert,
>
> Per the declination that was sent-it was declined due to the boarding room exposure
>
> Nancy J. Puzo
> Specialty Insurance Agency
> 1610 Route 88
> Brick, NJ, 08724
> Senior Underwriter/Clerical Supervisor
> npuzo@specialtyagency.com
> 732-701-8915 - Direct Line
> 1-800-836-1400 Toll Free
> 732-458-3728 Fax
>
>
> **From:** Robert Saracino <ars318@gmail.com>
> **Sent:** Friday, March 31, 2023 11:16 AM
> **To:** Nancy Puzo <npuzo@specialtyagency.com>
> **Subject:** Fwd: SAM 939 LLC DBA MAXI'S eff 4/9/2023
>
> nancy
>
> see below and attachments. When I called they said you were underwriter and declined it.
> Please explain why so i now for future reference.
> you can call me at 610-453-0276 to discuss if you like.
> Thanks very  much
> bob
>
> ---------- Forwarded message ---------
> From: **Robert Saracino** <ars318@gmail.com>
> Date: Tue, Mar 7, 2023 at 12:19 PM
> Subject: SAM 939 LLC DBA MAXI'S eff 4/9/2023
> To: Policy Applications <apps@specialtyagency.com>
>
>
> Attached for your quoting are liquor app, acords and loss runs.

CONFIDENTIAL
MA00290

SAM 939 LLC owns the liquor license and business.
ZAC 939 LLC owns the property and leases tavern area to SAM 939 LLC
We have a LRO policy for ZAC 939 already.

Thanks
Bob

**A. Robert Saracino**
*Commercial and Personal Insurance Producer*
610-453-0276 – Cell

John P. Meehan Agency
1 N. Belfield Ave.
Havertown, PA 19083
610-853-2220 – Office
610-853-4720 – Office Fax
**Error! Filename not specified.**

--
**A. Robert Saracino**
*Commercial and Personal Insurance Producer*
610-453-0276 – Cell

John P. Meehan Agency
1 N. Belfield Ave.
Havertown, PA 19083
610-853-2220 – Office
610-853-4720 – Office Fax

--
**A. Robert Saracino**
*Commercial and Personal Insurance Producer*
610-453-0276 – Cell

John P. Meehan Agency
1 N. Belfield Ave.
Havertown, PA 19083
610-853-2220 – Office
610-853-4720 – Office Fax
**Error! Filename not specified.**

--
**A. Robert Saracino**

CONFIDENTIAL
MA00291

*Commercial and Personal Insurance Producer*
<u>610-453-0276</u> – Cell

John P. Meehan Agency
1 N. Belfield Ave.
Havertown, PA 19083
<u>610-853-2220</u> – Office
<u>610-853-4720</u> – Office Fax

--
**A. Robert Saracino**
*Commercial and Personal Insurance Producer*
<u>610-453-0276</u> – Cell

John P. Meehan Agency
1 N. Belfield Ave.
Havertown, PA 19083
<u>610-853-2220</u> – Office
<u>610-853-4720</u> – Office Fax

--
**A. Robert Saracino**
*Commercial and Personal Insurance Producer*
<u>610-453-0276</u> – Cell

John P. Meehan Agency
1 N. Belfield Ave.
Havertown, PA 19083
<u>610-853-2220</u> – Office
<u>610-853-4720</u> – Office Fax



CONFIDENTIAL
MA00292

# **Exhibit M**

To Complaint for Declaratory Judgment
Hospitality Insurance Company v. Sam 939 LLC, et al.



# HOSPITALITY®
Insurance Company
Taking the Risk Out of Hospitality

October 25 ,2024

Mr. Samuel Arbitman
SAM 939 LLC d/b/a Maxi's
████████████████████████

RE: Policy No.: CPP3702631
Date of Loss:    01/25/2024
Claim No.:    CPA2400052
Case Caption: DeAndre Hopson v. SAM 939 LLC et al.

Dear Mr. Arbitman:

Hospitality Insurance Company ("Hospitality") received its initial notification of the above-captioned incident and subsequent civil action under the liquor liability insurance policy Hospitality issued to SAM 939 LLC d/b/a Maxi's ("Maxi's") having Policy No. CPP3702631 covering the period from April 9, 2023 to April 9, 2024 with per person limits of $1,000,000 and per occurrence limits of $1,000,000 (the "Liquor Liability Policy") on October 10, 2024.

For the reasons that follow, Hospitality is agreeing to assuming the defense of Sam 939 LLC and Samuel Arbitman against the lawsuit subject to a full and complete reservation of its rights to later withdraw from the defense and/or disclaim any obligation to indemnify Sam 939 LLC and Samuel Arbitman against any judgment that may be entered against them in the lawsuit.

## I.    DeAndre Hopson's allegations

The plaintiff, Mr. Hopson, alleges that both he and named defendant, Jacquleine Donlan, were visibly intoxicated when they were served excessive amounts of alcoholic beverages at Maxi's on the evening of January 25, 2024, into January 26, 2024. Mr. Hopson claims that Ms. Donlan was slurring her speech and had glassy and blood shot eyes while she was served numerous shots, beers, malt beverages, and spirits in violation of Pennsylvania's Dram Shop Act. Hopson alleges that Maxi's did not refuse Donlan any service of alcohol despite her visible signs of intoxication, nor did an employee of Maxi's check her fitness to operate her 2020 Mitsubishi Mirage upon exiting the establishment.

Hopson alleges that the alcohol he consumed at Maxi's impaired his judgment. Hopson later accepted a ride from Donlan just prior to her vehicle colliding with a traffic pole located in a nearby intersection in Marcus Hook, Pennsylvania.   The complaint alleges that Donlan and Hopson departed Maxi's at 2:30 AM.

Hopson asserts claims for negligent and reckless service of alcohol to Donlan and himself, in violation of Pennsylvania Dram Shop Act 47 P.S. Sections 4-493(1) and 4-497. Count III of the above referenced civil action lawsuit includes Hopson's desire to pierce the corporate veil of Maxi's. He also alleges that Maxi's failed to enact, implement, and/or enforce polices and procedures to prevent the service of alcohol to visibly intoxicated patrons.

## II.    The Liquor Liability Policy

The insuring agreement in the Liquor Liability Policy provides:

### A.    Insuring Agreement.

We will pay on behalf of the Insured all sums which the Insured becomes legally obligated to pay as "damages" because of "bodily injury" to any person, caused by an "occurrence", if such liability is imposed upon the Insured by reason of the negligence of the Insured in the distribution, sale or serving of any alcoholic beverage at the "Insured premises" to an intoxicated person or minor, or in violation of any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.  We shall have the right and duty to defend any "suit" against the Insured seeking such "damages", even if the allegations of the "suit" are groundless, false or fraudulent, and may make such investigation and settlement of any claim or "suit" as we deem expedient. However, we will have no duty to defend the Insured against any "suit" seeking damages for "bodily injury" to which this insurance does not apply. This insurance applies only to "occurrences" which result in "bodily injury" during the Policy period in the "coverage territory".  We have no other obligation or liability to pay any other sums or perform any other acts of services unless they are explicitly provided for under SUPPLEMENTARY PAYMENTS.

**Section IV - Conditions**

**A. Duties in the Event of "Bodily Injury", Claim or "Suit"**

   E. Representations

     By accepting this Policy, you agree that:

     1.  The statements in the Declarations are accurate and complete

     2.  Those statements are based upon representations made by you or on your behalf in your application for Liquor Liability Insurance and otherwise; and

     3.  We have issued this Policy in reliance upon the representations made you or on your behalf.  These representations are a condition precedent to issuance of the Policy and the Company shall have the right to void this Policy in which case we shall have no obligation under this Policy if those representations are false or materially incomplete.

The Pennsylvania Changes – Cancellation and Nonrenewal endorsement (IL 02 46 09 07) further states:

A. This **Cancellation** Common Policy Condition is replaced by the following:

   **CANCELLATION**

     ***

This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us.

     ***

On Friday October 11, 2024, I contacted you so that I could gather information about this incident.  During our discussion, I asked you to confirm at what time Maxi's closed each evening in 2023. You replied that the closing time of your establishment was 1:00 a.m. on weekdays and 2:00 a.m. on Friday and Saturday.  It closed at 2:00 a.m. on the date of this incident.

Review of the Liquor Liability Application submitted by Sam 939 LLC, and executed on April 5, 2023, shows that Sam 939 LLC listed its hours of operation to be from noon to midnight.  The application further provides:

     By signing this application, we certify that the information contained herein is true and accurate to the best of our knowledge and belief, and we acknowledge that providing truthful and accurate information is a condition precedent to obtaining liquor liability insurance.  We further acknowledge

that any insurance which may be issued upon receipt of this application will be issued upon the company's reliance on the information we have provided, and if such information is misleading or false, the company may void the insurance issued pursuant to this application.

After receipt of the Application, Hospitality's underwriter, Lucinda Yuille, inquired with Maxi's insurance agent, Robert Saracino of John Meehan Insurance Agency, to confirm the hours of operation listed on the application, as they differed from those listed on Maxi's website. Mr. Saracino responded on April 4, 2023, "This is to confirm closing is midnight and he will change on website." The Liquor Liability Policy was subsequently issued to Maxi based upon the representation of the hours of operation in the insurance application.

Based upon the information above it appears that material misrepresentations may have been made in the application with respect to Maxi's hours of operation. These misrepresentations were material to the risk and hazard insured by HIC. For these reasons Hospitality is currently investigating whether the policy should be considered cancelled from inception, in which case there would be no insurance coverage available to Sam 939 LLC or Samuel Arbitman for the Deandre Hopson lawsuit.

For these reasons, Hospitality is agreeing to assuming the defense of Sam 939 LLC and Samuel Arbitman subject to a full and complete reservation of its rights to later withdraw from the defense and/or disclaim any obligation to indemnify Sam 939 LLC and Samuel Arbitman against any judgment that may be entered against them in the lawsuit.

Hospitality expressly reserves all rights to assert any other defense or policy provision which may become apparent in the future. Nothing contained herein is intended, nor should it be construed as, a waiver of any of the policy terms and conditions.

Additional facts, circumstances and policy language not mentioned in this letter may apply to this claim and may provide additional reasons for the denial or limitation of coverage. Any action taken, declined, or deferred in this matter by Hospitality, its agents, or representatives has not been intended, nor should it be construed as, a waiver of any rights, claims or defenses under the policy or to which it is otherwise entitled. Instead, Hospitality reserves, without qualification or limitation, all rights, claims or defenses available to it under the policy and otherwise allowed by law. Hospitality expressly reserves all of its rights to limit or deny coverage for this claim or withdraw the defense it is providing on the basis of these or any additional grounds.

If you have additional information, you would like us to consider, please provide it to us as soon as possible.

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any

fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

Sincerely,

Stephanie Connon
Sr. Vice President of Claim Operations


Mr. Robert Saracino
John P. Meehan Agency, Inc.
1 N. Belfield Avenue
Havertown, PA 19083

106 Southville Road
Southborough, MA 01772

# HOSPITALITY®
## INSURANCE Group
Taking the Risk Out of Hospitality

**CERTIFIED MAIL**

9589 0710 5270 2434 1842 53



**FIRST-CLASS**



**US POSTAGE** M.P./PITNEY BOWES

ZIP 01772
02 7H
0006017972

**$ 009.64⁰**

OCT 25 2024

Mr. Samuel Arbitman
SAM 939 LLC d/b/a Maxi's

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Samuel Arbitman
SAM 939 LLC DBA Maxi's



9590 9402 6039 0069 7810 34

2. Article Number *(Transfer from service label)*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
  ☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ed Mail
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery



USPS TRACKING #

9590 9402 6039 0069 7830 34

United States
Postal Service

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box •

**Hospitality Mutual
Insurance Company**

106 Southville Road
Southborough, MA 01772

SC CPA24000S2



**HOSPITALITY®**
Insurance Company

Taking the Risk Out of Hospitality

September 10, 2025

Mr. Samuel Arbitman
SAM 939 LLC d/b/a Maxi's

████████████████████████

RE: Policy No.: CPP3702631
Date of Loss:   01/25/2024
Claim No.:       CPA2400052
Case Caption:  Deandre Hopson v. SAM 939 LLC et al.

Dear Mr. Arbitman:

On October 24, 2024, Hospitality Insurance Company ("Hospitality") sent you a reservation of rights letter pertaining to the above-captioned lawsuit ("Hopson Lawsuit") which informed you of Hospitality's investigation into a possible misrepresentation made on the Liquor Liability Application ("Application") for Policy No. CPP3702631 covering the period from April 9, 2023 to April 9, 2024 executed on April 5, 2023 for SAM 939 LLC d/b/a Maxi's ("Maxi's") with respect to Maxi's hours of operation. The first reservation of rights letter is incorporated here by reference.

For the reasons discussed below, Hospitality is continuing to defend Maxi's and you in the above referenced Hopson Lawsuit under a reservation of rights to deem the policy void ab initio for a material misrepresentation in the application, withdraw the defense it is providing to you and Maxi's, and disclaim any duty to indemnify you or Maxi's against any judgment or settlement that might be entered in the Hopson Lawsuit. In particular, Hospitality may file a declaratory judgment action seeking a declaration that the policy is void *ab initio*, and that it has no duty to defend or indemnify you or Maxi's against the Hopson Lawsuit.

As you are aware, the Application represented that Maxi's hours of operation were from noon to midnight. As previously discussed, Robert Saracino of the Meehan Agency also reported to Hospitality that he had confirmed the closing time of midnight with you. However, further investigation revealed that instead, during the relevant time period, Maxi's served liquor until 2:00 a.m. seven days a week. Since the prior reservation of rights, you submitted to an examination under oath, you produced documents, including text messages, and Hospitality obtained and reviewed Maxi's file from the Meehan Agency.

At your examination under oath, you confirmed that, during the relevant time period, Maxi's served liquor until 2:00 AM. While you raised a question at your examination under oath as to whether you signed the Application, documents produced by the Meehan Agency confirm that you e-signed the Application representing that the hours of operation were from noon to midnight. A text message sent from insurance agent Mr. Robert Saracino to you on April 5, 2023, the date the Application was executed, stated, "change hours to closing at midnight." Moreover, documents from the Meehan Agency show that applications submitted for coverage in prior years listed a closing time of 2:00 AM. It appears that the Application to Hospitality listing the midnight closing time followed closely after another insurer declined to write coverage for Maxi's based, in part, on its reported 7:00 AM to 2:00 AM hours of operation. These facts further tend to indicate a material misrepresentation in the Application. These representations were material to the risk and hazard insured by Hospitality.

Below is the relevant policy language:

## I.    The Liquor Liability Policy

The insuring agreement in the Liquor Liability Policy provides:

### A.    Insuring Agreement.

We will pay on behalf of the Insured all sums which the Insured becomes legally obligated to pay as "damages" because of "bodily injury" to any person, caused by an "occurrence", if such liability is imposed upon the Insured by reason of the negligence of the Insured in the distribution, sale or serving of any alcoholic beverage at the "Insured premises" to an intoxicated person or minor, or in violation of any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages. We shall have the right and duty to defend any "suit" against the Insured seeking such "damages", even if the allegations of the "suit" are groundless, false or fraudulent, and may make such investigation and settlement of any claim or "suit" as we deem expedient. However, we will have no duty to defend the Insured against any "suit" seeking damages for "bodily injury" to which this insurance does not apply. This insurance applies only to "occurrences" which result in "bodily injury" during the Policy period in the "coverage territory". We have no other obligation or liability to pay any other sums or perform any other acts of services unless they are explicitly provided for under SUPPLEMENTARY PAYMENTS.

2

**Section IV - Conditions**

**A. Duties in the Event of "Bodily Injury", Claim or "Suit"**
  E. Representations

   By accepting this Policy, you agree that:

   1. The statements in the Declarations are accurate and complete

   2. Those statements are based upon representations made by you or on your behalf in your application for Liquor Liability Insurance and otherwise; and

   3. We have issued this Policy in reliance upon the representations made you or on your behalf. These representations are a condition precedent to issuance of the Policy and the Company shall have the right to void this Policy in which case we shall have no obligation under this Policy if those representations are false or materially incomplete.

The Pennsylvania Changes – Cancellation and Nonrenewal endorsement (Form IL 46 09 07) further states:

   **A.**   The **Cancellation** Common Policy Condition is replaced by the following:


   **CANCELLATION**

   * * *

   This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us.

   * * *

As stated above, Hospitality is continuing to defend Maxi's and Samuel Arbitman subject to a full and complete reservation of its rights to later withdraw from the defense and/or disclaim any obligation to indemnify Maxi's and Samuel Arbitman against any judgment that may be entered against them in the lawsuit. Hospitality further reserves the right to file a declaratory judgment action seeking a declaration that the policy is void ab initio, and that it owes no duty to defend or indemnify you or Maxi's against the Hopson Lawsuit.

3

Hospitality expressly reserves all rights to assert any other defense or policy provision which may become apparent in the future. Nothing contained herein is intended, nor should it be construed as, a waiver of any of the policy terms and conditions.

Additional facts, circumstances and policy language not mentioned in this letter may apply to this claim and may provide additional reasons for the denial or limitation of coverage. Any action taken, declined, or deferred in this matter by Hospitality, its agents, or representatives has not been intended, nor should it be construed as, a waiver of any rights, claims or defenses under the policy or to which it is otherwise entitled. Instead, Hospitality reserves, without qualification or limitation, all rights, claims or defenses available to it under the policy and otherwise allowed by law. Hospitality expressly reserves all of its rights to limit or deny coverage for this claim or withdraw the defense it is providing on the basis of these or any additional grounds.

If you have additional information you would like us to consider, please provide it to us as soon as possible.

Sincerely,

Stephanie Connon
Sr. Vice President of Claim Operations

cc: Henry M. Clinton, Esq.
Law Office of Henry M. Clinton, LLC
Queen Memorial Building
1313 S. 33rd Street
Philadelphia, PA 19146

4





US POSTAGE AND PITNEY BOWES

$ 010.44⁰

ZIP 01772
02 7H
0006017972
SEP 10 2025

FIRST-CLASS

CERTIFIED MAIL®

HOSPITALITY®
INSURANCE Group
Taking the Risk Out of Hospitality

106 Southville Road
Southboro, MA 01772

9589 0710 5270 2439 1985 22

Mr. Samuel Arbitman
SAM 939 LLC d/b/a Maxi's

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

USPS TRACKING #

9590 9402 9096 4122 4116 67

United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•

Hospitality Mutual
Insurance Company
106 Southville Road
Southborough, MA 01772

SC CPA24000S2

SC CPA24/00053

**United States Postal Service**

● Sender: Please print your name, address, and ZIP+4® in this box●

**Hospitality Mutual Insurance Company**
106 Southville Road
Southborough, MA 01772

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

USPS TRACKING #

9590 9402 0494 9096 4726 55 16 67

100 Southville Road
Southboro, MA 01772

# HOSPITALITY®
## INSURANCE Group
Taking the Risk Out of Hospitality



**CERTIFIED MAIL®**

9589 0710 5270 2439 1985 39



**FIRST-CLASS**

US POSTAGE PITNEY BOWES

ZIP 01772
02 7H
0006017972

$ 010.44⁰

SEP 10 2025

Henry M. Clinton, Esq.
Law Office of Henry M. Clinton, LLC
Queen Memorial Building
1313 S. 33rd Street
Philadelphia, PA 19146

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Henry M. Clinton, Esq.
Law Office of Henry M. Clinton, LLC
Queen Memorial Building
1313 S. 33rd Street
Philadelphia, PA 19146

9590 9402 9096 4122 4116 74

2. Article Number (Transfer from service label)

9589 0710 5270 2439 1985 39

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                              ☐ Agent
                               ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt



**USPS TRACKING #**





9590 9402 9096 4122 4116 74

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States
Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

# Hospitality Mutual
# Insurance Company

106 Southville Road
Southborough, MA 01772

SC   CPA 2400052